**No. 25-2025**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

_____

**THE ASSOCIATED PRESS,
STATES NEWSROOM d/b/a Indiana Capital Chronicle,
GANNETT CO., INC., CIRCLE CITY BROADCASTING I, LLC, and
TEGNA INC.,**

*Plaintiffs-Appellants*,

v.

**RON NEAL and LLOYD ARNOLD *in their official capacities*,**

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:25-cv-00872-MPB-MJD
Hon. Matthew P. Brookman, U.S. District Judge

═══════════════════════════════════════

**APPELLANTS' PRINCIPAL BRIEF**

═══════════════════════════════════════

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
P.O. Box 150
Fishers, IN 46038
(463) 271-4676
kcundiff@rcfp.org

Lin Weeks
  *Counsel of Record*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
lweeks@rcfp.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-2025</u>

Short Caption: <u>The Associated Press et al. v. Neal et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

        The Associated Press, States Newsroom d/b/a Indiana Capital Chronicle, Gannett Co., Inc.,

        Circle City Broadcasting I, LLC, and TEGNA INC.

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

        Reporters Committee for Freedom of the Press

(3)      If the party, amicus or intervenor is a corporation:

        i)        Identify all its parent corporations, if any; and

                No parent corporations for any Appellant.

        ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

                Blackrock, Inc. owns 10% or more of TEGNA INC.'s stock; no disclosures for any other Appellant.

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A

Attorney's Signature: <u>/s/ Lin Weeks</u>        Date: <u>July 28, 2025</u>

Attorney's Printed Name: <u>Lin Weeks</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: <u>Reporters Committee for Freedom of the Press</u>

        1156 15th Street NW, Suite 1020, Washington, D.C. 20005

Phone Number: <u>(202) 800-3533</u>        Fax Number: <u>(202) 795-9310</u>

E-Mail Address: <u>lweeks@rcfp.org</u>

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2025

Short Caption: The Associated Press et al. v. Neal et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   The Associated Press, States Newsroom d/b/a Indiana Capital Chronicle, Gannett Co., Inc.,

   Circle City Broadcasting I, LLC, and TEGNA INC.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Reporters Committee for Freedom of the Press

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        No parent corporations for any Appellant.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        Blackrock, Inc. owns 10% or more of TEGNA INC.'s stock; no disclosures for any other Appellant.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Kristopher L. Cundiff    Date: July 28, 2025

Attorney's Printed Name: Kristopher L. Cundiff

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [✔]

Address: Reporters Committee for Freedom of the Press

   PO Box 150, Fishers, IN 46038

Phone Number: (463) 271-4676    Fax Number: (202) 795-9310

E-Mail Address: kcundiff@rcfp.org

rev. 12/19 AK

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................5

STATEMENT OF THE CASE ...................................................................6

    A.    Indiana's executions are set by court order and carried out pursuant
to state statute and IDOC policy. ...................................................6

    B.    Indiana's executions are closed to disinterested public observers and
IDOC employees are instructed by policy that members of the press
are subject to that rule. ...................................................................7

    C.    Indiana's enforcement and implementation of Section 6(a) and ISP
06-26 prevented all but one member of the press from observing the
execution of Joseph Corcoran. .......................................................8

    D.    The Media Coalition commenced this lawsuit seeking prospective
relief that would permit them to observe future executions.........................9

    E.    After the district court denied the Media Coalition's motion for
preliminary injunction, Indiana's execution of Benjamin Ritchie was
closed to disinterested public observers....................................10

STANDARD OF REVIEW ......................................................................13

SUMMARY OF THE ARGUMENT .......................................................14

ARGUMENT ...........................................................................................16

    I.    The *Press-Enterprise II* framework, properly applied, dictates
whether government proceedings, including executions, are subject
to a presumptive right of access.................................................16

            A.    The line of Supreme Court cases culminating with *Press-
Enterprise II* requires an analysis of the history and function of
public observers at executions. .........................................17

B.  The district court's order undermines the constitutional interest protected by the *Press-Enterprise II* framework. ..............................24

II.  The experience and logic factors of *Press-Enterprise II* require that Indiana make a particularized, constitutional showing to close an execution to public observers....................................................................28

A.  The tradition of neutral public observers at executions satisfies the experience prong...........................................................................30

1.  There is a strong historical tradition of permitting public observers at executions throughout the United States. ..............30

2.  The district court erred in applying the experience prong of *Press-Enterprise II*. ................................................................36

B.  Permitting neutral observers at executions enhances their function, satisfying the logic prong. ...................................................41

III.  The district court erred by failing to apply strict scrutiny to determine whether Section 6(a) and ISP 06-26 infringe the Media Coalition's rights under the Press Clause of the First Amendment.............47

A.  Section 6(a) and ISP 06-26 deny the press, including the Media Coalition, any meaningful way to conduct constitutionally protected newsgathering. .....................................................................48

B.  Section 6(a) and ISP 06-26 are not generally applicable....................54

CONCLUSION .......................................................................................................58

CERTIFICATE OF COMPLIANCE .......................................................................59

# TABLE OF AUTHORITIES

## Cases

*Am. C.L. Union of Ill. v. Alvarez,*
   679 F.3d 583 (7th Cir. 2012) ........................................................*passim*

*Ark. Times, Inc. v. Norris,*
   No. 5:07-CV-195, 2008 WL 110853 (E.D. Ark. Jan. 7, 2008)...........................31

*Ark. Writers' Project, Inc. v. Ragland,*
   481 U.S. 222 (1987) ...............................................................55

*Associated Press v. NLRB,*
   301 U.S. 103 (1937) ...............................................................54

*Associated Press v. Otter,*
   682 F.3d 821 (9th Cir. 2012).........................................................21

*B.H. v. McDonald,*
   49 F.3d 294 (7th Cir. 1995) .........................................................42

*Baze v. Rees,*
   553 U.S. 35 (2008) ................................................................43

*Bridges v. California,*
   314 U.S. 252 (1941) ...............................................................40

*Brown & Williamson Tobacco Corp. v. FTC,*
   710 F.2d 1165 (6th Cir. 1983)........................................................26

*Cal. First Amend. Coal. v. Woodford,*
   299 F.3d 868 (9th Cir. 2002).....................................................*passim*

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ...............................................................56

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988) ...............................................................55

*Cohen v. Cowles Media Co.,*
   501 U.S. 663 (1991) ...............................................................54

*Courthouse News Serv. v. Brown*,
  908 F.3d 1063 (7th Cir. 2018) ..........................................................11, 13, 22, 36

*Dahlstrom v. Sun-Times Media, LLC*,
  777 F.3d 937 (7th Cir. 2015) .......................................................................51, 52, 53

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002) .....................................................................20, 37, 41

*El Vocero de Puerto Rico v. Puerto Rico*,
  508 U.S. 147 (1993) ..........................................................................18, 28, 36, 37

*Eli Lilly & Co. v. Arla Foods, Inc.*,
  893 F.3d 375 (7th Cir. 2018) .......................................................................13, 28, 36

*First Amend. Coal. of Ariz., Inc. v. Ryan*,
  938 F.3d 1069 (9th Cir. 2019)..............................................................................22, 27

*First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*,
  784 F.2d 467 (3d Cir. 1986)...................................................................................37

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ...............................................................................................56

*Globe Newspaper Co. v. Superior Court*,
  457 U.S. 596 (1982) .....................................................................................*passim*

*Gregg v. Georgia*,
  428 U.S. 153 (1976) ...............................................................................................45

*Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*,
  24 F.3d 893 (7th Cir. 1994) ..........................................................................*passim*

*Hall v. Zenk*,
  692 F.3d 793 (7th Cir. 2012) .......................................................................38, 39

*Holden v. Minnesota*,
  137 U.S. 483 (1890) .......................................................................................39, 40

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ...................................................................................................23

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) ....................................................13, 28, 36

*In re Cont'l Ill. Sec. Litig.*,
    732 F.2d 1302 (7th Cir. 1984) ............................................................*passim*

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*,
    994 F.3d 602 (7th Cir. 2021) ............................................11, 50, 51, 55

*Kennedy v. Louisiana*,
    554 U.S. 407, *as modified* (Oct. 1, 2008) ...........................................45

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ...............................................................21

*Mills v. Alabama*,
    384 U.S. 214 (1966) ..............................................................................48

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) .......................................................15, 49, 55, 56

*N. Jersey Media Grp., Inc. v. Ashcroft*,
    308 F.3d 198 (3d Cir. 2002) ..........................................................21, 37

*N.Y. C.L. Union v. N.Y.C. Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012)..........................................................21, 37, 41

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) ..............................................................................40

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931) ..............................................................................40

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ..............................................................................38

*Pell v. Procunier*,
    417 U.S. 817 (1974) ....................................................................11, 23, 52

*Phila. Inquirer v. Wetzel*,
    906 F. Supp. 2d 362 (M.D. Pa. 2012)................................22, 29, 38, 44

*Press-Enter. Co. v. Superior Court*,
464 U.S. 501 (1984) ...............................................................18, 19, 24

*Press-Enter. Co. v. Superior Court*,
478 U.S. 1 (1986) ..............................................................................*passim*

*Publicker Indus., Inc. v. Cohen*,
733 F.2d 1059 (3d Cir. 1984) ...........................................................20

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) .........................................................................*passim*

*Ritchie v. State*,
254 N.E.3d 1064 (Ind. 2025)......................................................7, 9, 46

*Ritchie v. State*,
Nos. 49S00-0409-PD-420, 24S-SD-342,
2025 WL 1248038 (Ind. Apr. 30, 2025) ...........................................9

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
695 F.3d 676 (7th Cir. 2012) ...........................................................13

*Tandon v. Newsom*,
593 U.S. 61 (2021) ...........................................................................56

*Trop v. Dulles*,
356 U.S. 86 (1958) ...........................................................................42

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) .....................................................................54, 55

*United States v. Danovaro*,
877 F.2d 583 (7th Cir. 1989) ...........................................................25

*United States v. Eppinger*,
49 F.3d 1244 (7th Cir. 1995)............................................................11

*Westmoreland v. CBS, Inc.*,
752 F.2d 16 (2d Cir. 1984).............................................................20

*Whiteland Woods, L.P. v. Twp. of West Whiteland*,
193 F.3d 177 (3d Cir. 1999)...........................................................21

*Worrell Newspapers of Ind., Inc. v. Westhafer*,
   739 F.2d 1219 (7th Cir. 1984) ...........................................................40

*Younger v. Harris*,
   401 U.S. 37 (1971) ..........................................................................22

**Statutes**

1885 Ohio Laws 170 ..........................................................................32

1889 Ind. Acts 193 ............................................................................33

1892 N.Y. Laws 36 ............................................................................33

1910 Ky. Acts 112 .............................................................................32

28 U.S.C. § 1292 ...............................................................................4

28 U.S.C. § 1331 ...............................................................................4

28 U.S.C. § 1343 ...............................................................................4

42 U.S.C. § 1983 ............................................................................4, 9

61 Pa. Stat. and Cons. Stat. Ann. § 4305 .............................................33

Ala. Code § 15-18-83 ........................................................................33

Ariz. Rev. Stat. Ann. § 13-758 ...........................................................34

Ark. Code Ann. § 16-90-502 ..............................................................34

Cal. Penal Code § 3605 .....................................................................34

Fla. Stat. Ann. § 922.11 .....................................................................33

Ga. Code Ann. § 17-10-41 ..................................................................34

Ind. Code § 35-38-6-1 .....................................................................7, 26

Ind. Code § 35-38-6-2 .....................................................................6, 26

Ind. Code § 35-38-6-5 ........................................................................7

Ind. Code § 35-38-6-6 ...........................................................4, 8, 35, 57

Ind. Code § 35-50-2-9 ...................................................................7

Kan. Stat. Ann. § 22-4003 ...........................................................34

Ky. Rev. Stat. Ann. § 431.250 .....................................................33

La. Stat. Ann. § 15:570 ................................................................34

Miss. Code Ann. § 99-19-55 .........................................................33

Mo. Ann. Stat. § 546.740 .............................................................34

Mont. Code Ann. § 46-19-103 ......................................................33

N.C. Gen. Stat. Ann. § 15-190 .....................................................35

Neb. Rev. Stat. Ann. § 83-970 .....................................................33

Nev. Rev. Stat. Ann. § 176.355 ....................................................34

Ohio Rev. Code Ann. § 2949.25 ...................................................33

Okla. Stat. tit. 22, § 1015 .............................................................33

Or. Rev. Stat. Ann. § 137.473 ......................................................33

S.C. Code Ann. § 24-3-550 ..........................................................33

S.D. Codified Laws § 23A-27A-34 ..............................................33

Tenn. Code Ann. § 40-23-116 ......................................................33

Tex. Code Crim. Proc. Ann. art 43.20 .........................................34

Utah Code Ann. § 77-19-11 ..........................................................33

Wyo. Stat. Ann. § 7-13-908 .........................................................35

**Other Authorities**

1 William E. Miller, Revised and Annotated Code of Iowa (1880),
    https://bit.ly/3TqgN0n ...........................................................32

28 C.F.R. § 26.4.............................................................................35

*A Wife Murder Expiated*, The Indianapolis J., Oct. 11, 1884, at 5,
https://perma.cc/2SJC-YJTC ...........................................................................31

Ariz. Dep't of Corr., Rehab. & Reentry, Order No. 710 – Execution Procedures
(May 20, 2025),
https://perma.cc/ZP7G-76KY...........................................................................34

Ben Welter, *Feb. 13, 1906: Minnesota's Last Execution*,
Minn. Star Trib. (May 1, 2014),
https://perma.cc/WLJ7-2RTS ...........................................................................45

Bob Baker & Laura Laughlin, *Arizona Executes Killer; State Gripped by Grisly Accounts*, L.A. Times (Apr. 7, 1992),
https://perma.cc/M6VA-YYMN..........................................................................45

Bryan A. Garner et al., The Law of Judicial Precedent (2016) ...............................20

Casey Smith, *State Executes Death Row Inmate Benjamin Ritchie for Fatal Shooting of Police Officer*, Ind. Cap. Chron. (May 20, 2025),
https://indianacapitalchronicle.com/2025/05/20/state-executes-death-row-inmate-benjamin-ritchie-for-fatal-shooting-of-police-officer/...........................12

Cass R. Sunstein & Adrian Vermeule, *Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs*,
58 Stan. L. Rev. 703 (2005)................................................................................46

Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*,
35 Wm. & Mary L. Rev. 551 (1994) ..................................................................33

*Execution*, Ind. Centinel, Sept. 2, 1820, at 2,
https://perma.cc/5Q9B-RVY4 ...........................................................................30

*Expiate Crimes on the Gallows*, Urbana Daily Courier, Apr. 23, 1904, at 1,
https://idnc.library.illinois.edu/?a=d&d=TUC19040423.2.1 .............................33

*For Media – Access for Scheduled Executions*, Ga. Dep't of Corr.,
https://perma.cc/P75U-HG69 (last visited July 10, 2025) ..................................34

*Gruesome Death in Gas Chamber Pushes Arizona Toward Injections*,
N.Y. Times (Apr. 25, 1992),
https://perma.cc/CP4H-ETP5..............................................................................45

Idaho Dep't of Corr., *Execution Procedures* (Oct. 11, 2024),
    https://perma.cc/3NDW-7LP9..................................................................35

*Indiana Executes Cop Killer*, United Press Int'l (July 18, 1996),
    https://perma.cc/P6ZS-X3F2..................................................................44

John D. Bessler, *Televised Executions and the Constitution: Recognizing A First Amendment Right of Access to State Executions*,
    45 Fed. Commc'ns L.J. 355 (1993).................................................30, 45

La. Dep't of Pub. Safety & Corr., Regulation No. OP-D-8 (Feb. 7, 2025),
    https://perma.cc/3PC8-Q2C4 ...............................................................34

*Man Who Murdered His Father-in-Law Executed in Indiana*,
    N.Y. Times (Oct. 17, 1985),
    https://perma.cc/3WE9-GCYZ.............................................................43

Mo. Dep't of Corr., *Execution Witnesses* (Nov. 15, 2018),
    https://perma.cc/FR2K-M5AH...............................................................34

Nev. Dep't of Corr., *Execution Manual* (June 9, 2021),
    https://perma.cc/6NU6-6DB6................................................................34

Order,
    *Ward v. State*, Nos. 74S00-0907-PD-320, 25S-SD-167 (Ind. July 7, 2025),
    https://www.in.gov/courts/files/order-other-2025-25S-SD-167.pdf...............7, 12

Randy J. Kozel, *The Scope of Precedent*,
    113 Mich. L. Rev. 179 (2014) ..............................................................20

Revised Statutes of the State of Illinois (Harvey B. Hurd ed., 1885),
    https://bit.ly/458QIbJ...........................................................................33

*Selection of Execution Witnesses*, N.C. Dep't of Adult Corr.,
    https://perma.cc/MMG7-9YYD (last visited July 10, 2025)..............................35

Sheherezade C. Malik & D. Paul Holdsworth, *A Survey of the History of the Death Penalty in the United States*,
    49 U. Rich. L. Rev. 693 (2015) ...........................................................30

x

Sophia Tareen & Ed White, *Man Executed for the 2000 Killing of a Police Officer in Indiana's Second Execution in 15 Years*, AP News (May 20, 2025), https://apnews.com/article/execution-indiana-police-shooting-54aee13773b5b249601ef3f4bf7c6266 ................................................................12

Stuart Banner, The Death Penalty: An American History (2002) ....................30, 31

*The First Judicial Hanging in the State in Six Years*, Mount Pleasant Weekly News, Nov. 7, 1894, at 6, https://perma.cc/XZF5-8BKU ......................................................................32, 33

*The Law Executed*, The Indianapolis News, Sept. 19, 1879, https://perma.cc/R7TY-NBST ..............................................................................32

Tracy L. Snell, Bureau of Just. Stat., *Capital Punishment, 2023 – Statistical Tables* (July 2025), https://bjs.ojp.gov/document/cp23st.pdf ............................................................35

*Two States Carry Out Executions*, N.Y. Times (Jan. 23, 1992), https://www.nytimes.com/1992/01/23/us/two-states-carry-out-executions.html ................................................................35

*Viewing Executions*, Tex. Dep't of Crim. Just., https://perma.cc/P3UR-3VBZ (last visited July 10, 2025)..................................34

## INTRODUCTION

Later this year, the State of Indiana will execute Roy Lee Ward. State law permits only five invitees of the condemned, eight family members of the victim, a spiritual advisor, a physician, and state employees to observe the process. Indiana Department of Correction ("IDOC") policy forbids employees at the state prison from adding journalists to this set of observers—gratuitously, since they are not among those named in the statute. This law and policy violate the First Amendment rights of the public and the press to witness a proceeding wherein the government exercises the apex of its power. Yet the district did not require Indiana to demonstrate that it was likely to meet any constitutional standard before denying Appellants' motion for preliminary injunction. That ruling was in error.

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Supreme Court established that the First Amendment prevents the government from closing criminal trials without adequate justification. In that landmark ruling, which yielded no majority opinion, the Court reversed an order made pursuant to state statute that excluded the press and public from observing a murder trial. *Id.* Seven of the eight participating justices wrote or joined opinions that recognized a First Amendment basis for the reversal. *See generally id.* All seven recognized that the protection against undue closure was one held by the public generally. *Id.* at 577–78 (plurality opinion); *id.* at 585 (Brennan, J., concurring); *id.* at 599 (Stewart, J., concurring); *id.*

at 604 (Blackmun, J., concurring).  Over the next six years, the Supreme Court elucidated the contours of that protection, setting forth two "complementary considerations" to determine when the government holds the constitutional burden for justifying the closure of a proceeding and also describing how the government may attempt to meet that burden.  This framework, which has never been limited or abrogated by the Supreme Court, is known as "experience and logic."  It asks whether there is a tradition of openness to public observation of the process the government seeks to close, and whether public observers enhance that process. *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 7–9 (1986) ("*Press-Enterprise II*").

The closure of executions to the public is out of step with tradition and counterproductive.  Indiana is one of just two death penalty states in which disinterested members of the public cannot observe the process by which the government kills one of its citizens as punishment for a crime.  The other, Wyoming, has no prisoners on death row and has not carried out an execution since 1992.  And throughout history, across the United States, public observers have been permitted to attend executions.  There are good reasons for this.  Neutral observers help ensure that executions are humanely administered, promote public discussion that can lead to changes in the death penalty's application and procedure, enhance the deterrent effect of the death penalty, and promote the community catharsis achieved through seeing justice done.

2

Four of the eight participating justices in *Richmond Newspapers* also identified the First Amendment's protection against governmental infringement on the freedom of the press as an independent basis for their decision. 448 U.S. at 576 (plurality opinion); *id.* at 600 & n.3 (Stewart, J., concurring). Under the decisions of the Supreme Court and this Court in the years that followed, a restriction that poses a greater than incidental burden on the press—like a law that shuts down the only meaningful avenue for journalists to report on events in the execution chamber yet allows certain non-press observers—is subject to strict scrutiny.

In this appeal from the district court's denial of Appellants' motion for preliminary injunction, Appellants seek a remand. The district court's denial rests on the erroneous conclusion that neither the protection against undue closure of governmental proceedings nor the protection against restrictions that infringe press freedom in a more than incidental manner are viable constitutional claims. These errors, if uncorrected, mean that Indiana will execute its death row prisoners in closed proceedings without so much as an attempt to justify those closures. The district court must determine, under the correct constitutional framework, whether Indiana is likely to carry its burden of proof in the case on both counts of Appellants' complaint.

## JURISDICTIONAL STATEMENT

Appellants' complaint, which seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, alleges that Indiana Code § 35-38-6-6(a) (hereinafter "Section 6(a)") and Indiana State Prison Facility Directive ISP 06-26: Execution of Death Sentence, Sec. C (June 17, 2024) (hereinafter "ISP 06-26") violate the First Amendment to the United States Constitution.  The district court had federal question jurisdiction over Appellants' claims pursuant to 28 U.S.C. §§ 1331 and 1343.

Appellants filed a notice of appeal on June 13, 2025, seeking review of the district court's order denying a preliminary injunction entered on May 16, 2025. Order Denying Pls.' Mot. for Prelim. Inj., *Associated Press v. Neal*, No. 25-cv-00872 (S.D. Ind. May 16, 2025), ECF 36 (hereinafter the "Order").  This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the "complementary considerations" of experience and logic set forth in *Press-Enterprise II*, 478 U.S. 1 (1986), are the correct framework to determine whether the First Amendment provides the public with a rebuttable right to observe executions.

2.     Whether the *Press-Enterprise II* considerations of experience and logic are likely to be satisfied in this case, and, as a result, Appellees are required to make a particularized showing that they have carried their constitutional burden to close an execution to disinterested public observers, including those in the press.

3.     Whether the Press Clause of the First Amendment requires Appellees to satisfy strict scrutiny to enforce Section 6(a) and ISP 06-26 and preclude the press from observing executions.

## STATEMENT OF THE CASE

Appellants (collectively, the "Media Coalition") are five organizations that gather and report news in Indiana. ECF 9, Compl. ¶¶ 8–12.[1] Each employs professional journalists who are assigned to cover the affairs of government, including law enforcement, the criminal justice system, and corrections. *Id.* ¶¶ 15–19. Each member of the Media Coalition covers death penalty cases in Indiana, and each has reporters that would attend and observe executions carried out by the state, if they were permitted to do so. *Id.* ¶¶ 18–20, 48.

Appellees, both sued in their official capacities (collectively, "Indiana"), are Ron Neal, the Superintendent of Indiana State Prison, and Lloyd Arnold, the Commissioner of the Indiana Department of Correction ("IDOC").

### A.    Indiana's executions are set by court order and carried out pursuant to state statute and IDOC policy.

Executions in Indiana are carried out pursuant to Indiana Code § 35-38-6-1 through -10. The statute requires "[t]he court in which a death sentence is ordered shall issue a warrant to the sheriff . . . that contains notice of the conviction and the sentence," and "orders the warden to execute the convicted person at a specified time and date in the state prison." Ind. Code § 35-38-6-2. When Indiana's Supreme Court stays the execution of a death sentence during the pendency of an appeal, it is

---

[1]    All ECF citations refer to the district court docket.

responsible for setting a new date for the execution upon resolution of the appeal. Ind. Code § 35-50-2-9(h). It does so through published order. *See, e.g.*, *Ritchie v. State*, 254 N.E.3d 1064, 1065 (Ind. 2025); Order, *Ward v. State*, Nos. 74S00-0907-PD-320, 25S-SD-167 (Ind. July 7, 2025).[2]

The Department of Correction is authorized by statute to promulgate rules to implement the carrying out of the death penalty. Ind. Code § 35-38-6-1(d). The warden of the state prison, Neal, approved ISP 06-26, which contains those rules. ECF 37, Tr. of Prelim. Inj. Hr'g at 23:2–9. Indiana Code § 35-38-6-5 requires that "[t]he execution must take place inside the walls of the state prison." In practice, executions take place on Indiana State Prison ("ISP") property in "the Support Services building," which also contains "some offices in a conference room in front of the [execution] chamber." ECF 37 at 18:8–17.

> **B. Indiana's executions are closed to disinterested public observers and IDOC employees are instructed by policy that members of the press are subject to that rule.**

Section 6(a) provides that only certain, limited categories of witnesses may observe executions carried out in Indiana: (i) the warden of the state prison; (ii) persons designated by the warden to assist in the execution; (iii) the prison physician; (iv) an additional physician; (v) the convicted person's spiritual advisor; (vi) the

---

[2]    Available at https://www.in.gov/courts/files/order-other-2025-25S-SD-167.pdf.

prison chaplain; (vii) up to five friends or relatives of the convicted person; and (viii) up to eight specified adult members of the victim's immediate family. Ind. Code § 35-38-6-6(a).

In addition, ISP 06-26 explicitly provides that the press "shall not be permitted to witness the execution or to be in the Execution Chamber," unless "invited by the offender to witness the execution." A18 § C.3. No other category of public witness is explicitly excluded from witnessing an execution in the state of Indiana.

### C. Indiana's enforcement and implementation of Section 6(a) and ISP 06-26 prevented all but one member of the press from observing the execution of Joseph Corcoran.

In December 2024, Indiana executed Joseph Corcoran. ECF 20-7, Smith Decl. Attach. 5. The execution was the state's first in 15 years, and the first carried out under a single-drug protocol in which pentobarbital is administered intravenously. *Id.*, Smith Decl. Attach. 2.

The press—with the exception of Casey Smith, a reporter for the Indiana Capital Chronicle who was invited to attend by Corcoran under Section 6(a)(7), *id.*, Smith Decl. ¶ 13—was unable to observe Corcoran's execution. Instead, the Media Coalition covered Corcoran's execution from ISP's parking lot. ECF 20-4, Tareen Decl. ¶ 14; ECF 20-12, Spears Decl. ¶ 13; ECF 20-9, Dits Decl. ¶ 13; *see also* ECF 20-7, Smith Decl. ¶¶ 15–17. IDOC officials communicated with the assembled press through email and by silently placing written information in a box marked "media

8

statements" in the parking lot.  ECF 20-4, Tareen Decl. ¶ 16; ECF 20-7, Smith Decl. ¶ 16.  The state's announcement that Corcoran had been executed was sent through those same channels. ECF 20-4, Tareen Decl. ¶ 20; ECF 20-8, Phillips Decl. ¶ 14, Attach. 4; ECF 20-9, Dits Decl. ¶ 14.

> **D.    The Media Coalition commenced this lawsuit seeking prospective relief that would permit them to observe future executions.**

On April 15, 2025, the Indiana Supreme Court set a date for the execution of Benjamin Ritchie.  *Ritchie*, 254 N.E.3d at 1065.  Ritchie applied for rehearing; the Indiana Supreme Court denied his request on April 30, 2025, and set the execution to occur on May 20, 2025. *Ritchie v. State*, Nos. 49S00-0409-PD-420, 24S-SD-342, 2025 WL 1248038, at *1 (Ind. Apr. 30, 2025).

On May 7, 2025, the Media Coalition filed the operative complaint in the Southern District of Indiana.  *See generally* ECF 9.  The complaint sets forth two claims, each alleging that Indiana's enforcement of Section 6(a) and ISP 06-26 violates the First Amendment as applied to the Media Coalition.  It also seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, including a permanent injunction restraining Indiana from enforcing Section 6(a) and ISP 06-26 to exclude the Media Coalition from observing future executions.  ECF 9 at 18.

**E.**     **After the district court denied the Media Coalition's motion for preliminary injunction, Indiana's execution of Benjamin Ritchie was closed to disinterested public observers.**

Shortly after filing its complaint, the Media Coalition filed a motion for preliminary injunction. ECF 19.  In support of that motion, the Media Coalition filed a memorandum of law, ECF 20, and nine declarations from journalists currently or formerly employed by Appellants. ECF 20-4 through -12.  The preliminary injunction motion sought an order requiring Indiana to permit press observers at executions during the pendency of the Media Coalition's lawsuit.

The district court held a hearing on the motion, at which it received evidence and heard argument.  The Media Coalition proceeded on the record created through its complaint and its preliminary injunction motion, including the exhibits and declarations submitted in support of those filings.  ECF 37, Tr. of Prelim. Inj. Hr'g at 6:17–7:2, 7:9–8:10.  Indiana offered the testimony of one witness, Neal.  *Id.* at 8:19–31:14.

After the hearing, the district court issued a written order denying the Media Coalition's preliminary injunction motion.  A1.  Its denial was based solely on its analysis of the Media Coalition's likelihood of success on the merits of its claims.  A5.  The district court held that Indiana carried no constitutional burden to justify its closure of executions to public observers.  A9.  It reached that holding in two ways.  First, the district court reasoned that "the Seventh Circuit has never extended the

10

*Press-Enterprise II* framework to an event beyond a judicial proceeding, let alone something after the imposition of a judgment in a case, such as an execution." A7; *but see id.* (citing *United States v. Eppinger*, 49 F.3d 1244, 1253 (7th Cir. 1995) (applying the *Press-Enterprise II* framework to affirm that the public has a presumptive right to observe sentencing hearings, which occur post-judgment)). It proceeded from that premise to conclude that because an execution is not a "'court proceeding[]' as contemplated by the Seventh Circuit, [in *Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir. 2018)], the *Press-Enterprise II* framework does not apply to this case." A9. Second, it found that "[e]ven if *Press-Enterprise II* applies to executions as a threshold matter, executions do not pass the experience and logic test such that a qualified right of access exists." *Id.*

As to the Media Coalition's Press Clause claim, the district court held that "[t]he mere fact that *some* narrowly defined members of the public (who may also be journalists) can attend the execution does not mean that the press are singled out for differential treatment." A13. Citing *Pell v. Procunier*, 417 U.S. 817 (1974), and *John K. MacIver Institute for Public Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021), the district court wrote that the Media Coalition's claim was actually one seeking "equal access," but that it was "not being singled out for disparate treatment." A13–A14.

11

Ritchie was executed shortly after midnight on May 20, 2025, with no press observers present.  ECF 37, Tr. of Prelim. Inj. Hr'g at 36:10–37:4; *see* Casey Smith, *State Executes Death Row Inmate Benjamin Ritchie for Fatal Shooting of Police Officer*, Ind. Cap. Chron. (May 20, 2025);[3] Sophia Tareen & Ed White, *Man Executed for the 2000 Killing of a Police Officer in Indiana's Second Execution in 15 Years*, AP News (May 20, 2025).[4]  Although journalists employed by the Media Coalition had requested that Ritchie invite them to observe his execution, he did not do so.  ECF 37, Tr. of Prelim. Inj. Hr'g at 36:10–37:4; ECF 20-7, Smith Decl. ¶¶ 37–39; ECF 20-11, Nye Decl. ¶ 25; ECF 20-12, Spears Decl. ¶¶ 23–25.

The Media Coalition filed a timely notice of appeal on June 13, 2025.  ECF 42.  Proceedings in the district court are stayed pending appeal.  ECF 51.  On July 7, 2025, the Indiana Supreme Court set a "tentative" date of October 10, 2025 for the execution of Roy Lee Ward.  Order, *Ward v. State*, Nos. 74S00-0907-PD-320, 25S-SD-167 (Ind. July 7, 2025).[5]

---

[3]    Available at https://indianacapitalchronicle.com/2025/05/20/state-executes-death-row-inmate-benjamin-ritchie-for-fatal-shooting-of-police-officer/.

[4]    Available at https://apnews.com/article/execution-indiana-police-shooting-54aee13773b5b249601ef3f4bf7c6266.

[5]    Available at https://www.in.gov/courts/files/order-other-2025-25S-SD-167.pdf.

## STANDARD OF REVIEW

"When reviewing a district court's grant or denial of a preliminary injunction," this Court "review[s] the court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation omitted).

At the preliminary injunction stage, to demonstrate "some likelihood of success on the merits," *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018), a plaintiff "need not show that it definitely will win the case," *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). A showing of how "the applicant proposes to prove the key elements of its case" is all that is required. *Id.*; *see also Eli Lilly & Co. v. Arla Foods, Inc*., 893 F.3d 375, 382 (7th Cir. 2018) (emphasizing extensive proof at preliminary injunction stage is not required "in the truncated timeframe between filing suit and seeking a preliminary injunction").

For claims seeking access to government proceedings, "[t]he difficulties inherent in quantifying the First Amendment interests at issue require that [the Court] be firmly convinced that disclosure is inappropriate before arriving at a decision limiting access. Any doubts must be resolved in favor of disclosure." *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) (citing *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1313 (7th Cir. 1984)).

## SUMMARY OF THE ARGUMENT

The Media Coalition successfully demonstrated that Section 6(a) and ISP 06-26 likely infringe their First Amendment rights by depriving them of their ability to observe executions with no constitutionally adequate justification.  The district court erred in three ways.

*First*, the district court erred by holding that it need not inquire into whether the history and logic factors permit the government to close execution proceedings to disinterested public observers without meeting a heightened constitutional burden for doing so.  The First Amendment limits the government's discretion to close certain government processes to public observers by imposing a heightened burden on state actors to justify the closure.  This protection exists in part to ensure that the "constitutionally protected 'discussion of governmental affairs' is an informed one." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–05 (1982) (citation omitted).  Government officials carry this heightened, constitutional burden when they attempt to close a proceeding (or seal records of a proceeding) that has traditionally been open to the public and where public observation plays a significant positive role in its functioning.  *Press-Enterprise II*, 478 U.S. at 7–9 (describing those two "complementary considerations," termed "experience" and "logic").  Proceedings that meet that description "cannot be closed unless specific, on the

record findings are made" demonstrating that the government's constitutional burden has been met. *Id.* at 13.

*Second*, the district court committed several errors in its evaluation of whether disinterested public observers, including the press, have historically been permitted to attend executions throughout the United States. The court also misconstrued the standard for determining whether public observation, including the press' first-hand reporting, plays a significant positive role in the function of execution proceedings. Under the test set out by the Supreme Court in *Press-Enterprise II*, the Media Coalition established each of those factors, confirming that the public is vested with a qualified constitutional right of access to observe executions.

And *third*, members of the press are members of the public, but, as reflected in the Press Clause of the First Amendment, they also have a special, constitutionally recognized role in our democracy. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 584 (1983). Section 6(a) and ISP 06-26 cut off press access to executions entirely, *see Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (hereinafter "*ACLU*"), but provide exceptions for certain individuals—friends and relatives of the condemned, the spiritual advisor of the condemned, and relatives of the victim. Because Section 6(a) and ISP 06-26 present more than an incidental burden on press freedom, the district court erred by failing to require Indiana to satisfy strict scrutiny.

15

# ARGUMENT

**I.    The *Press-Enterprise II* framework, properly applied, dictates whether government proceedings, including executions, are subject to a presumptive right of access.**

The district court failed to apply a Supreme Court standard that has never been overruled or abrogated. Instead, it created its own test, purportedly based on this Court's decision in *Courthouse News Service*, to discern whether executions are "court proceedings" presumptively open to the public. But *Courthouse News Service* does not limit the scope of *Press-Enterprise II* in that way. Nor, for that matter, does any other decision of this Court or the Supreme Court. Instead, *Press-Enterprise II* provides the correct framework for determining when the government is constitutionally required to overcome a presumption that a particular proceeding is open to public observers.

Even beyond adherence to settled precedent, the rationale underlying the experience and logic factors in *Press-Enterprise II* strongly supports the use of that framework in this case. Of all possible "governmental affairs," *Globe Newspaper Co.*, 457 U.S. at 604–05 (citation omitted), executions are surely among those for which informed public access and discussion are most important to protect.

16

A.     **The line of Supreme Court cases culminating with *Press-Enterprise II* requires an analysis of the history and function of public observers at executions.**

In the years that followed *Richmond Newspapers*, the Supreme Court issued a series of opinions explaining both *when* the government was required to make a particularized demonstration that closing a proceeding would be warranted and *how* it was required to carry that burden.  In 1982, it announced the First Amendment imposed upon the government a responsibility to ensure that the "constitutionally protected 'discussion of governmental affairs' is an informed one."   *Globe Newspaper Co.*, 457 U.S. at 604–605 (citation omitted).  In accordance with that principle, the Court held that restrictions preventing the press and public from observing the in-court testimony of children who survived sexual assault were unconstitutional because the government had not shown that they were "necessitated by a compelling governmental interest, and [] narrowly tailored to serve that interest."  *Id.* at 607.  The government bore that burden because criminal trials "historically ha[ve] been open to the press and general public" and "the right of access to criminal trials plays a particularly significant role" in their proper functioning.  *Id.* at 605–06.

In 1984, the Supreme Court considered the same two factors, which it termed "experience and logic," to determine that a trial judge was required to demonstrate "an overriding interest based on findings that closure is essential to preserve higher

values and is narrowly tailored to serve that interest" to justify closing the courtroom for, and seal the transcript of, jury selection in a capital murder case. *Press-Enter. Co. v. Superior Court* ("*Press-Enterprise I*"), 464 U.S. 501, 510 (1984). Because the trial court had not met that burden, the Supreme Court held that it had unconstitutionally abridged "the opportunities for the communication of thought and the discussion of public questions" guaranteed by the First Amendment. *Press-Enterprise I*, 464 U.S. at 511 n.10, 513 (citation omitted).

And in 1986, the Supreme Court reversed a decision of the California Supreme Court that *Press-Enterprise I* and *Globe Newspaper Co.* "extended only to actual criminal trials." *Press-Enterprise II*, 478 U.S. at 5. The "two complementary considerations" of experience and logic required the government to establish that closure of a preliminary hearing in a capital murder case was essential to "preserve higher values and is narrowly tailored to serve that interest." *Id.* at 8–10 (citation omitted). The Court wrote that "the First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise." *Id.* at 7. Instead, "[i]f the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches." *Id.* at 9; *see also El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (applying *Press-Enterprise II* to hold that trial judges carry a constitutional burden to demonstrate adequate reason to close criminal preliminary hearings); *Grove Fresh Distribs.*, 24

18

F.3d at 897 ("The First Amendment presumes that there is a right of access to proceedings and documents which have 'historically been open to the [press and general] public' and where the disclosure of which would serve a significant role in the functioning of the process in question. . . . This presumption is rebuttable upon demonstration that suppression 'is essential to preserve higher values and is narrowly tailored to serve that interest.'" (first quoting *Press-Enterprise II*, 478 U.S. at 8; then quoting *Press-Enterprise I*, 464 U.S. at 510)).

Principled adherence to the foregoing Supreme Court precedent counsels that the *Press-Enterprise II* framework must be applied to determine if a qualified First Amendment right of access attaches to a particular government proceeding. As a recent treatise co-authored by Bryan Garner and twelve appellate judges explains, when a court with the authority to make precedent announces a standard that "forms the basis of the holding," that standard is itself "precedential":

> The Court in *Miranda v. Arizona*, for example, need not have set forth in detail a specific set of warnings to resolve the question presented; nonetheless, it chose to do so, and the full set of warnings is generally viewed as part of the holding. Similarly, in *McDonnell Douglass Corp v. Green*, the Court need not have set forth a three-step analysis for adjudicating claims of international discrimination. But the court was empowered to resolve the question before it however broadly it wished. And as future courts have understood, *McDonnell Douglas's* three-step framework is precedential.

Bryan A. Garner et al., The Law of Judicial Precedent 88 (2016) (citations omitted).

Similarly, "[d]isputes over racial classifications generally assume that the

appropriate question is whether the government has narrowly tailored its regulations

to serve a compelling interest. Disputes over the *Ex Post Facto Clause* give

canonical force to Justice Chase's four categories of prohibited laws as articulated

in *Calder v. Bull*." Randy J. Kozel, *The Scope of Precedent*, 113 Mich. L. Rev. 179,

194 (2014). "In these and scores of other situations, generalized doctrinal

frameworks exert binding force." *Id.*

Unsurprisingly, then, the Courts of Appeals have applied the *Press-Enterprise*

*II* framework to an array of government proceedings not specifically contemplated

by the Supreme Court. The experience and logic factors have been applied to

determine First Amendment access rights to civil judicial proceedings. *See, e.g.*,

*Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1067–71 (3d Cir. 1984) (holding

that the First Amendment right of access applies to civil proceedings);

*Westmoreland v. CBS, Inc.*, 752 F.2d 16, 22–23 (2d Cir. 1984) (same); *In re Cont'l*

*Ill. Sec. Litig.*, 732 F.2d at 1309 (holding that First Amendment provides a

presumptive right to access a motion to terminate shareholder derivative claims).

They have been applied to administrative deportation proceedings. *Detroit Free*

*Press v. Ashcroft*, 303 F.3d 681, 694 (6th Cir. 2002) (finding the experience and

logic framework to be generally applicable and using it to find a First Amendment

right of access to deportation proceedings); *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 208–09 (3d Cir. 2002) (recognizing that the experience and logic framework is "broadly applicable to issues of access to government proceedings" and using it to conclude that there is no First Amendment right of access to "special interest" deportation proceedings).  They have been applied to proceedings conducted by the Transit Adjudication Bureau of the New York City Transit Authority.  *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 297 (2d Cir. 2012). They have been applied to town planning commission meetings.  *Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 181 (3d Cir. 1999).  And they have even been applied to assess a photojournalist's claim of a First Amendment right to observe a "horse roundup" conducted by the Bureau of Land Management.  *Leigh v. Salazar*, 677 F.3d 892, 898–900 (9th Cir. 2012) (noting the "common understanding" that the experience and logic framework "is not limited to criminal judicial proceedings").

Most relevantly, the *Press-Enterprise II* framework has been applied to executions.  In *California First Amendment Coalition v. Woodford*, the Ninth Circuit applied the experience and logic factors to find "a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process." 299 F.3d 868, 877 (9th Cir. 2002).  In *Associated Press v. Otter*, it applied

the same analysis to the execution process in Idaho and reversed the denial of a preliminary injunction to require public access.  682 F.3d 821, 826 (9th Cir. 2012). And in *First Amendment Coalition of Arizona, Inc. v. Ryan*, the same framework was used to determine that the public has a constitutional right to hear the entire execution process.  938 F.3d 1069, 1075 (9th Cir. 2019); *see also Phila. Inquirer v. Wetzel*, 906 F. Supp. 2d 362, 368 (M.D. Pa. 2012) (applying experience and logic framework to find qualified right of access to portions of execution that Pennsylvania corrections department protocol instructed its employees to obstruct).

Although the district court implied otherwise, *Courthouse News Service v. Brown* did not limit the reach of *Press-Enterprise II* to the judiciary.  In *Courthouse News Service*, this Court applied the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), and held that a district court had erred by exercising jurisdiction over a lawsuit by a news organization that sought contemporaneous electronic access to all civil complaints filed in Illinois state courts.  908 F.3d at 1073–74.  Because it disposed of the case on jurisdictional grounds, the Court "d[id] not answer" the First Amendment questions presented in the appeal, *id.* at 1070, but a brief overview of those issues included a description of "the framework for analyzing restrictions on the press's right of access to court proceedings and documents," *id.*  That description merely accounted for the facts of the case before the Court—it was not an announcement or holding that the same framework would not apply to executions.

22

The district court similarly erred by looking to two Press Clause cases, *Pell v. Procunier*, 417 U.S. 817 (1974) and *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978). A5–A6. *Pell* and the plurality opinion in *Houchins* discuss whether the press may assert an *additional* right of access beyond that already provided to the general public, not whether the general public has a right of access to executions in the first place. *Pell*, 417 U.S. at 834; *Houchins*, 438 U.S. at 15. Moreover, both involved the government denying press requests to access "information" controlled by the government, not to observe a distinct proceeding like an execution. *Pell*, 417 U.S. at 834; *Houchins*, 438 U.S. at 15–16. The narrow holding of *Pell* and the plurality opinion in *Houchins* thus have no bearing on whether the later-adopted experience and logic test is properly applied to determine whether a qualified access right attaches to executions. In any event, the opinion of the Court in *Pell* and the plurality opinion in *Houchins* are not even inconsistent with the result sought in this case. Applying the later-developed experience and logic test to the facts in *Houchins* and *Pell* would lead to the same result that the Supreme Court ultimately reached in those cases. *See Richmond Newspapers*, 448 U.S. at 576 n.11 (plurality opinion) (distinguishing *Pell*); *id.* at 585–86 (Brennan, J., concurring) (distinguishing *Houchins*).

For these reasons, the district court's failure to apply the *Press-Enterprise II* framework to assess the merits of Appellants' First Amendment claim for access to Indiana execution proceedings was in error.

**B.    The district court's order undermines the constitutional interest protected by the *Press-Enterprise II* framework.**

The constitutional interest protected in the cases applying the *Press-Enterprise II* framework is the same interest at issue in this case.  The experience and logic framework was developed to reflect the Supreme Court's understanding that "a major purpose of th[e] [First] Amendment was to protect the free discussion of governmental affairs."  *Globe Newspaper Co.*, 457 U.S. at 604–05 (citation omitted).  By "offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government."  *Id.*  Through their action, the Media Coalition seeks access to executions in Indiana to ensure that the public is informed on a government proceeding of the highest import.

The Supreme Court's constitutional access decisions are premised on the conclusion that the "common core purpose" of the First Amendment  is "assuring freedom of communication on matters relating to the functioning of government."  *Richmond Newspapers*, 448 U.S. at 575 (plurality opinion); *see also Press-Enterprise I*, 464 U.S. at 511 n.10 (the First Amendment protects "opportunities for the communication of thought and the discussion of public questions" (citation

omitted)).  "[O]ur republican system of self-government" requires "uninhibited, robust, and wide-open" debate about governmental affairs that is "informed" by observing its proceedings.  *Richmond Newspapers*, 448 U.S. at 587 (Brennan, J., concurring) (citation omitted).  Succinctly, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."  *Id.* at 572 (plurality opinion).

As this Court and others have affirmed, that purpose is effectuated by consistent application of the experience and logic factors to closed government proceedings (or sealed records of proceedings) in order to determine whether such proceedings were "historically [] open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enterprise II*, 478 U.S. at 8.  For instance, in *United States v. Danovaro*, in which this Court cited *Press-Enterprise II* for the proposition that public access to plea hearings is entitled to First Amendment protection, the Court's decision was rooted in recognition of the importance of informed public discussion.  877 F.2d 583, 589 (7th Cir. 1989) ("Public access to [plea hearings] reveals the basis on which society imposes punishment, especially valuable when the defendant pleads guilty while protesting innocence.").  And in *In re Continental Illinois Securities Litigation*, in which this Court held that the First Amendment provides a presumptive right to access a motion to terminate shareholder derivative

claims, the Court wrote that it "agree[d] with the Sixth Circuit that the policy reasons for granting public access to criminal proceedings apply to civil cases as well." 732 F.2d at 1308–09 (citing *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)). The Sixth Circuit had stressed "the concept of the 'consent of the governed,'" and noted that "in either the civil or the criminal courtroom, secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1177–79.

This concern is no less present in proceedings in which the state imposes the most severe punishment available. In Indiana, executions are initiated under judicial authority and administered by a state agency. Ind. Code § 35-38-6-2. Individual executions are typically the subject of many judicial proceedings and court orders relating to the prisoner's appeals and petitions for habeas relief. In Indiana, to commence an execution, "[t]he court in which a death sentence is ordered shall issue a warrant . . . that orders the warden to execute the convicted person at a specified time and date in the state prison." *Id.* IDOC is permitted by statute to "adopt rules" to govern the execution, Ind. Code § 35-38-6-1(d); those rules extensively document the procedure by which executions are carried out, *see generally* A16–A38 (ISP 06-26). IDOC specifies record keeping practices, A22–A23 § H, requires a log of "steps taken during the execution process," A23–A24 § I.7, requires that notice of the

execution be orally provided to the condemned offender, A24–A25 § I.7.i, and specifies when and how various IDOC employees should carry out their roles, *id.* § I.7.j–p. The constitutional interest in affording the public access to observe government proceedings is particularly acute when the government is carrying out this discrete and observable process at the apex of its authority.

In the leading case applying the experience and logic framework to executions, the Ninth Circuit affirmed the proposition asserted here that the constitutional right at issue is "premised on" the guarantee that "the individual citizen can effectively participate in and contribute to our republican system of self-government." *Woodford*, 299 F.3d at 874 (quoting *Globe Newspaper Co.*, 457 U.S. at 604). It confirmed this rationale seventeen years later in *First Amendment Coalition of Arizona, Inc. v. Ryan*, writing that the First Amendment "guarantees the public and the press a measure of access to governmental proceedings, to ensure that public discussion of governmental affairs is informed." 938 F.3d at 1074.

The underlying constitutional rationale for applying the experience and logic factors of *Press-Enterprise II* is unquestionably present in this case. The district court erred by reaching a decision without using that framework.

27

**II.    The experience and logic factors of *Press-Enterprise II* require that Indiana make a particularized, constitutional showing to close an execution to public observers.**

The Media Coalition amply demonstrated a likelihood that executions meet both prongs of the experience and logic framework under the standard of review for preliminary injunction motions. *Ill. Republican Party*, 973 F.3d at 763 (movant "need not show that it definitely will win the case" because a showing of how "the applicant proposes to prove the key elements of its case" is all that is required); *see also Eli Lilly & Co.*, 893 F.3d at 382 (extensive proof at preliminary injunction stage not required "in the truncated timeframe between filing suit and seeking a preliminary injunction").

The district court's opinion denying the Media Coalition's preliminary injunction motion rested on several erroneous findings.   The district court misconstrued *Press-Enterprise II* as requiring a showing that the Indiana public has enjoyed an "unbroken, uncontradicted history" of public access similar to or exceeding that of criminal trials.  A11 (quoting *Richmond Newspapers*, 448 U.S. at 573 (plurality opinion)).  This is not the standard; the undisputed tradition of public observers throughout the United States is more than sufficient to meet the Media Coalition's burden.  *El Vocero de Puerto Rico*, 508 U.S. at 150 (experience factor depends not on "particular practice of any one jurisdiction, but instead [] the experience in that *type* or *kind* of hearing throughout the United States" (citation and

internal quotation marks omitted)).  The district court also miscategorized public observers in modern times as comparable to a trial jury, and erroneously excluded them from its analysis of the experience prong.  A10–A11.

Further, the district court erred in applying the logic prong by finding that Appellants "confus[ed] policy goals with constitutional requirements."  A12.  The "constitutional requirements" in this case are the benefit that public observers bring to the public's understanding of the execution process.  *See, e.g.*, *Press-Enterprise II*, 478 U.S. at 11–12 (discussing public observers' "significant positive role in the actual functioning of the process").  Namely, public observers play a positive role by helping to ensure that the death penalty is competently and humanely accomplished, promoting its deterrent effect, and demonstrating that justice has been done.  *Woodford*, 299 F.3d at 876–77; *Phila. Inquirer*, 906 F. Supp. 2d at 371.

Because the district court failed to correctly apply either prong of the *Press-Enterprise II* analysis, it reached the constitutionally untenable conclusion that Indiana need not make a particularized factual showing of any sort prior to closing its executions.

A.    **The tradition of neutral public observers at executions satisfies the experience prong.**

1.    **There is a strong historical tradition of permitting public observers at executions throughout the United States.**

"In early America, as in England, public hangings were the most common method of execution." Sheherezade C. Malik & D. Paul Holdsworth, *A Survey of the History of the Death Penalty in the United States*, 49 U. Rich. L. Rev. 693, 696 (2015); *see also* Stuart Banner, The Death Penalty: An American History 24 (2002) (explaining "[u]ntil the nineteenth century, hangings were conducted outdoors, often before thousands of spectators" in a ceremony that was "as conspicuous as any event could possibly be"). This tradition of public hangings continued well after the founding. In New York, for instance, large public executions were carried out until the state legislature adopted a private execution statute in 1835. John D. Bessler, *Televised Executions and the Constitution: Recognizing A First Amendment Right of Access to State Executions*, 45 Fed. Commc'ns L.J. 355, 361–62 (1993). And "[a]ccording to one account, at the last public hanging in Philadelphia, which took place on May 19, 1837, an estimated crowd of 20,000 people witnessed the execution of nineteen-year-old James Moran." *Id.* at 359. In Indiana, members of the public and press were allowed to attend executions and did so by the hundreds or thousands until the late nineteenth century. *See, e.g.*, *Execution*, Ind. Centinel, Sept. 2, 1820, at 2, https://perma.cc/5Q9B-RVY4 (describing execution of Amasa

Fuller in Lawrenceburg, noting that "thousands of men, women, and children, from all quarters, assembled to witness the awful spectacle"); *A Wife Murder Expiated*, The Indianapolis J., Oct. 11, 1884, at 5, https://perma.cc/2SJC-YJTC (describing execution of Charles Butler in Columbia City, noting "[t]wo hundred and fifty people witnessed" it).

The district court relied on *Arkansas Times, Inc. v. Norris*, No. 5:07-CV-195, 2008 WL 110853, at *4 (E.D. Ark. Jan. 7, 2008), to find that executions became "private events" by the 1830s. A10. That characterization is not accurate. States began shifting executions away from public squares and into jailhouse yards in the 1830s. *See* Banner, *supra*, at 146 (describing shift to jail yards in northern states as happening "[b]etween 1830 and 1860," while in southern states "most kept the ceremony open to the public until the later nineteenth and early twentieth centuries"). In many states, however, including in Indiana, members of the press and the public continued to attend these jail yard executions until the late nineteenth century. *See id.* at 157–58 (noting that "[j]ail-yard hangings were thus still conducted before a crowd, but a smaller and more elite crowd than before" and that "[s]paces were normally reserved for journalists"). In one account of an 1879 jailhouse execution in Marion County, Indiana, for example, a newspaper described the crowd: "[a]bout 250 tickets of invitation had been issued, and every one was represented" in the jailhouse yard— including "members of the press"—and that "at

least 5,000 people throng[ed] the court yard and adjacent streets" who had not been issued tickets to witness the execution from within the jailhouse yard itself. *The Law Executed*, The Indianapolis News, Sept. 19, 1879, https://perma.cc/R7TY-NBST.

"When executions were moved out of public fora and into prisons, the states implemented procedures that ensured executions would remain open to some public scrutiny," *Woodford*, 299 F.3d at 875, including by providing that members of the public or press would attend as official witnesses to "act as representatives for the public at large," *id.* at 876. Ohio, for example, adopted a statute protecting press access to executions as early as 1885. ECF 20-3, 1885 Ohio Laws 170 (permitting "a reporter for each one of the two leading newspapers of opposite politics published in said county that the sheriff may designate" to be present at the execution). Kentucky protected press access in 1910. ECF 20-2, 1910 Ky. Acts 112 (permitting "one representative of every newspaper published in the county in which the condemned was convicted, and one representative of every daily newspaper published in the State" to be present at the execution). Other states—including Iowa, Illinois, and New York—did not statutorily protect press access, but in those states, members of the press were still regularly invited to attend executions.[6] Thus, when

---

[6]     *Compare* 1 William E. Miller, Revised and Annotated Code of Iowa, at 909 (1880), https://bit.ly/3TqgN0n (title XXIV, chapter 2, section 13 of the Iowa Code permitting sheriff executing death judgment to choose "twelve respectable citizens of his county" to witness execution), *with The First Judicial Hanging in the State in*

Indiana limited witnesses to those invited by the condemned in 1889, it was an extreme outlier.  *See* 1889 Ind. Acts 193, https://perma.cc/9VZY-TUKW.

In more recent years, of the twenty-seven states that maintain the death penalty today, twenty-five have provided more public access than Indiana.[7]  Fourteen have provided for press access by statute.[8]  Seven others have provided for members

---

*Six Years*, Mount Pleasant Weekly News, Nov. 7, 1894, at 6, https://perma.cc/XZF5-8BKU (describing 1894 execution of James Dooley in Iowa, noting that "representatives of a score of newspapers and as many sheriffs, together with a dozen privileged persons, were admitted"); *compare* Revised Statutes of the State of Illinois, at 445 (Harvey B. Hurd ed., 1885), https://bit.ly/458QIbJ (chapter 38, division XIV, section 3 of Illinois Criminal Code permitting sheriff to choose "twelve reputable citizens" to attend), *with Expiate Crimes on the Gallows*, Urbana Daily Courier, Apr. 23, 1904, at 1, https://idnc.library.illinois.edu/?a=d&d=TUC19040423.2.1 ("The newspapers were represented" at triple execution in Illinois in 1904); *compare* 1892 N.Y. Laws 36, https://bit.ly/44TBZm8 (providing for selection of "twelve reputable citizens"), *with* Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*, 35 Wm. & Mary L. Rev. 551, 603–05 (1994) (discussing press access to first execution by electrocution in New York, prison authorities' short-lived efforts to exclude press from several executions thereafter, and noting that "[t]he press' continued criticism and suspicion over their exclusion from these six executions resulted in their invitation to witness the seventh electrocution, that of Charles E. MacElvaine, on February 8, 1892").

[7]    Four of the states included in this analysis—California, Oregon, Pennsylvania, and Ohio—have execution moratoriums in place.

[8]    Ala. Code § 15-18-83; Ky. Rev. Stat. Ann. § 431.250; Fla. Stat. Ann. § 922.11; Miss. Code Ann. § 99-19-55; Mont. Code Ann. § 46-19-103; Neb. Rev. Stat. Ann. § 83-970; Ohio Rev. Code Ann. § 2949.25; Okla. Stat. tit. 22, § 1015; Or. Rev. Stat. Ann. § 137.473; 61 Pa. Stat. and Cons. Stat. Ann. § 4305; S.C. Code Ann. § 24-3-550; S.D. Codified Laws § 23A-27A-34; Tenn. Code Ann. § 40-23-116; Utah Code Ann. § 77-19-11.

of the general public to serve as witnesses,[9] and at least four of those have adopted regulations that provide for press witnesses to attend.[10]  Four other states do not statutorily require public or press witnesses, but have promulgated policies or rules allowing press access.[11]  The federal government—which *carries out its executions*

---

[9]     Ariz. Rev. Stat. Ann. § 13-758 (department of corrections director to select "at least twelve reputable citizens"); Ark. Code Ann. § 16-90-502(e)(1)(D) (department of corrections director to select "not fewer than six (6) nor more than twelve (12)" citizens); Cal. Penal Code § 3605(a) (warden to select "at least 12 reputable citizens"); Kan. Stat. Ann. § 22-4003(a) (secretary of corrections to select "not more than 10 persons" as official witnesses); La. Stat. Ann. § 15:570(A)(6) (requiring "[n]ot less than five nor more than seven other witnesses" to be present); Mo. Ann. Stat. § 546.740 (department of corrections director to invite "at least eight reputable citizens"); Nev. Rev. Stat. Ann. § 176.355(2)(e) (department of corrections director to select "not less than six reputable citizens" to attend).

[10]     Those states are Arizona, Louisiana, Missouri, and Nevada.  *Compare* Ariz. Rev. Stat. Ann. § 13-758, *with* Ariz. Dep't of Corr., Rehab. & Reentry, Order No. 710 – Execution Procedures § 5.1.1.2 (May 20, 2025), https://perma.cc/ZP7G-76KY (providing that twelve citizens will include "up to five members of the media"); *compare* La. Stat. Ann. § 15:570(A)(6), *with* La. Dep't of Pub. Safety & Corr., Regulation No. OP-D-8 § 7(E)(1) (Feb. 7, 2025), https://perma.cc/3PC8-Q2C4 (providing that two of the "other witnesses" "shall be members of the news media"); *compare* Mo. Ann. Stat. § 546.740, *with* Mo. Dep't of Corr., Execution Witnesses § II(A)(3)(c) (Nov. 15, 2018), https://perma.cc/FR2K-M5AH (providing for selection of media representatives); *compare* Nev. Rev. Stat. Ann. § 176.355(2)(e), *with* Nev. Dep't of Corr., Execution Manual §§ 101.03 & 102.01 (June 9, 2021), https://perma.cc/6NU6-6DB6 (providing director discretion to select media witnesses).

[11]     Those states are Texas, Georgia, North Carolina, and Idaho.  *Compare* Tex. Code Crim. Proc. Ann. art 43.20, *with Viewing Executions*, Tex. Dep't of Crim. Just., https://perma.cc/P3UR-3VBZ (last visited July 10, 2025); *compare* Ga. Code Ann. § 17-10-41, *with For Media – Access for Scheduled Executions*, Ga. Dep't of Corr., https://perma.cc/P75U-HG69 (last visited July 10, 2025); *compare* N.C. Gen. Stat.

*exclusively in Indiana*—has required access for the press and public; up to "[t]en representatives of the press" and "[e]ight citizens" may be present at federal executions taking place at USP Terre Haute. 28 C.F.R. § 26.4(c)(4)(i)–(ii). Only two states—Indiana and Wyoming—have departed from this consensus. Ind. Code § 35-38-6-6(a) (limiting access to those related to the victim or chosen by the condemned); Wyo. Stat. Ann. § 7-13-908 (limiting access to those chosen by the condemned).[12]

The geographically encompassing review set forth above is the right one because the history prong analysis in this case is not limited to historical practice in Indiana. The Supreme Court held, in reversing a Puerto Rican court's flawed "reliance on Puerto Rican tradition," that a qualified First Amendment right of access attached to a criminal pretrial hearing because "the 'experience' test . . . does not look to the particular practice of any one jurisdiction, but instead to the

---

Ann. § 15-190, *with Selection of Execution Witnesses*, N.C. Dep't of Adult Corr., https://perma.cc/MMG7-9YYD (last visited July 10, 2025); Idaho Dep't of Corr., Execution Procedures, at 11 (Oct. 11, 2024), https://perma.cc/3NDW-7LP9.

[12] Wyoming has no prisoners on death row and has only carried out one execution since 1977. Tracy L. Snell, Bureau of Just. Stat., *Capital Punishment, 2023 – Statistical Tables*, at 2, 7, 13 (July 2025), https://bjs.ojp.gov/document/cp23st.pdf. That execution took place in 1992. *Two States Carry Out Executions*, N.Y. Times (Jan. 23, 1992), https://www.nytimes.com/1992/01/23/us/two-states-carry-out-executions.html.

experience in that *type* or *kind* of hearing throughout the United States[.]" *El Vocero de Puerto Rico*, 508 U.S. at 150 (citation and internal quotation marks omitted).

### 2. The district court erred in applying the experience prong of *Press-Enterprise II*.

The long-rooted historical tradition of access to executions throughout the United States is more than enough to establish "a well-developed tradition of access to a specific process," *see Courthouse News Serv.*, 908 F.3d at 1070, particularly at the preliminary injunction stage, *cf. Ill. Republican Party*, 973 F.3d at 763; *Eli Lilly & Co.*, 893 F.3d at 382. In reaching the opposite conclusion, the district court misconstrued the experience prong of the *Press-Enterprise II* framework as requiring an "unbroken, uncontradicted history" of public access comparable to criminal trials described in *Richmond Newspapers*, 448 U.S. at 573 (plurality opinion), and involving a similar scope of "*general access*," A11. Accordingly, despite accepting that "there has certainly been public access to executions throughout this Nation's history," the district court found that the Media Coalition had failed to satisfy the experience prong because "the scope of that access is not on par with the historical access to other proceedings that have passed the experience test." A10.

That was error. A tradition of access need not be unbroken, nor must it be identical in scope to that of access to criminal trials to be sufficiently well-developed to demonstrate a history of openness. The Courts of Appeals that have considered

the application of *Press-Enterprise II* outside the context of judicial proceedings have rejected the overly rigid approach employed by the district court. *See, e.g.*, *Detroit Free Press*, 303 F.3d at 700 (rejecting premise that plaintiff must make "significantly long showing that the proceedings at issue were historically open, such as a common law tradition," and finding that right of access attached to deportation proceedings); *N. Jersey Media Grp.*, 308 F.3d at 213 (agreeing that "a 1000–year history is unnecessary, and that in some cases, largely limited to the criminal context, relatively little history is required," but finding that right of access did not attach to deportation proceedings); *N.Y.C. Transit Auth.*, 684 F.3d at 301 (finding right of access attached to certain state administrative proceedings and emphasizing that it "would come to the same conclusion" regardless of whether those proceedings were the "functional[] equivalent" of criminal proceedings because "the Supreme Court has instructed us to ask not whether the First Amendment was formulated with some particular forum in mind, but whether 'the place and process have historically been open'"). Instead, courts "may be guided by the unique history and function of" the particular proceedings at issue, *First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*, 784 F.2d 467, 472 (3d Cir. 1986), subject to the Supreme Court's instruction that they "look . . . throughout the United States," *El Vocero de Puerto Rico*, 508 U.S. at 150 (citation and internal quotation marks omitted).

37

The district court's analogy between public observers at executions and the jury at a criminal trial was thus off base for two reasons.  First, as described above, there is a well-established tradition of access *to executions* for official witnesses and members of the press.  An unbroken history of "*general access*" to executions is not required to satisfy the experience prong.  *Cf.* A11.  As explained in *California First Amendment Coalition v. Woodford*, the fact that in modern practice "only select members of the public attend" an execution does not erode its public nature because "these official witnesses act as representatives for the public at large."  299 F.3d at 876; *see also Phila. Inquirer*, 906 F. Supp. 2d at 370 (finding experience test was satisfied in light of tradition that official "witnesses were still invited to view the entirety of the hanging" even after abolition of fully public executions).

Second, in acting as representatives for the public in this capacity, official witnesses, unlike jurors in criminal trials, vindicate the public's First Amendment right of access to execution proceedings.  Analogizing official witnesses to executions to jurors in criminal trials is thus inapt because a trial by jury vindicates a different constitutional interest—namely, a defendant's Sixth Amendment right to be judged by peers.  *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) (differentiating between purpose of jury and impact of other public observers).  To serve those interests, jurors are forbidden from discussing ongoing trials with the public and may even be sequestered.  *See, e.g.*, *Hall v. Zenk*, 692 F.3d 793, 807 (7th

Cir. 2012) (remanding case for determination on whether extraneous information that reached the jury prejudiced defendant's fair trial rights). Thus, as the *Richmond Newspapers* plurality opinion made clear, the presence of a jury at a criminal trial does not substitute for public access to those proceedings. 448 U.S. at 572 ("[T]he community did not surrender its right to observe the conduct of trials."). By contrast, laws and policies that grant access to execution proceedings by official witnesses are more akin to the "reasonable restrictions on general access" that traditionally apply in criminal trials, "including preferential seating for media representatives," *see id.* at 581 n.18—they are by no stretch evidence that the public's right of access has been foreclosed. Laws or policies that permit a small group of journalists to observe executions confirm that the press functions "as surrogates for the public" so that they may "report what people in attendance have seen and heard" in scenarios where more general access may be impractical. *See id.* at 573.

The district court's reliance on *Holden v. Minnesota*, 137 U.S. 483 (1890), was also misplaced. In *Holden*, the Governor of Minnesota issued a warrant to execute a man convicted of murder and sentenced to death. The warrant commanded the local sheriff to comply with a newly enacted statute that required condemned inmates to be kept in solitary confinement. 137 U.S. at 484–86. The man argued— unsuccessfully; there was no evidence that he had actually been subject to solitary confinement—that the warrant violated his constitutional due process rights because

it imposed an *ex post facto* punishment for his crime. *Id.* at 490–91. In *dicta*, the Court noted that other sections of the new law also did not affect Holden's substantive due process rights, *id.* at 491, including a provision preventing any "newspaper reporter or representative" from attending the execution and prohibiting any "account of the details of such execution, beyond the statement of the fact that [the] convict was on the day in question duly executed according to law" from being "published in any newspaper," *id.* at 486. Whether those press-focused provisions violated the First Amendment rights of the press or public was not a question before the Court, nor was it one on which the Court opined. *See id.* at 491; *see also Woodford*, 299 F.3d at 875 n.3 (discussing *Holden*). Certainly, under modern jurisprudence a provision that prohibited newspapers from publishing any account of executions would face virtually insurmountable constitutional scrutiny. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 720–21 (1931); *Bridges v. California*, 314 U.S. 252, 263 (1941); *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam); *Worrell Newspapers of Ind., Inc. v. Westhafer*, 739 F.2d 1219 (7th Cir. 1984) (holding that an Indiana statute that prohibited members of the public from truthfully disclosing the name of a person charged via sealed indictment was unconstitutional).

*Holden* has little relevance to the question presented here because (i) Minnesota abolished the death penalty just twenty years later, *see infra* pp. 44–45; (ii) it was decided well before *Richmond Newspapers* and its progeny; and (iii) in

the century that followed, nearly all jurisdictions confirmed and protected public and press access to executions, *see supra* pp. 32–35.  In short, this single example of a law restricting access to executions passed 135 years ago is not probative of the experience prong of *Press-Enterprise II*.  *Cf. Detroit Free Press*, 303 F.3d at 700 (finding that regulation creating a presumption of access to deportation proceedings dating back to 1965 sufficient to establish tradition of access); *N.Y.C. Transit Auth.*, 684 F.3d at 302 (finding that presumption of openness with roots in proceedings dating back to 1966 was sufficient to establish tradition of access).

**B.    Permitting neutral observers at executions enhances their function, satisfying the logic prong.**

The Media Coalition also demonstrated a likelihood of success on the merits of the logic prong of *Press-Enterprise II*.  Press and public observers at executions are a significant positive factor because their presence helps ensure that executions are competently and humanely administered, "provid[es] an outlet for community concern, hostility, and emotion," *Richmond Newspapers*, 448 U.S. at 571 (plurality opinion), and facilitates the deterrent goal of the death penalty.  Contrary to the district court's characterization, these interests do not "confus[e] policy goals with constitutional requirements."  A12.  Instead, they demonstrate that disinterested public observers enhance the function of execution proceedings, as required under *Press-Enterprise II*.

41

First, public and press access to executions contributes to the functioning of those proceedings by ensuring that they are competently and humanely administered. In this way, much like public access to criminal trials "creates accountability, minimizing judicial error and misconduct, and thus benefits the litigants, defendants and society as a whole," *B.H. v. McDonald*, 49 F.3d 294, 301 (7th Cir. 1995), access to executions provides a check on the activities of prison officials involved in the execution process as well as the condemned themselves. This function is particularly important in light of the Eighth Amendment's guarantee against cruel and unusual punishment. "An informed public debate is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" *Woodford*, 299 F.3d at 876 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Without access to execution proceedings, neither the public nor the courts have any ability to evaluate how Indiana's executions are administered at all. *See* ECF 20-11, Nye Decl. ¶¶ 26–27 ("Without being there to witness the execution in some way, we will not know how Mr. Ritchie spends the last moments of his life. . . . The public will be left with only questions[.]"). That includes a lack of reliable, independent factual information about whether the state's lethal injection protocol is "administered as intended" in a particular case or in the majority of cases such to create an "objectively intolerable" risk of pain, considerations which the Supreme Court has

recognized as directly relevant to the Eighth Amendment analysis. *See Baze v. Rees*, 553 U.S. 35, 62 (2008) (citation omitted) (rejecting challenge to Kentucky's lethal injection protocol under objectively intolerable risk framework).

Historical accounts of executions in Indiana demonstrate that first-person reporting from independent observers would illuminate issues with IDOC's processes that accounts from IDOC officials and/or witnesses related to the condemned individual or their victim simply will not. In 1985, Indiana executed William Vandiver by electrocution. ECF 9, Compl. ¶ 28. Contemporaneous news reporting relied on the account of a prison doctor, who stated that after an initial administration of 2,300 volts, "[t]he current was applied three more times before [Vandiver] was pronounced dead 17 minutes later." *Man Who Murdered His Father-in-Law Executed in Indiana*, N.Y. Times (Oct. 17, 1985), https://perma.cc/3WE9-GCYZ. Vandiver's attorney, who witnessed the execution, called the proceeding "outrageous," and a spokesperson for IDOC said the execution "did not go according to plan," but few other details were made available to the public. *Id.* Similarly, in 1996, Indiana executed Tommy Smith by lethal injection. ECF 9, Compl. ¶ 29. Contemporaneous reporting relied on the account of an Indiana State Prison spokesperson who conveyed that "the primary procedure of putting a catheter in two of the prisoner's extremities could not be completed, so a catheter had to be put in Smith's foot. [The spokesperson] said the procedure caused a 35-minute delay."

*Indiana Executes Cop Killer*, United Press Int'l (July 18, 1996), https://perma.cc/P6ZS-X3F2.  Again, few other details could be publicly reported because of the absence of disinterested public observers.

Relatedly, much like public access to criminal trials "foster[s] more accurate fact finding," *Grove Fresh Distribs.*, 24 F.3d at 897, press and public observers at executions foster more accurate information about those proceedings, thereby informing both public debate about the death penalty itself and the implementation of that punishment.  In-person reporting has a compounding positive effect on the reliability and depth of coverage of execution proceedings, as it "gives a reporter both facts about the current situation and a base of knowledge for the next time they witness and report on an execution."  ECF 20-4, Tareen Decl. ¶ 32.  Reporters who cover multiple executions "know what to look for, what is usual and what is unusual.  They can pick up on nuances and report this information objectively to the public." *Id.* ¶ 33.  Allowing media access ensures multiple witness accounts for more complete reporting.  ECF 20-10, Runevitch Decl. ¶ 16.  Consistent, mandatory access for the press "promote[s] the public perception of fairness and transparency concerning the death penalty, which can only be achieved by permitting full public view of the execution." *Phila. Inquirer*, 906 F. Supp. 2d at 371.

Press and public observation of executions also informs debate about capital punishment policy, which can lead directly to legislative action.  In Arizona, for

44

example, media witness accounts of the "gruesome" prolonged death of a man executed by gas chamber in 1992 prompted the state to adopt lethal injection as its execution method.  Bob Baker & Laura Laughlin, *Arizona Executes Killer; State Gripped by Grisly Accounts*, L.A. Times (Apr. 7, 1992), https://perma.cc/M6VA-YYMN; *Gruesome Death in Gas Chamber Pushes Arizona Toward Injections*, N.Y. Times (Apr. 25, 1992), https://perma.cc/CP4H-ETP5.  And in 1906 in Minnesota, members of the media reported on the botched hanging of William Williams, which lasted fourteen minutes.  Ben Welter, *Feb. 13, 1906: Minnesota's Last Execution*, Minn. Star Trib. (May 1, 2014), https://perma.cc/WLJ7-2RTS.  These reports "ignited a movement . . . to abolish capital punishment" in the state, and governors commuted every death sentence imposed in Minnesota until the death penalty was abolished by the legislature five years later.  Bessler, *supra*, at 364 & n.42.

Permitting public observers at executions also promotes the intended deterrent effect of that punishment.  The death penalty has been said to "serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders."  *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (plurality opinion); *Kennedy v. Louisiana*, 554 U.S. 407, 420, *as modified* (Oct. 1, 2008) ("[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution.").  While the deterrence rationale has been subject to significant public debate, it is self-evident that public and press access to

executions increases their salience, thereby contributing to any such deterrent effect. *See* Cass R. Sunstein & Adrian Vermeule, *Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs*, 58 Stan. L. Rev. 703, 711–16 (2005) (surveying empirical studies on deterrence rationale and noting that, at least as a theoretical matter, "[i]f executions are highly salient and cognitively available, some prospective murderers will overestimate their likelihood, and will be deterred as a result").

Finally, public access to executions has a cathartic effect similar to public trials by "serv[ing] an important prophylactic purpose, [and] providing an outlet for community concern, hostility, and emotion." *Richmond Newspapers*, 448 U.S. at 571 (plurality opinion). This, in turn, "promote[s] community respect for the rule of law." *Grove Fresh Distribs.*, 24 F.3d at 897. "Although this may reflect the dark side of human nature . . . the public must be permitted to see justice done[.]" *Woodford*, 299 F.3d at 877. Benjamin Ritchie, for example, was convicted of murder and sentenced to death in 2002 after shooting a police officer, William Toney. *Ritchie*, 254 N.E.3d at 1064–65. Both Ritchie and officer Toney were part of the Indianapolis community. ECF 20-11, Nye Decl. ¶ 20. "When a shocking crime occurs," such as that one, "no community catharsis can occur if justice is done in a corner [or] in any covert manner." *Richmond Newspapers*, 448 U.S. at 571 (plurality opinion) (citation and internal quotation marks omitted).

46

In sum, the district court's application of the experience and logic factors contradicted this Court's instruction that "[t]he difficulties inherent in quantifying the First Amendment interests at issue require that we be firmly convinced that disclosure is inappropriate before arriving at a decision limiting access. Any doubts must be resolved in favor of disclosure." *Grove Fresh Distribs.*, 24 F.3d at 897 (citing *In re Cont'l Ill. Sec. Litig.*, 732 F.2d at 1313). Accordingly, the district court's order denying the Media Coalition's preliminary injunction motion should be vacated and remanded for consideration of whether Indiana is likely to meet its constitutional burden. While the district court did not reach that issue in its decision, the Media Coalition does not anticipate that Indiana will be able to make that demonstration. *See* ECF 20, Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 15–17 (arguing that Indiana cannot carry its burden).

## III. The district court erred by failing to apply strict scrutiny to determine whether Section 6(a) and ISP 06-26 infringe the Media Coalition's rights under the Press Clause of the First Amendment.

The district court failed to evaluate whether Section 6(a) and ISP 06-26, as applied to the Media Coalition, are likely to satisfy strict scrutiny. Its holding that Indiana need not satisfy that standard was based on its reasoning that the First Amendment provides no "special right of access" to government information. A8, A13–A14. But the Media Coalition did not allege that it has a broad "right of access" to government "information." *See id.* Instead, it alleged that Indiana's

restrictions on access infringe the specific, Press Clause-protected newsgathering identified in *Richmond Newspapers*, leave no meaningful alternative for the press to perform that function, and apply in a manner not generally applicable to all members of the public.  ECF 9, Compl. ¶¶ 69–76.  This confluence of factors signals that Section 6(a) and ISP 06-26 pose more than an incidental burden on press freedom and require the application of strict scrutiny.  *ACLU*, 679 F.3d at 600 (holding that a statute that "interferes with the gathering and dissemination of information about government officials performing their duties in public . . . burdens speech and press rights and is subject to heightened First Amendment scrutiny").  The district court erred by failing to hold Indiana to that constitutional standard.

> **A.    Section 6(a) and ISP 06-26 deny the press, including the Media Coalition, any meaningful way to conduct constitutionally protected newsgathering.**

The Media Coalition consists of members of the press who seek to fulfill a core press function—attending and reporting on Indiana's most severe criminal sanction, ECF 9, Compl. ¶¶ 17–22, 48—and the state of Indiana is constitutionally prohibited from "abridging" their free exercise of that function.  U.S. Const. amend. I.  "The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, to play an important role in the discussion of public affairs."  *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (internal citation omitted).  "When the Constitution was proposed

without an explicit guarantee of freedom of the press, the Antifederalists objected. . . . The concerns voiced by the Antifederalists led to the adoption of the Bill of Rights," *Minneapolis Star & Trib. Co.*, 460 U.S. at 584, and the First Amendment protection for "freedom . . . of the press," U.S. Const. amend. I.

In *Richmond Newspapers*, a plurality of the Court concluded that the constitutional protection for observing the affairs of government derived in part from the Press Clause. 448 U.S. at 580. As Chief Justice Burger wrote, "in the context of trials . . . the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted." *Id.* at 576; *id.* at 582–83 (Stevens, J., concurring) ("Today . . . for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgment of the freedoms of speech *and of the press* protected by the First Amendment." (emphasis added)). In a concurring opinion, Justice Stewart also wrote that press rights were at issue, because "every courtroom has a finite physical capacity," and in cases where space is limited, "representatives of the press must be assured access." *Id.* at 600 & n.3 (Stewart, J., concurring).

The restrictions on press access in this case share two crucial similarities with those in *Richmond Newspapers*. As with the Virginia statute that permitted closure of criminal trials, Section 6(a) and ISP 06-26 provide the government with the

authority to (i) *entirely* exclude the press from (ii) a discrete and observable government process. Taken together, these factors mean that the press has no reasonable alternative means of exercising its constitutionally protected newsgathering function.

The complete lack of access for the press in Section 6(a) and ISP 06-26 makes this case distinguishable from *John K. MacIver Institute for Public Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021), and other cases involving preferential or discriminatory treatment *between* certain members of the press who seek to attend government briefings. *Cf.* A13 (citing *MacIver Institute*). In *MacIver Institute*, two reporters from a think tank's news arm asserted that the Press Clause required the governor of Wisconsin to let them attend a press event held in his offices. The governor's press office had invited a small group of press representatives but excluded the two reporters based on a set of content-neutral criteria. 994 F.3d at 608. To determine whether the government was permitted to exclude the reporters based on those criteria, the Court applied public forum analysis; that doctrine is not press-specific, but rather used to determine "[t]he amount of access to which the government must give the public for First Amendment activities, and the standards by which a court will evaluate limitations on those rights." *Id.* at 609. The Court pointed out that permitting a party to invoke newsgathering rights under the Press Clause when the government has already provided other members of the press with

the access sought "is really an argument that any restriction on someone acting as a member of the press must be subject to strict scrutiny." *Id.* at 612. As the Court held, "no one's needs would be served if the government were required to allow access to everyone or no one at all." *Id.* at 614. In other words, public forum analysis controls claims that assert "'equal access' among members of the media." *Id.* at 612. But the same need for a limiting principle is not implicated in cases like *Richmond Newspapers*, and this case, where the press has no access at all.

The discrete and observable nature of executions distinguishes this case from *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937 (7th Cir. 2015), and other cases adjudicating whether the press has a constitutional right to information under government control. In *Dahlstrom*, the Court upheld the constitutionality of the federal Driver's Privacy Protection Act, which in relevant part prohibited "knowingly obtaining an individual's personal information from motor vehicle records." 777 F.3d at 949. The holding relied on the Court's insight that "the DPPA's prohibition on the acquisition of personal information" only cut off "a single, isolated source" for obtaining that information. *Id.* at 948. For that reason, the Court wrote, "[i]t can hardly be said that this targeted restriction renders Sun-Times's right to publish the truthful information at issue here—much of which can be gathered from physical observation . . . or from other lawful sources . . . —'largely ineffective.'" *Id.* (quoting *ACLU*, 679 F.3d at 595). Indeed, the Court noted several

other ways that the personal information controlled by the government might be obtained, including through a state public records request or through personal observation at a traffic stop. *Id*. The circumstance in *Dahlstrom* is thus distinguishable from the restrictions Section 6(a) and ISP 06-26 impose on press access to executions—there is a vast difference between a restriction on a discrete government process like an execution and a restriction on information controlled by the government; restricting access to the former kneecaps newsgathering in a way that the latter often does not.

For the same reasons, this is not a claim controlled by *Pell v. Procunier*, 417 U.S. 817 (1974). *Cf.* A13. In *Pell*, the fact that the government controlled "information" sought by the press that could be obtained through other means informed the Supreme Court's analysis. When "the press and the general public are accorded full opportunities to observe prison conditions," the Constitution does not "impose[] upon government the affirmative duty" to provide the press with additional "sources of information"—specifically, interviews with prisoners—if that opportunity is "not available to the public generally." *Pell*, 417 U.S. at 830, 833–35 (citation omitted). A challenge to the constitutionality of a California law restricting press interviews with prisoners was therefore unsuccessful. *Id.* at 835. In short, the Supreme Court made clear that the restrictions on government-controlled

information in *Pell* did not actually prevent the press from conducting its constitutionally protected newsgathering.

*American Civil Liberties Union of Illinois v. Alvarez* ("*ACLU*") provides an illustrative contrast with *Dahlstrom* and *Pell*. In *ACLU*, the Court held that an Illinois law that prohibited making audio recordings of police officers performing their duties in public triggered First Amendment scrutiny under both the Speech and Press Clauses. 679 F.3d at 586–87. "The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Id.* at 595. The case was distinguishable from and not controlling over *Dahlstrom* because the statute at issue in *ACLU* left no alternative means for newsgathering. *Dahlstrom*, 777 F.3d at 948. While the restriction in *Dahlstrom* would not stop the press from reporting information obtained through other means, "the Illinois eavesdropping statute operated as a total ban on recording police officers' activities." *Id.* The restriction in *ACLU* implicated "expression commonly used for the preservation and dissemination of information and ideas. . . . Any way you look at it, the eavesdropping statute burdens speech and press rights and is subject to heightened First Amendment scrutiny." *ACLU*, 679 F.3d at 595, 600.

53

**B.      Section 6(a) and ISP 06-26 are not generally applicable.**

Section 6(a) and ISP 06-26 have a more than incidental effect on newsgathering, as they amount to a total ban over access to a discrete government process that cannot be observed through other channels.  And Section 6(a) and ISP 06-26 present more than an incidental burden on the Media Coalition's rights under the Press Clause for another reason: they are not generally applicable.[13]

When a law "does not target or single out the press," it does "not offend the First Amendment simply because [its] enforcement against the press has incidental effects on its ability to gather and report the news."  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669–70 (1991); *see, e.g.*, *Associated Press v. NLRB*, 301 U.S. 103, 130–31 (1937) (holding that the National Labor Relations Act does not abridge the freedom of the press).  However, laws that have a more than incidental effect on press freedom, including laws that *do* target or single out the press, cannot avoid

---

[13]      This section ultimately seeks to answer the same question as the last—whether Section 6(a) and ISP 06-26 pose more than an "incidental" burden on newsgathering. In fact, under this Court's caselaw, the general applicability analysis in this section may even be superfluous, because even "enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment." *ACLU*, 679 F.3d at 602 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640 (1994)).  The Court in *ACLU* held that "[w]hen the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play." *Id.* at 602.  In such cases, the restriction on First Amendment rights is said to be "direct[]," not "incidental[]," and constitutional scrutiny may apply even without a demonstration that the law is not generally applicable. *Id.* at 602–03.

constitutional scrutiny under this principle.[14] "[L]aws that single out the press, or certain elements thereof, for special treatment 'pose[] a particular danger of abuse by the State,' and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys.*, 512 U.S. at 640–41 (quoting *Ark. Writers' Project*, 481 U.S. at 228); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760–61 (1988) (ordinance regulating placement of newspaper racks was subject to constitutional scrutiny, as distinguished from a law of general applicability governing the placement of soda machines because "[n]ewspapers are in the business of expression, while soda vendors are in the business of selling soft drinks"); *Minneapolis Star & Trib. Co.*, 460 U.S. at 582 ("By creating this special use tax, which, to our knowledge, is without parallel in the State's tax scheme, Minnesota has singled out the press for special treatment. We then must determine whether the First Amendment permits such special taxation.").

---

[14]     Laws that are not "neutral" with respect to different members of the press that are performing the same activity also do not avoid constitutional scrutiny. *See, e.g.*, *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 222, 223, 234 (1987) (holding that "a state sales tax scheme that taxes general interest magazines, but exempts newspapers and religious, professional, trade, and sports journals, violates the First Amendment's guarantee of freedom of the press"). Neutrality among and between members of the press might be analyzed under public forum doctrine, *e.g.*, *MacIver Inst.*, 994 F.3d at 608–12, or through the lens of whether the regulation is content neutral, *e.g.*, *Ark. Writers' Project*, 481 U.S. at 230–31. But here, all members of the press are equally restricted from observing executions by Section 6(a) and ISP 06-26.

"[D]ifferential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Minneapolis Star & Trib. Co.*, 460 U.S. at 585. The most analogous recent Supreme Court decisions to review whether a law restricting First Amendment activity is "generally applicable" are two challenges to COVID-19 restrictions brought by religious organizations, *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021), and *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). In those cases, the Supreme Court held that when an exception to a law is made for a secular group, or for members of the public who are not exercising First Amendment activity—in *Tandon*, religious exercise—that law cannot be said to be generally applicable. Instead, the court must consider "the asserted government interest that justifies the regulation at issue," *Tandon*, 593 U.S. at 62, and whether the risk presented by providing an exception to a group not specifically protected by the First Amendment is justifiable under a strict scrutiny analysis, *id.* at 64–65 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). Importantly, this analysis is not changed by the fact that members of the public not named in the regulation are also treated as disfavorably as those exercising their First Amendment rights. Rather, strict scrutiny should be applied in either situation. *Id.* at 62, 64–65; *Fulton*, 593 U.S. at 533.

Indiana excepts certain individuals from its law and policy of closing executions. Specifically, friends and relatives of the condemned, the spiritual advisor of the condemned, the prison chaplain, and relatives of the victim are all permitted to observe the process. Ind. Code § 35-38-6-6(a). Moreover, ISP 06-26 explicitly singles out the press for disfavorable treatment, stating "Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber." A18 § C.3. Accordingly, the district court erred by failing to apply strict scrutiny to Section 6(a) and ISP 06-26. As with Indiana's burden of overcoming the qualified right of access, the district court did not reach this issue; again, the Media Coalition does not believe that is a showing Indiana can make. ECF 20, Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 19–20.

# CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order denying the Media Coalition's motion for preliminary injunction and remand for reconsideration under the applicable constitutional standards.

Dated:  July 28, 2025

Respectfully submitted,

*/s/ Lin Weeks*
Lin Weeks
    *Counsel of Record*
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
lweeks@rcfp.org

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
P.O. Box 150
Fishers, IN 46038
(463) 271-4676
kcundiff@rcfp.org

*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Cir. R. 32(c) because

it contains 13,667 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Cir. R. 32(b) and Fed.

R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6)

because it has been prepared in a proportionally spaced typeface using Microsoft

Word in 14-point Times New Roman.

Dated:  July 28, 2025                          */s/ Lin Weeks*_____
                                                       Lin Weeks
                                                            *Counsel of Record*
                                                       REPORTERS COMMITTEE FOR
                                                            FREEDOM OF THE PRESS

# REQUIRED SHORT APPENDIX

Pursuant to Circuit Rule 30(d), Appellants submit the following Appendix,

which contains all of the materials required under Circuit Rule 30(a)–(b).

Dated:  July 28, 2025                  */s/ Lin Weeks*_____
                                       Lin Weeks
                                         *Counsel of Record*
                                       REPORTERS COMMITTEE FOR
                                         FREEDOM OF THE PRESS

**No. 25-2025**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

_____

**THE ASSOCIATED PRESS,
STATES NEWSROOM d/b/a Indiana Capital Chronicle,
GANNETT CO., INC., CIRCLE CITY BROADCASTING I, LLC, and
TEGNA INC.,**

*Plaintiffs-Appellants*,

v.

**RON NEAL and LLOYD ARNOLD** *in their official capacities*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:25-cv-00872-MPB-MJD
Hon. Matthew P. Brookman, U.S. District Judge

_____

**APPELLANTS' REQUIRED SHORT APPENDIX**

_____

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
P.O. Box 150
Fishers, IN 46038
(463) 271-4676
kcundiff@rcfp.org

Lin Weeks
  *Counsel of Record*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
lweeks@rcfp.org

## TABLE OF CONTENTS

Order Denying Plaintiffs' Motion for Preliminary Injunction (ECF 36) ...............A1

Complaint, Ex. A – Indiana State Prison Facility Directive ISP 06-26:
Execution of Death Sentence (June 17, 2024) (ECF 9-1) ...................................A15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE ASSOCIATED PRESS,<br>STATES NEWSROOM d/b/a INDIANA<br>CAPITAL CHRONICLE,<br>GANNETT CO., INC.,<br>CIRCLE CITY BROADCASTING I, LLC,<br>TEGNA INC.,<br><br>           Plaintiffs,<br><br>           v.<br><br>RON NEAL in his official capacity as the<br>Superintendent of Indiana State Prison,<br>LLOYD ARNOLD in his official capacity as the<br>Commissioner of the Indiana Department of<br>Correction,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 1:25-cv-00872-MPB-MJD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

      Plaintiffs The Associated Press, States Newsroom d/b/a Indiana Capital Chronicle,

Gannett Co., Inc., Circle City Broadcasting I, LLC, and Tegna Inc. (collectively, "Plaintiffs") are

media outlets that report on aspects of Indiana's law enforcement, criminal justice system, and

correctional institutions, including execution proceedings. On May 5, 2025, Plaintiffs sued

Defendants Ron Neal and Lloyd Arnold (collectively, "Defendants"), bringing a First

Amendment challenge to the constitutionality of a provision under Indiana law—as applied to

them—that prohibits Plaintiffs from observing a forthcoming execution in Indiana. (Docket No.

1). At issue is Plaintiffs' Motion for Preliminary Injunction (Docket No. 19). For the reasons that

follow, Plaintiff's Motion (Docket No. 19) is **DENIED**.

## I.      Background

Plaintiffs are a collection of newspapers and digital news media networks. (Docket No. 9 at ECF pp. 2–3). They publish newspapers such as the Associated Press, the Capital Chronicle, and the Indianapolis Star, and broadcast on networks including WISH-TV and WTHR-13. (*Id.*). While Plaintiffs seek an injunction that would allow them to attend and observe all executions carried out by the state of Indiana for the duration of this case, the only execution presently scheduled is that of Benjamin Ritchie. (*Id.* at ECF p. 12). Plaintiffs have reported on Ritchie's legal process, including his pending execution and requests for judicial intervention. (*Id.* at ECF pp. 4–5). Plaintiffs intend to send a reporter to witness and report on the execution of Ritchie but claim that their "proposed course of conduct" is prohibited by Indiana Code § 35-38-6-6(a) and Defendants' corresponding implementing policy ("ISP 06-26"). (*Id.* at ECF pp. 7, 12). The Indiana Supreme Court scheduled Richie's execution for May 20, 2025. (*Id.* at ECF p. 12). The execution will take place at the Indiana State Prison in Michigan City, Indiana. (*Id.* at ECF p. 10).

Defendant Ron Neal is the Superintendent of Indiana State Prison. (*Id.* at ECF p. 3). Defendant Lloyd Arnold serves as the Commissioner of the Indiana Department of Corrections ("IDOC"). (*Id.*). Plaintiffs allege that Defendant Arnold "is authorized to adopt rules and regulations governing execution protocols," and that Defendant Neal is tasked with "administer[ing]" Indiana Code and the regulations set forth by the IDOC. (*Id.* at ECF pp. 3–4).

Plaintiffs contend that Indiana is one of only two states that do not allow for media members to witness an execution. (*Id.* at ECF p. 6). Indiana law specifies which people may be present at an execution. That list is limited to:

(1) The warden of the state prison.

(2) The person designated by the warden of the state prison and any assistants who are necessary to assist in the execution.

(3) The prison physician.

(4) One (1) other physician.

(5) The spiritual advisor of the convicted person.

(6) The prison chaplain.

(7) Not more than five (5) friends or relatives of the convicted person who are invited by the convicted person to attend.

(8) Except as provided in subsection (b), not more than eight (8) of the following members of the victim's immediate family who are at least eighteen (18) years of age:

> (A) The victim's spouse.
>
> (B) One (1) or more of the victim's children.
>
> (C) One (1) or more of the victim's parents.
>
> (D) One (1) or more of the victim's grandparents.
>
> (E) One (1) or more of the victim's siblings.

Ind. Code § 35-38-6-6(a). Media members may gain access to the proceeding by qualifying under one of those listed categories. Practically, that limits members of the media to being one of the five friends or relatives designated by the convicted person. Such was the case when Casey Smith, a journalist for the Capital Chronicle, was chosen by Joseph Corcoran to be present at his execution in 2024. (Docket No. 9 at ECF p. 10). According to Defendant Neal, Benjamin Ritchie has not invited any of Plaintiffs' reporters to attend his execution. (Docket No. 34-1 at ECF p. 5).

The IDOC devised and implemented regulations to carry out executions in accordance with Indiana Code. (Docket No. 9-1 at ECF p. 2). Relevant here, ISP 06-26 contains rules concerning news media. (*Id.* at ECF p. 4). The regulation states that a staff member shall "assist the State Prison in the coordination of media communications." (*Id.*). Representatives of media companies are granted access to a "designated area" and must remain in that area during the execution. (*Id.*). Moreover, "[m]edia personnel shall not be permitted to witness the execution or

3

**A3**

to be in the Execution Chamber. The only exception to this rule is if the offender requests . . .

that a member or members of the media be present" as one of their five chosen witnesses. (*Id.*).

During the 2024 execution of Corcoran, Indiana State Prison officials did not let Plaintiffs and

other members of the media, other than Ms. Smith, inside the prison. (Docket No. 9 at ECF p.

10). Instead, they covered the execution from a parking lot outside the Indiana State Prison

facility. (*Id.*).

Plaintiffs filed their Complaint on May 5, 2025. (Docket No. 1). They filed a Motion for

Preliminary Injunction (Docket No. 9) on May 12, 2025. The parties appeared for an emergency

hearing on May 16, 2025. Plaintiffs were represented by attorneys Lin Weeks, Elizabeth Soja,

and Kristopher Cundiff. Defendants were represented by attorneys Jefferson Garn, Brandyn

Arnold, and Thomas Pratt. Plaintiffs seek a preliminary injunction allowing up to four members

of the press to attend the execution of Benjamin Ritchie on May 20, as well as other executions

carried out by IDOC that are scheduled before this case is decided on the merits.[1]

## II.     Legal Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only

when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir.

2015). Plaintiffs, as the moving parties, must establish that they are "likely to succeed on the

merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Ill.*

---

[1] During the Preliminary Injunction hearing, the Court asked Plaintiffs to clarify the exact relief they are seeking. While they did provide some additional clarity, the Court retains serious questions as to the shape and scope of the injunctive relief requested. (*See* Preliminary Injunction Hearing Transcript at ECF pp. 59–61). Would these media members take the place of the victim's family? Or are they added in addition to those permitted by Indiana statute? And what exactly would they be permitted to see? The ambiguity as to Plaintiffs' requested relief hamstrings this Court, particularly in light of the tight timeframe in which it has to rule on Plaintiffs' Motion. Nonetheless, the Court decides their Motion under the traditional preliminary injunction framework.

*Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). In First Amendment cases, such as this one, "the likelihood of success on the merits will often be the determinative factor." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012).

### III.  Discussion

Plaintiffs bring two as applied challenges under the First Amendment. First, they argue that they have a qualified First Amendment right to view executions under *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) and its progeny. Second, Plaintiffs argue that Indiana Code § 35-38-6-6(a) and ISP 06-26 violate the Press Clause of the First Amendment because members of the media are treated differently than members of the public. The Court begins and ends its analysis with the likelihood of success on the merits. That analysis is determinative of both claims.[2]

### A.  Right of Access to Execution Proceedings

#### 1.  *The* Press–Enterprise II *Framework Does Not Apply*

As a foundational principle, the First Amendment's protection of the press has "traditionally focused on the right of the press to publish information without government restraint . . . rather than on the acquisition of the information in the first place." *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965). While the process of gathering news is afforded certain First Amendment protections, *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972), the First Amendment "as a general proposition, does not afford the press a special right of access not available to the public generally." *Oklahoma Observer v. Patton*, 73 F.Supp.3d 1318, 1323 (W.D. Okla. 2014)

---

[2] Defendants argue that the timing of Plaintiffs' Motion for Preliminary Injunction, just days before an execution is scheduled, merits a denial of Plaintiffs' request on the equities. They cite *Ramirez v. Collier*, 595 U.S. 411, 434 (2020), for the proposition that "a party's inequitable conduct can make equitable relief inappropriate," particularly where there are "last-minute claims arising from long-known facts." While Plaintiffs' choice of timing is perplexing here, the Court reaches its conclusion by looking to the likelihood of success on the merits alone.

(citing *Houchins v. KQED, Inc.*, 438 U.S. 1, 15–16 (1978) (plurality opinion)). *See also Pell v. Procunier*, 417 U.S. 817, 834 (1974) ("[N]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public.").

But the Supreme Court has recognized circumstances where the press has a right to access certain proceedings. That process started in *Richmond Newspapers*, where the Court held that the First Amendment implicitly guarantees the press a right of access to criminal trials. 448 U.S. at 574. The Court arrived at that conclusion by observing the "unbroken, uncontradicted history" of public access to criminal trials, such that a "presumption of openness inhere[s] in the very nature of a criminal trial under our system of justice." *Id.* Thus, it found that the right of the public and press to attend criminal trials is guaranteed under the First Amendment. *Id.* The Court expanded that right of access to other aspects of the criminal adjudication process in subsequent cases. *See, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) (testimony of a child victim); *Press–Enter. Co. v. Superior Court*, 464 U.S. 501, 510–11 (1984) (*Press–Enterprise I*) (voir dire examinations); *Press–Enter. Co. v. Superior Court*, 478 U.S. 1, 8–9, (1986) ("*Press–Enterprise II*") (preliminary hearings).

In *Press–Enterprise II*, the Supreme Court laid down "two complimentary considerations" to help courts determine whether a "right of access" attaches to a "criminal proceeding." 478 U.S. at 8. First "whether the place and process have historically been open to the press and general public." *Id.* This is commonly referred to as the "experience" consideration. *Id.* at 9. Second, "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 8. This is the "logic" consideration. *Id.* at 9. "If the particular proceeding in question passes these tests of experience and logic, a qualified First

Amendment right of public access attaches." *Id.* Here, Plaintiffs argue that executions are the sort
of proceeding to which this framework should apply, and that if it applies, both tests are satisfied.

The Seventh Circuit has applied the twin considerations recognized in *Press–Enterprise
II* to contexts beyond criminal proceedings. Indeed, it has characterized that case as supplying
"the framework for analyzing restrictions on the press's right of access to *court proceedings* and
documents." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1070 (7th Cir. 2018) (emphases
added). As such, the Seventh Circuit has held that there is a right of access to sentencing
hearings, *United States v. Eppinger*, 49 F.3d 1244 (7th Cir. 1995), plea hearings, *United States v.
Danovaro*, 877 F.2d 583 (7th Cir. 1989), and civil proceedings, *In re Continental Ill. Sec. Litig.*,
732 F.2d 1302 (7th Cir. 1984). But the Seventh Circuit has never extended the *Press–Enterprise
II* framework to an event beyond a judicial proceeding, let alone something after the imposition
of a judgment in a case, such as an execution.[3] Thus, there is no binding authority on this Court
that applies this framework to an execution.

To bridge the gap in precedent, Plaintiffs ask this Court to rely on *California First
Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), for the proposition that courts
"have held that the qualified constitutional right of access attaches to execution proceedings."
(Docket No. 20 at ECF p. 9). There, the Ninth Circuit held that "the public enjoys a First
Amendment right to view executions from the moment the condemned is escorted into the
execution chamber" after finding that executions passed the experience and logic test under
*Press–Enterprise II*. 299 F.3d at 877. Of course, out-of-circuit precedent is not binding on this

---

[3] Plaintiffs point to *Wisc. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, where the Seventh Circuit noted that in
certain cases "the public and media often have the right—either by statute or even the Constitution—to attend a
public proceeding like an execution or trial." 658 F.3d 614, 627 (7th Cir. 2011). But that case dealt with the media's
ability to stream video of middle school and high school athletic events. *Id.* at 615–16. At most, the Seventh Circuit's
reference to attendance at executions is dicta about a categorically different scenario that is readily distinguishable
from this case.

Court, though it is entitled to "respectful consideration." *OSF Healthcare Sys. v. Insperity Grp. Health Plan*, 82 F.Supp.3d 860, 865 (C.D. Ill. 2015) (citation and quotations omitted).

In the years following *Woodford*, other district courts have declined to adopt its reasoning.[4] For example, in *Oklahoma Observer*, the court noted its "considerable doubt" that the *Press–Enterprise II* framework "even potentially applies" to an execution. 73 F.Supp.3d at 1324. The court opined that the Supreme Court's rulings in both *Press–Enterprise* cases, as well as *Richmond Newspapers*, suggested that the Supreme Court views the *Press–Enterprise II* framework "as applying to the criminal *adjudication* process rather than to the process of *implementing* a court's judgment, such as is involved" in an execution. *Id.* (emphases in original). The district court noted its skepticism was "consistent with the [Supreme] Court's different treatment of access issues in the prison context, where the implementation of criminal sentences normally occurs." *Id.*

To support that proposition, the court cited to *Houchins*, where the Supreme Court held that "the media have no special right of access" to a prison in the wake of a prisoner's suicide, "different from or greater than that accorded the public generally." 438 U.S. at 16; *see also Pell*, 417 U.S. at 834 ("The Constitution does not . . . require government to accord the press special access to information not shared by members of the public generally."). Thus, the district court concluded that the *Press–Enterprise II* framework "does not extend" to executions as they are "outside the criminal adjudication process." *Oklahoma Observer*, 73 F.Supp.3d at 1325. That

---

[4] The Court also notes that a district court in Pennsylvania granted a preliminary injunction based on the qualified right to public access in an execution case. *Philadelphia Inquirer v. Wetzel*, 906 F.Supp.2d 362, 370 (M.D. Pa. 2012). That case, however, is distinguishable because executions in Pennsylvania do not occur inside penal institutions. *Id.* at 369. Moreover, the Third Circuit had applied the *Richmond Newspapers* line of cases to "administrative proceedings, including executive directives," something the Seventh Circuit has not done. *Id.* at 370.

court ultimately denied the plaintiff's motion for a preliminary injunction based on the qualified right of access theory. *Id.* at 1331.

A district court from Virginia expressed similar doubts about the persuasive value of *Woodford*. In granting a motion to dismiss plaintiff's qualified right of access claim, the court noted that it would be "quite a reach" to look at Supreme Court precedent and apply it to executions "which do not occur in the adjudicatory process." *BH Media Group, Inc. v. Clarke*, 466 F.Supp.3d 653, 662 (E.D. Va. 2020), *vacated and remanded*, 851 F.App'x 386 (4th Cir. 2021) (rendering the case moot after Virginia abolished the death penalty). Stepping out on that limb, in the eyes of the district court, was a decision better left for the Supreme Court, and so the court "decline[d] the invitation to follow *Woodford*[.]" *Id.* This Court will not take that step either, absent authority from the Supreme Court or the Seventh Circuit.

Plaintiffs argue that executions are criminal proceedings that are "initiated under judicial authority" and that carry "hallmarks of other administrative proceedings" codified within the Indiana State Prison's rules and regulations. (Docket No. 20 at ECF p. 7). But that argument ignores the fact that, in Indiana, once a sentence is imposed and a judgment is entered "the custody of the defendant is with the Executive branch, represented by the Department of Corrections . . . not the Judicial branch." *Barnes v. State*, 435 N.E.2d 235, 242 (Ind. 1982). Thus, because an execution is not a "court proceeding[]" as contemplated by the Seventh Circuit. *Courthouse News Serv*, 908 F.3d at 1070, the *Press–Enterprise II* framework does not apply to this case.

### 2.   *Even if* Press–Enterprise II *Applies, Plaintiffs Are Unsuccessful*

Even if *Press–Enterprise II* applies to executions as a threshold matter, executions do not pass the experience and logic test such that a qualified right of access exists.

9

**A9**

First, the experience consideration instructs courts to ask "whether the place and process have historically been open to the press and general public." *Press–Enterprise II*, 478 U.S. at 8. While there has certainly been public access to executions throughout this Nation's history, the scope of that access is not on par with the historical access to other proceedings that have passed the experience test. To be sure, "executions were open to all comers" in the United States in the early 1800s. *See Woodford*, 299 F.3d at 875 (highlighting the history of executions and citing to academic articles). But in the 1830s, "executions in the United States became private events and moved from the public square to inside prison walls." *Arkansas Times, Inc. v. Norris*, No. 5:07-CV-195, 2008 WL 110853, at *4 (E.D. Ark. Jan. 7, 2008) (citing Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 Buff. L.Rev. 461, 557 (1995)). As states started to move executions away from public settings, many chose to "implement[] procedures that ensured executions would remain open to some public scrutiny," often via laws that allowed for "respectable citizens" to be present. *Woodford*, 299 F.3d at 875. For its part, Indiana has conducted executions at the Indiana State Prison since 1897.[5] *See* Dawn Mitchell, *A History of Executions in Indiana*, IndyStar (Dec. 11, 2019), https://www.indystar.com/story/news/2019/12/11/indiana-executions-full-list-peopleexecuted-since-1897/4357164002/. And since at least 1983, Indiana has not provided for media members to be among the people eligible to witness an execution. *See* Ind. Code § 35-38-6-6 (1983).

Plaintiffs contend that "while the history of public access to execution proceedings in Indiana is mixed," the general history of public access to executions satisfies the experience test of *Press–Enterprise II*. This Court is not convinced. Compare the public access to criminal trials,

---

[5] The Court is aware that the experience factor looks to historical practices throughout the United States, rather than to those of the challenged jurisdiction. *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150, (1993). But, "courts have routinely considered the traditions of the state in which the dispute arises." *See Oklahoma Observer*, 73 F.Supp.3d at 1326 n.10 (collecting cases).

a proceeding which certainly passes the test, to executions. While the "town meeting approach to [criminal] trials was supplanted by a twelve-person jury functioning as the public's representatives" in the process, "the community did not surrender its right to observe the conduct of trials." *Oklahoma Observer*, 73 F.Supp.3d at 1327 (citing *Richmond Newspapers*, 448 U.S. at 572). But while many states allowed for some representatives of the public to attend executions, no comparable right of *general access* exists. *See, e.g., Arkansas Times, Inc.*, 2008 WL 110853, at *4 ("[T]he presence of six to twelve citizen witnesses does not transform a private execution into a public proceeding comparable to a criminal trial."). Members of the public cannot attend an execution in the same way that they could walk into a courthouse and observe a trial. Indeed, "the number and character of those who may witness the execution, and the exclusion altogether of reporters or representatives of newspapers . . . are regulations which the legislature, in its wisdom, and for the public good, could legally prescribe in respect to executions[.]" *Holden v. State of Minn.*, 137 U.S. 483, 491 (1890). While *Holden* concerned an *ex post facto* challenge to a state statute, the recognition that a state could regulate attendance at an execution is a good clue that executions do not have the same "unbroken, uncontradicted history" of public access as criminal trials. *Richmond Newspapers*, 448 U.S. at 573. In short, Plaintiffs have not established that public access to executions were part of the same, unbroken and uncontradicted historical tradition in the United States as other proceedings that pass muster under *Press–Enterprise II*.

Second, as to the logic consideration, courts ask "whether public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II*, 478 U.S. at 9. Here, Plaintiffs argue that "enjoining enforcement" of challenged provisions "will help the public evaluate whether Indiana's lethal injection procedure is competently administered and consistent with the Eighth Amendment." (Docket No. 20 at ECF

11

**A11**

p. 13). Perhaps so. But while this argument is appealing, it cannot, standing alone, "serve as a basis for reading a right of public access into the First Amendment." *Arkansas Times, Inc.*, 2008 WL 110852, at *5. After all, the *Press–Enterprise II* framework requires the proceeding to reflect both considerations—experience *and* logic—before a "qualified First Amendment right of public access attaches." 478 U.S. at 9. Courts must guard against confusing policy goals with constitutional requirements. *See Houchins*, 438 U.S. at 13 ("We must not confuse what is good, desirable, or expedient with what is constitutionally commanded by the First Amendment.").

Finally, because this Court finds that Plaintiffs are unable to pass the experience and logic test, it need not determine whether the government interest in closing executions is "essential to preserve higher values and is narrowly tailored to preserve that interest." *Press–Enterprise I*, 464 U.S. at 510.

In sum, Plaintiffs are unlikely to succeed on the merits of their qualified right of access claim. The Court does not believe that an execution is a criminal proceeding to which the *Press–Enterprise II* framework applies. And even if it did apply, there is not a historical tradition of public access to executions sufficient to pass the experience and logic test. Thus, Plaintiffs' request for a preliminary injunction as to their first claim is **DENIED**.

### B. Free Press Clause

Plaintiffs second claim is that Indiana Code § 35-38-6-6 and ISP 06-26 treat members of the media less favorably than some members of the public, and hence they violate the First Amendment. The First Amendment, made applicable to the states through the Fourteenth Amendment, states that "Congress shall make no law . . . abridging the freedom . . . of the press[.]" U.S. CONST. amend. I. The press is protected and assigned "to play an important role in the discussion of public affairs." *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (citation omitted).

The bulk of Plaintiffs' argument attempts to superimpose free exercise of religion caselaw—and the standard for neutral laws of general applicability—onto their rights as members of the press. (*See* Docket No. 20 at ECF pp. 17–18). But their attempt misses the mark, and the only case pertaining to the treatment of the press is unpersuasive. To be sure, the press cannot be "singled out" for differential treatment in a way that burdens their First Amendment rights "unless the burden is necessary to achieve an overriding governmental interest." *Minneapolis Star & Tribune Co. v. Minn. Com'r of Rev.*, 460 U.S. 575, 582 (1983). But that case involved the imposition of a special use tax on ink, a regulation that "singled out the press for special treatment." *Id.* In contrast, the Indiana statute treats members of the press the same as everyone else—they are excluded from attending an execution unless they meet one of the criteria established by the legislature. Ind. Code § 35-38-6-6(a).

The mere fact that *some* narrowly defined members of the public (who may also be journalists) can attend the execution does not mean that the press are singled out for differential treatment. *See Pell*, 417 U.S. at 832 n. 8 (noting that just because the state of California "permitted family, friends, attorneys, and clergy to visit inmates" does not mean that the press is given less access to "engage in face-to-face discourse" than the general public). Defendants characterize Plaintiffs' claim as one seeking "equal access." (Docket No. 34 at ECF p. 19). This Court agrees. But that sort of equal access framework "fails for several reasons." *John K MacIver Inst. For Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2021). One reason is that "reporters are not cloaked with automatic strict scrutiny protection" simply because they are members of the press. *Id.* (quotations omitted). But perhaps more fundamentally, Plaintiffs' contention fails because the First Amendment "'does not guarantee the press a constitutional right

of *special access* to information not available to the public generally.'" *Id.* (quoting *Branzburg*, 408 U.S. at 684) (emphases added).

At bottom, Indiana law treats members of the press the same as members of the public at large. They are not being singled out for disparate treatment, even though Indiana law permits physicians and spiritual advisors to attend executions. Ind. Code § 35-38-6-6(a). And while ISP 06-26 states that "[m]edia personnel shall not be permitted to witness the execution," the prison regulation then states that an exception exists if the media member is among one of the five people invited by the offender. (Docket No. 9-1 at ECF p. 4). Thus, the media can attend the *same way* that members of the public can: through one of the eight designated pathways identified by the General Assembly. Because Plaintiffs' free press clause claim is unlikely to succeed on the merits, their request for a preliminary injunction is hereby **DENIED**.

## IV.    Conclusion

For the reasons stated above Plaintiffs' Motion for Preliminary Injunction (Docket No. 19) is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated:  May 16, 2025

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Served electronically on all ECF-registered counsel of record.

14

**A14**

# Exhibit A

CONFIDENTIAL

INDIANA DEPARTMENT OF CORRECTION

*INDIANA STATE PRISON*
*FACILITY DIRECTIVE*

ISP 06-26:  EXECUTION OF DEATH SENTENCE

A.  **PURPOSE**:

The purpose of this Facility Directive is to establish appropriate guidelines to enable the Indiana State Prison to comply with state statutes governing the administration of the death penalty.

B.  **LEGAL BASIS**:

1.  **EXECUTION OF DEATH SENTENCE; SPECIFIED TIME AND DATE; EXECUTIONER:**

    a.  The punishment of death shall be inflicted by intravenous injection of a lethal substance or substances into the convicted person in a quantity sufficient to cause the death of the convicted person and until the convicted person is dead.

    IC 35-38-6-1(a).

    b.  The Warden of the State Prison, or persons designated by the Warden, shall designate the person who is to serve as the executioner (referred to herein as the "Execution Director").

    IC 35-38-6-1(c).

2.  **PLACE OF EXECUTION OF DEATH SENTENCE:**

    The execution must take place inside the walls of the state prison in a room designed for that purpose.  The department of correction shall provide the necessary room (referred to herein as the "Execution Chamber") and appliances to carry out the execution as provided in this chapter.

    IC 35-38-6-5.

3.  **PERSONS PERMITTED TO BE PRESENT AT THE EXECUTION OF DEATH SENTENCE:**

    a.  Only the following persons may be present at the execution:

        i.   The Warden and any assistants who are necessary to assist in the execution;

1

Revised June 17, 2024

**A16**

ii.     Up to two (2) physicians;

iii.    The spiritual advisor of the convicted person;

iv.    The State Prison Chaplain;

v.     The convicted person may invite up to, but no more than, five (5) relatives or friends to attend;

vi.    Up to eight (8) of the following members of the victim's immediate family who are at least eighteen (18) years of age;

     a.     The victim's spouse.

     b.     One or more of the victim's children.

     c.     One or more of the victim's parents.

     d.     One or more of the victim's grandparents.

     e.     One or more of the victim's siblings.

The offender shall submit a list of witness names and their relationships: (family, friends, and spiritual advisor) to the Warden for approval at least twenty (20) days prior to the execution date.

If there was more than one (1) victim, no more than (8) eight persons who are members of the victims' immediate families may be present at the execution.

If an agreement between the victims' immediate family members cannot be reached, the Warden shall conduct a lottery to determine which members are selected to be present at the execution.

The Warden shall provide a support room for the use of an immediate family member of the victim who is not selected to be present at the execution and persons invited by the immediate family for support. One or more members of the designated Critical Incident Stress Management (CISM) Team shall accompany the individual(s).

The Warden may exclude a person from viewing the execution if it is determined that the presence of the person would threaten the safety and security of the Indiana State Prison. The determination will be provided in writing.

IC 35-38-6-6(a)-(d).

**b.**    The Department of Correction shall keep confidential the identities of persons who assist the Warden of the State Prison in an execution and may classify as confidential and withhold from the public any part of a document relating to an execution that would reveal the identity of a person who assists the Warden in the execution.

IC 35-38-6-6(e).

2

**A17**

**C.**    **NEWS MEDIA**:

1.    The Commissioner or their designee shall designate a Central Office staff person to assist the State Prison in the coordination of media communications. The designated Central Office staff person shall be present at the State Prison to assist with the media during the period preceding the execution. Additionally, the Warden shall designate a staff person to assist with coordinating media activities.

2.    Authorized and properly identified representatives of the news media shall be permitted access to a designated area. Media personnel must remain in the designated area until the execution has been completed. The Warden or designee shall assign a staff person to remain with the media personnel at all times.

3.    Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber. The only exception to this rule is if the offender requests, in writing, that a member or members of the media be present. The name of the individual(s) must then be included on the list of five (5) persons who are invited by the offender to witness the execution.

4.    Under no circumstances will cameras or recorders not under the control of the Department of Correction be permitted in the execution area.

**D.**    **COMMUNICATION SYSTEMS:**

1.    Prior to an execution date, the Warden or designee shall ensure appropriate communications systems are established in close proximity to the Execution Chamber. At a minimum, these communication systems shall consist of the following:

  a.    A dedicated line to the Governor's office and residence;

  b.    A dedicated line to the Supreme Court Administrator;

  c.    A dedicated line to the Indiana Department of Correction Central Office Command Center;

  d.    An open line between the Execution Chamber and the Indiana State Prison Command Center;

  e.    An open line between the Lethal Injection Chemical Room and the Physician's Room;

  f.    Two-way communication radio open to outside areas, on a frequency separate for the frequency used for general in-house communications.

2.    The Warden or designee shall ensure that adequate staff persons are assigned to continually monitor the communication system during the time preceding the execution.

3

**A18**

### E.     <u>SELECTION OF EXECUTION TEAM AND SUPPORT PERSONNEL</u>:

1.     When an Execution Team vacancy occurs, the Warden or designee shall appoint a Screening Committee to assist with the Execution Team selection process. ███████████████████████████████████████ The Screening Committee shall interview appropriate personnel and assess their emotional stability and their willingness/ability to handle the stress of assisting with the execution. The following issues are discussed:

<u>Personal History and Background</u>

     a.     Obtain information about the individual in order to ascertain whether or not they have life experiences which might make their participation more difficult.

     b.     Determine values regarding death penalty.

     c.     Determine religious values and talk about potential conflicts in regard to taking another person's life.

     d.     Obtain information about the individual's personal support system (e.g., family, friends, etc.) that is available to help cope with stress.

<u>Medical/Psychological Background</u>

     a.     Determine this person's belief about their medical/physical ability to cope with stressful situations.

     b.     Solicit examples of how this person copes with other stressful situations in their life.

     c.     Establish current coping mechanisms used by this person and evaluate their ability to learn new skills if necessary.

     d.     Evaluate levels of trust this person has in their own ability to carry out difficult tasks, and their perceived beliefs regarding how others view that ability.

     e.     Define the individual's interpretation of confidentiality.

     f.     Identify issues that would prevent them from carrying out this type of duty.

     g.     Determine if they have ever been involved with a counseling experience and what their reaction was to it.

<u>Professional Experience</u>

     a.     Identify professional experiences (e.g., departmental, custody, educational, administrative, medical, etc.) that would aid them in performing this task.

**A19**

    b.    Identify the professional characteristics of this individual and what role they played in making them a candidate to become a member of the team.

2. Following the individual screening process, the Committee shall provide a list of candidates to the Warden. The Warden shall approve the personnel who will assist in the execution.

3. ████████████████████████████████████ shall select, subject to the approval of the Warden, personnel who will perform support roles in the execution process, including, but not limited to: security, communications, and other appropriate support activities.

4. During the preparation for an execution, should a staff person desire to be relieved of these responsibilities or should observations of a staff person's behavior dictate that they may be unsuitable for the task, they will be relieved of these duties. In either case, the Warden or designee shall contact ████████████████████████ to arrange a debriefing session with the staff person(s).

5. The Warden or designee shall locate and select a physician to be present at the State Prison at the time of the execution. The physician's duties shall include monitoring or performing any medical procedures conducted in accordance with this Facility Directive and pronouncing death.

**F.**    **TEAM TRAINING**:

Staff selected for the Execution Team are trained at least quarterly. The training includes intensive cell extraction/restraint training, protocols in starting IV's including practical training with regional EMS oversight. Lighting is evaluated during training sessions by the team. The IV team also uses an intravenous light and equipment such as a Venoscope, which assists in identification and finding of veins to start the IV. Practical training is conducted in the Execution Chamber so that staff are well prepared and accustomed to the environment prior to the actual execution.

Staff will consult with a licensed physician in the preparation and administration of the lethal chemicals used to carry out the duty described in IC 35-38-6-1. This consultation shall include an examination of how the lethal chemicals are transferred to syringes and delivered.

**G.**    **PRELIMINARY PROCEDURES**:

1. Thirty (30) days prior to a scheduled execution or one (1) week after receiving a warrant for execution or equivalent order for the execution of a death sentence ("Execution Order"), ██████████████████████████ ███████████████████████████████████████████████ who will be the offender's contact person, will attend a meeting with the condemned offender. They will discuss the lethal injection procedures,

establish a visiting list for approval, and determine if the offender wishes to prepare a will and write a last statement. The offender shall receive translated instructions and materials if English is not his primary language. If a literacy problem exists, a staff member will assist the offender in understanding the material. If the offender refuses to leave his cell for the notification meeting, the Warden may meet with the offender in front of his cell and provide him a packet of the applicable information, including appropriate timelines.

2.    The offender will receive a full medical evaluation, including venous access, approximately thirty (30) days prior to a scheduled execution. A weekly assessment of the offender's veins will be conducted up to the day of execution. Fluids will be provided orally to maintain hydration.

3.    The facility shall be constantly monitored during the days immediately before the scheduled date of execution. Activities of the facility may be adjusted in order to maintain a proper level of security.

4.    Visitors of the condemned will visit in conjunction with regular visiting hours, 8:00 a.m. through 4:30 p.m. Extended visiting hours (visitation) may be requested and approved only by the Warden or designee. Legal counsel shall be subject to the same hours listed above.

     Approved spiritual advisors may visit longer if extra time is requested and approved in advance by the Warden or designee. All visits will conclude by 10:00 p.m.

5.    Prior to the scheduled date of the execution, the Warden or designee shall arrange for the Execution Chamber to be equipped, and for the necessary supplies to be ordered.

6.    An inspection of the building and immediate area housing the Execution Chamber will be made weekly, beginning thirty (30) days prior to the scheduled date of execution, and beginning five (5) days prior to the scheduled execution, inspections will be conducted daily. The inspection will be conducted by the Deputy Warden of Operations, the Physical Plant Supervisor, and a custody supervisor. This inspection will concentrate on the level of security and sanitation of the building in general, and more specifically, the immediate area where the execution will occur.

7.    At the discretion of the Warden, the condemned offender may be moved to ██████████████████████████████████ within thirty (30) days of the scheduled date of the execution. The custody staff person assigned to this post shall maintain constant supervision of the condemned offender and will maintain a log, recording the offender's activities and visitors. In the event the condemned offender is not moved to ████████████████████████ ██████████████████████████ Custody staff are to maintain observation of the offender and maintain a log, recording the offender's activities and listing all persons entering and exiting the housing unit.

6

**A21**

8.    Prior to the scheduled date of the execution, the Warden shall determine the appropriate time to move the condemned offender to a holding cell in the Execution Chamber. When moved, appropriate staff shall be assigned to maintain security and continue constant observation of the offender. Staff are to maintain a log, recording the offender's activities and listing all persons entering and exiting the Execution Chamber. The offender may have in his possession the following items: Bible or equivalent religious book and other religious materials, up to 20 photographs, address book, eyeglasses, appropriate writing materials and any other items, as approved by the Warden or designee. A television and telephone will be provided for the offender's use.

9.    If the condemned offender wishes to receive a special meal, he will be permitted to order his choice of food (within reason, based on availability and legality) seven (7) days prior to execution. This meal will be eaten thirty-six (36) to forty-eight (48) hours before the execution and is to be consumed in one sitting, not exceeding four (4) hours. Any leftovers will be removed from the cell and discarded. The condemned offender is to have nothing to eat or drink past 12:00 p.m. on the day of the execution. A limited amount of water will be permitted in order to take oral medication.

10.   If requested, an approved spiritual advisor or prison chaplain may be present with the offender on the day preceding the execution to provide pastoral care and sacramental functions. The name of the spiritual advisor must be submitted to the Warden or designee for approval a minimum of twenty (20) hours prior to the execution. The spiritual advisor may visit in the Execution Chamber until 10:00 p.m. the night preceding the execution.

11.   The offender may be provided with a sedative upon request. The strength should be sufficient to calm him, however, not enough to render him unconscious.

12.   One team member will be available to translate if English is not the offender's primary language.

## H.    RECORD KEEPING:

Upon receipt of an Execution Order, all associated correspondence will be forwarded to the Warden's Office. This includes, but is not limited to: petition for clemency, clemency schedule, request for modification of visitation, personal autopsy preference, last will and testament, request for spiritual advisor, request for execution witness, request for last meal, media statements or interview requests, news releases, funeral arrangements, confirmation of coroner and funeral home, E-Squad Security Procedures, victim witnesses, master visiting list, staff authorized in the Execution Chamber and Command Center, facility memoranda, all chamber inspection reports, team practices, rehearsal schedule, all observation logs and CISM debriefing schedule. Upon confirmation of a stay of execution or

the completion of an execution, all documents will be maintained in accordance with record retention requirements or department policy.

I. **EXECUTION PROCEDURES**:

1.    The execution of an offender shall generally occur between midnight and no later than an hour before sunrise on a date fixed by the sentencing court. The execution must not occur until, at least, one hundred (100) days after the conviction. An example of an execution schedule is located in 06-26 Appendix B.



2.

3.

4.

5.    The Warden or designee shall designate staff to monitor the communications systems put in place for the execution.

6.    Persons authorized to be in the facility command center are as follows: [redacted] A list of approved persons will be maintained by the Warden.

7.    The [redacted] will record the steps taken during the execution process and log the times. In carrying out the execution process, the followings steps shall be taken:

    a.    Injection Team prepares the syringes to be used during the execution, according to the designated injection method. [redacted] IV Team sets up IV trays.

    b.    [redacted]

    c.    [redacted]

    d.    The Warden or designee and [redacted] report to the Execution Chamber.

    e.    Security staff escorts offender witnesses to the holding location. A chaplain is available if needed.

**A23**

The Warden calls the command center to ensure the execution is to proceed.

f.  The Extraction Team is notified by radio.

   i.  At the command of the Warden or designee, the Extraction Team will approach the holding cell and ask the condemned offender to approach the cell door and be handcuffed.

   ii.  The ███████████████ will then ask the offender to step back and place his hands above his head, on the wall in front of him.  (If the condemned offender refuses to cooperate, Departmental Extraction Policy will be used.)

   iii.  The ███████████████ will unlock the cell door to allow the Extraction Team to enter.  The offender will then be escorted from the cell and walked into the Execution Chamber.  He will be assisted onto a stationary gurney.  His legs will be secured to the gurney with soft leather restraints on his ankles, as well as a soft leather strap that will go across his chest and upper arms. His wrists will be secured to the gurney with soft restraints.  The team leader will ensure good circulation of the extremities. The Extraction Team will return to the holding cell staging area, out of view of any witnesses.

g.  The IV Team is notified by radio to move in.  The IV Team will insert a venous catheter in each arm, attach the necessary tubing, and start an IV flow by slow infusion consisting of a saline solution. Continued surveillance of the IV site will be conducted to monitor for infiltration. The catheter must be properly secured using tape. The IV process will be observed by the physician, Warden, Execution Director and Injection Team.

If a suitable vein cannot be discovered in an arm, the IV Team shall substitute a suitable vein in another part of the body under the supervision of the physician.

Upon completion, the IV Team announces "IV process completed," then proceeds to the holding cell staging area.

h.  If access cannot be established through peripheral intravenous cannulation, the physician will provide access by central venous cannulation or alternative means in accordance with reasonable medical standards.

Upon completion, the Execution Director announces "IV process completed." ███████████████████████

i.  The Warden or designee will then read the Execution Order to the condemned offender.

9

**A24**

i.    After the Execution Order has been read, the Warden or designee will then ask the condemned offender if he has any last words. If he does, they will be recorded by the Warden, ███████████ and/or designee.

NOTE: The condemned offender will be given ample opportunity to prepare a written statement prior to the execution.

ii.    The ███████████ secures the recorder, checks IV lines and notifies the ███████ to transport the witnesses into the viewing area by radio.

iii.   Victim witnesses will be escorted from the Deputy Warden's office or designated area to the Execution Chamber and seated left of the partition. ███████ and law enforcement will provide security.

NOTE: The victim witnesses who do not wish to view the execution or cannot view the execution will remain in the Deputy Warden's office or designated area.

iv.   Offender witnesses will be escorted from the holding location and seated to the right of the partition. ██████ and law enforcement will provide security.

j.    The ███████████████████ provides notice that the witnesses are in place.

k.    The Warden checks with the Command Center to proceed.

l.    The Warden orders the lights to be dimmed and the viewing window blinds and louvered doors opened.

m.   The Warden instructs the Injection Team to proceed.

n.    The Injection Team proceeds, advising the Warden by radio after each syringe. Extreme care will be exercised during the selection of syringes. The Injection Team members will verify the syringe by number, color code, and description prior to use. Once the "Proceed" command is given, the injection procedure will begin with slow, even syringe pressure. IV lines will be constantly monitored for leaks or stoppage. The injection procedure will continue until all the chemicals in the syringe set have been injected into the condemned offender and the offender is pronounced dead.

o.    The Injection Team provides notice that the injection process is complete.

p.    Following the completion of the injection process, the Warden will then order the blinds and louvered doors to be closed and the lights turned up. The physician comes out and pronounces time of death, and then returns to the holding area.

10

**A25**

q.    If the offender's heart has not stopped, the physician will return to the holding area, the lights will be dimmed, the blinds and louvered doors will be reopened, and the Warden or designee shall order the injection procedure to be repeated. After this procedure is completed, the blinds and louvered doors will be closed, and the lights turned up.

The physician reenters and pronounces time of death, and then returns to the holding area.

r.    The Warden advises the Command Center of the time of death and of the last statement if there is one.

s.    The ███████████████████████████████████████ that the witnesses may leave.



Designated State Prison staff will be available to address questions from witnesses.

t.    The ██████████████████████████████████████ when the visiting areas are clear.

u.    IV Team, Injection Team, Extraction Team are authorized to leave by the Warden.

v.    ████████████████████████

w.    The Warden returns to the facility Command Center.

x.    ████████████████████████████████████████ to assist the ID & Release Officer in the preparing, photographing and fingerprinting of the body. The Warden or designee may request that color photographs are taken and maintained by ████████████ staff.

y.    The Coroner is escorted to the Execution Chamber to photograph, claim, and prepare the body for transportation. The body will be released to the Coroner utilizing established departmental procedures.

11

**A26**

z.    The hearse enters the institution through ███████████ ████████████ The deceased is loaded into the hearse for transport to the funeral home.

**J.    CODES FOR COMMUNICATION:**



(2 members will have headsets)
(2 members will have headsets)
(2 members will have headsets)

**K.    POST EXECUTION PROCEDURES:**

1.    After the body has been removed from the facility, a representative of the facility or Department of Correction shall make a statement to the news media.

2.    Following the execution, any staff who request it shall meet with CISM staff for debriefing.

3.    The Warden or designee shall return the Execution Warrant to the Clerk of the sentencing court as soon as possible following the execution of the offender.

4.    The Warden shall conduct a debriefing, separate from the debriefing by CISM, to identify concerns with personnel involved with the execution process. This debriefing shall be conducted as soon as practical following the execution.

**L.    REVIEW:**

The contents of this document will be reviewed and/or revised as needed on an annual basis, in accordance with Policy 00-04-101, "THE DEVELOPMENT, and APPROVAL AND IMPLEMENTATION OF POLICY."

**APPROVED:**    Signature on file    **DATE:** _____
    **Warden, Indiana State Prison**

# CONFIDENTIAL

## ISP 06-26
## Appendix A

### PREPARATION AND ADMINISTRATION OF CHEMICALS

**A.    Procurement and Maintenance of Inventories**

1.    Procurement of pharmaceuticals is in accordance with applicable state and federal law. The Warden and the ███████████ will manage all pharmaceuticals, once delivered to the Administration Building, for secured storage and inventory.

2.    Inventories must be adequate to cover expected usage.  Sharps and controlled substances must be maintained under careful control at all times.  A perpetual inventory of pharmaceuticals and supplies (e.g., needles, syringes, medications, trays, etc.) will be maintained.

3.    Expired and/or damaged pharmaceuticals may be used by the Execution Team for training purposes.  These items will be clearly marked as expired and/or damaged and will be destroyed in accordance with established protocols.

**B.    Preparation of Chemicals**

1.    **<u>Method 1</u>**

The Injection Team prepares two sets equaling eight (8) injection syringes.  One set is used as a backup in the event the first attempt fails.  Safety precautions will be exercised when preparing the syringes, including the use of gloves and safety glasses.  Spills will be promptly diluted with saline and absorbed with towels.  Expiration dates of the drugs are verified prior to use.  As each syringe is prepared, it is clearly numbered, color coded and described with the chemical name and amount.

- Syringe 1: Sodium Pentothal, Pentobarbital (1.0 grams per vial) or Brevital (2.5 grams per vial) is carefully mixed with 50 mL of sterile saline. Two (2) vials are used.  This process is under the direct observation of the physician.  This syringe is color coded yellow.

- Syringe 2: Sodium Pentothal, Pentobarbital (1.0 grams per vial) or Brevital (2.5 grams per vial) is carefully mixed with 50 mL of sterile saline. Two (2) vials are used. This process is under the direct observation of the physician. This syringe is color coded yellow.

- Syringe 3: 60cc syringe is 50 mL of sterile saline and is color coded black.

- Syringe 4: 60cc syringe is 50 mg of Pancuronium Bromide or Vecuronium Bromide and is color coded blue.

- Syringe 5: 60cc syringe is 50 mg of Pancuronium Bromide or Vecuronium Bromide and is color coded blue.

- Syringe 6: 60cc syringe is 50 mL of sterile saline and is color coded black.

- Syringe 7: 60cc syringe is 50 mEq of Potassium Chloride and is color coded red.

- Syringe 8: 60cc syringe is 50 mEq of Potassium Chloride and is color coded red.

2.   **<u>Method 2</u>**

The Injection Team prepares three identical sets equaling nine (9) injection syringes. Two (2) of the sets will be used as backups. Safety precautions will be exercised when preparing the syringes, including the use of gloves and safety glasses. Spills will be promptly diluted with saline and absorbed with towels. Expiration dates of the drugs are verified prior to use. As each syringe is prepared, it is clearly numbered, color coded and described with the chemical name and chemical amount.

**Primary Set A**:

- <u>Syringe 1A</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1A and color coded yellow.

- <u>Syringe 2A</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2A and color coded yellow.

- <u>Syringe 3A</u>: 60 mL of a sterile saline solution, labeled 3A and color coded black.

**Backup Set B**:

- <u>Syringe 1B</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1B and color coded yellow.

- <u>Syringe 2B</u>: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2B and color coded yellow.

- <u>Syringe 3B</u>: 60 mL of a sterile saline solution, labeled 3B and color coded black.

**A29**

**Backup Set C**:

-   Syringe 1C: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 1C and color coded yellow.

-   Syringe 2C: Two and one-half (2.5) grams of pentobarbital, 50 mL of a 50 mg/mL solution, labeled 2C and color coded yellow.

-   Syringe 3C: 60 mL of a sterile saline solution, labeled 3C and color coded black.

3.  After the Injection Team prepares all syringes with the proper chemicals and labels as provided above for the method selected, the IV Team must ensure that the IV setup is completed.

**C.     Administration of Chemicals**

1.  **Method 1**

    a.  Syringes 1 (yellow), 2 (yellow), 3 (black), containing Sodium Pentothal, Pentobarbital, or Brevital and the saline solution, are injected in order. The offender will be closely and vigilantly monitored to ensure the surgical depth or surgical plane is deep enough so that the offender is unconscious. The depth may be tested through the use of ammonia inhalant, pin prick, or other accepted stimuli.

    b.  Syringes 4 (blue), 5 (blue), and 6 (black), containing Pancuronium Bromide or Vecuronium Bromide and the saline solution, are injected in order.

    c.  The Warden signals approval to proceed. Syringes 7 (red) and 8 (red), containing Potassium Chloride, are injected in order.

    d.  At the completion of the process and after a sufficient amount of time for death to have occurred, the injection process will be completed.

2.  **Method 2**

    a.  The lethal chemicals from Syringes 1A and 2A shall be injected in order.

    b.  The saline solution from Syringe 3A shall be injected.

    c.  Following a sufficient amount of time for death to occur after the injection of Syringe 3A, the Physician shall examine the offender to determine if death has occurred.

**A30**

If the offender is still exhibiting visible signs of life, Syringes 1B and 2B shall be injected, followed by Syringe 3B.

If the offender is still exhibiting visible signs of life, Syringes 1C and 2C shall be injected, followed by Syringe 3C.

    d.    At the completion of the process and after a sufficient amount of time for death to have occurred, the injection process will be completed.

3.    Each chemical must be administered in the predetermined order in which the syringes are prepared and labeled. The full dose contained in each syringe must be administered to the offender. If all electrical activity of the heart ceases prior to administering all of the chemicals prepared, the Injection Team must continue to follow the protocol and administer all remaining chemicals in the set in the order and amounts set forth above.

4.    The IV lines will be constantly monitored for leaks or stoppage. If this situation should occur, the Injection Team shall immediately transfer to the alternate line to restart the injection procedure. The Injection Team will not proceed until approval is obtained from the Warden.

5.    The actual time of death will be when the physician pronounces death.

6.    All of the prepared chemicals must be used or properly disposed of no later than twenty-four (24) hours after the time designated for the execution to occur. Should a stay delay the execution beyond twenty-four (24) hours of the scheduled executions, another complete set of syringes must be prepared in accordance with this procedure when the execution is rescheduled.

**D.    Disposal**

All supplies and equipment used during an execution will be discarded or sanitized in accordance with established protocols.

**A31**

1

**A32**

4

**A35**

5

**A36**

7

**A38**

## CERTIFICATE OF SERVICE

I, Lin Weeks, do hereby certify that I have filed the foregoing Principal Brief and Required Short Appendix for Appellants electronically with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system on July 28, 2025.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  July 28, 2025            */s/ Lin Weeks*
                                  Lin Weeks
                                    *Counsel of Record*
                                  REPORTERS COMMITTEE FOR
                                    FREEDOM OF THE PRESS