No. 25-2025

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

THE ASSOCIATED PRESS,
STATES NEWSROOM D/B/A INDIANA CAPITAL CHRONICLE, GANNETT CO.,
INC., CIRCLE CITY BROADCASTING, LLC, AND TEGNA INC.,
*Plaintiffs-Appellants*,

v.

RON NEAL AND LLOYD ARNOLD,
*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
No. 1:25-cv-872-MPB-MJD
The Honorable Matthew P. Brookman, Judge.

---

**BRIEF OF APPELLEES**

---

THEODORE E. ROKITA
Indiana Attorney General

TYLER BANKS
Supervising Deputy Attorney General
Attorney No. 30514-36

MEGAN M. SMITH
Deputy Attorney General
Attorney No. 31518-32

OFFICE OF INDIANA ATTORNEY GENERAL TODD ROKITA
IGC South, 5th Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
(317) 234-7016
Tyler.Banks@atg.in.gov

# TABLE OF CONTENTS

Table of Authorities ............................................................................... ii

Jurisdictional Statement ..........................................................................1

Statement of the Issues ............................................................................1

Statement of the Case .............................................................................2

Summary of the Argument........................................................................6

Argument:

    Indiana Code Section 35-38-6-6 and ISP 06-26 do not violate the First
    Amendment...........................................................................................8

    I.     The *Press-Enterprise II* framework does not apply to executions
        because they are not court proceedings ......................................12

    II.    The district court properly found that even if *Press-Enterprise II*
        applied to executions, the Media Plaintiffs have failed to establish
        that executions pass the experience-and-logic test ....................21

        A.  Executions have not historically been open to the press and
            general public.........................................................................22

        B.  Public access to executions would not play a significant positive
            role in their functioning......................................................29

    III.   The district court correctly determined that Indiana Code
        § 35-28-6-6 and ISP 06-26 do not violate the Free Press Clause of
        the First Amendment...............................................................32

Conclusion...............................................................................................38

Fed. R. App. P. 32(g) Word Count Certificate ........................................39

Certificate of Service................................................................................39

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992)................................. 8

*American Civil Liberties Union of Illinois v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ...................................................................... 37

*Ark. Times, Inc. v. Norris*, No. 5:07-cv-00195 SWW,
    2008 WL 110853 (E.D. Ark. Jan. 7, 2008) .............................. 19, 22, 25, 27, 28, 32

*Associated Press v. Nat'l Labor Relations Bd.*, 301 U.S. 103
    (1937) ...................................................................................................... 38

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) ............................................. 30

*Barnes v. State*, 435 N.E.2d 235 (Ind. 1982) ................................................................. 16

*BH Media Grp., Inc. v. Clarke*, 466 F. Supp. 3d 653
    (E.D. Va. 2020) ..................................................................................... 18, 19

*Bradley v. United States*, 410 U.S. 605 (1973) ............................................................. 16

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ....................................................... 9, 32, 37

*Cal. First Amend. Coal. v. Woodford,* 299 F.3d 868 (9th Cir. 2002) ........ 18, 19, 20, 21

*Cal. First Amend. Coalition v. Calderon*, 150 F.3d 976
    (9th Cir. 1998) ...................................................................................... 20

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) ....................................................... 8

*Matter of Cont'l Ill. Sec. Litig.*, 732 F.2d 1302 (7th Cir. 1984)............................ 12, 14

*Corcoran v. State*, 246 N.E.3d 782 (Ind. 2024) ........................................................... 3

*Courthouse News Serv. v. Brown*, 908 F.3d 1063 (7th Cir. 2018) ............................... 12

*Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937 (7th Cir. 2015)........................... 37

*Furman v. Georgia*, 408 U.S. 238 (1972) .................................................................... 26

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) ................................................................... 17

*Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596 (1982) ........................... 5, 12, 20, 31

*Gregg v. Georgia*, 428 U.S. 153 (1976) ....................................................................... 29

**CASES (cont'd)**

*Holden v. State of Minnesota,* 137 U.S. 483 (1890) .................................. 15, 16, 20, 25

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) .....................8, 9, 16, 17, 19, 21, 29, 31, 35

*John K. MacIver Inst. For Pub. Policy, Inc. v. Evers,*
    994 F.3d 602 (7th Cir. 2021) ............................................... 5, 14, 17, 33, 34

*Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454 (1989) .................................... 13, 17, 21

*Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015) ............................................. 20

*Love v. Vanihel*, 73 F.4th 439 (7th Cir. 2023) ............................................. 14

*McBurney v. Young*, 569 U.S. 221 (2013)..................................................... 32

*Minnesota v. Pioneer Press Co.*, 110 N.W. 867 (Minn. 1907) ............................... 25, 26

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................. 16

*Near v. Minnesota*, 283 U.S. 697 (1931).................................................... 21

*New York Times Co. v. United States*, 403 U.S. 713 .................................... 33

*Okla. Observer v. Patton*, 73 F. Supp. 3d 1318
    (W.D. Okla. 2014) ...............................13, 14, 18, 19, 22, 25, 27, 28, 29, 32

*Pell v. Procunier*, 417 U.S. 817 (1974) ..................................5, 9, 13, 17, 18, 21, 35, 36

*Press-Enterprise Co. v. Super. Ct. of Cal. for*
    *Riverside Cnty.*, 464 U.S. 501 (1984) .................................... 5, 12, 14, 20

*Press-Enterprise Co. v. Super. Ct. of Cal. for*
    *Riverside Cnty.*, 478 U.S. 1 (1986) .............4, 5, 9, 11, 12, 13, 14, 15, 20, 22, 28, 29

*Procunier v. Martinez*, 416 U.S. 396 (1974) ............................................... 30

*Richmond Newspapers v. Virginia,*
    448 U.S. 555 (1980) .................................5, 11, 12, 15, 20, 21, 22, 25, 28

*Ritchie v. State*, 254 N.E.3d 1064 (Ind. 2025)............................................. 3

*Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001)........................................... 15

*Tribune Review Publ'g Co. v. Thomas*, 254 F.2d 883
    (3d Cir. 1958) ........................................................................ 33

CASES (cont'd)

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,*
453 U.S. 114 (1981) ................................................................ 17

*In re United Press Ass'ns v. Valente*, 308 N.Y. 71 (1954) ........................................... 33

*United States v. Franklin*, 546 F. Supp. 1133
(N.D. Ind. 1982) .................................................................. 13, 17

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ...................................................... 8

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ............................................... 17

*Zemel v. Rusk*, 381 U.S. 1 (1965) ............................................................ 21, 33, 35

STATUTES

1830 Conn. Laws, 284 § 147 ............................................................... 23

1833 R.I. Laws, 50-51 .................................................................... 23

1883 Tenn. 139-40 ....................................................................... 24

1884 La. Laws, 102 No. 79 ................................................................ 24

1889 Colo. Laws, 119 .................................................................... 26

1891 Cal. Laws, 274 § 1229 ............................................................... 24

1908 Va. Laws, 686 ...................................................................... 26

1913 Ark. Laws, 174 § 10 ................................................................. 26

1858 Kan. Terr. Laws, 190 ................................................................ 24

1859 Colo. Terr. Laws, 57 § 365 .......................................................... 24

1864 Mont. Terr. Laws, 250 § 222 ......................................................... 24

1875 Nev. Stat., 53 Ch. X ................................................................ 24

1876 Wyo. Terr. Laws, 161 § 170 .......................................................... 24

1878 Utah Terr. Laws, 136 § 356 .......................................................... 24

1909 Ariz. Terr. Laws, 96–97 ............................................................. 24

## STATUTES (cont'd)

1849 Del. Laws, 366–67 § 1 .......................................................... 23

1859 Ga. Laws, 62–63 § 1 ............................................................ 24

1859 Ill. Laws, 17 § 1 .................................................................. 24

1852 Ind. Acts, vol. II, 379 § 134 ................................................. 23

1882 Md. Laws, 630–31 § 31 ........................................................ 24

1889 Minn. Laws, 66–67 § 5 ......................................................... 26

1889 Minn. Laws, 66 § 5 ............................................................... 24

1839 Miss. Laws, 110 § 25 ............................................................ 23

1887 Mo. Laws, 169 ..................................................................... 24

1835 N.H. Laws, 241–42 § 5 ......................................................... 23

1834 N.J. Laws 170 ...................................................................... 23

1903 N.M. Laws, 141 Ch. 76 § 1 ................................................... 24

1835 N.Y. Laws 299 § 1 ............................................................... 23

1888 N.Y. Laws, 780 § 507 ........................................................... 26

1901 Neb. Laws, 506 § 2 ............................................................... 24

1843 Ohio Laws, 71 § 1 ................................................................ 23

1874 Or. Laws, 115–116 ............................................................... 24

1833–34 Pa. Laws, 234–35 ............................................................ 23

1901 Wash. Laws, 101 .................................................................. 24

1909 Wash. Laws, 952 .................................................................. 26

Act of Mar. 1, 1887, Pub.L. No. 24, § 1, 1887 Ark. Acts 29 ......................................... 25

Ark. Code § 16-90-502(d)(1) ......................................................... 25

STATUTES (cont'd)

Ind. Code § 11-8-2-1 ............................................................... 10, 16

Ind. Code § 35-38-6-6 ........................................ 2, 3, 8, 14, 19, 32

Ind. Code § 35-38-6-6(a) .............................................................. 34

Ind. Code § 35-38-6-6(a)(8) ........................................................... 2

Ind. Code § 35-38-6-6(b) ............................................................... 2

Ind. Code § 35-50-2-9 ................................................................. 10

OTHER AUTHORITIES

U.S. Const. amend. I ................................................................... 12

Idaho Rev. St. §§ 8005-21 (1899) ............................................... 25

P.L. 311-1983, Sec. 3 .................................................................... 2

P.L. 56-2006, Sec. 1 ...................................................................... 2

Casey Smith, *Death row inmate Joseph Corcoran executed for quadruple murder*, Ind. Capital Chronicle, Dec. 18, 2024, available at https://indianacapitalchronicle.com/ 2024/12/18/death-row-inmate-jospeh-corcoran-executed-for-quadruple-murder/ .......................................... 30, 31

Dane A. Drobny, *Death TV: Media Access to Executions Under the First Amendment*, 70 Wash. U. L.Q. 1179 (1992) ..................................... 25, 27, 31

Dawn Mitchell, *A History of Executions in Indiana*, Indianapolis Star, Dec. 11, 2019, available at https://www.indystar.com/story/news/2019/12/11/indiana-executions-full-list-peopleexecuted-since-1897/4357164002 .................................................... 23

Kathy Deinhardt Hill, *Hanged—A History of Idaho's Executions* (2010) ................. 25

Matt Adams, Fox 59, *Benjamin Ritchie executed at prison in Michigan City*, May 20, 2025, available at https://fox59.com/indiana-news/benjamin-ritchie-executed-at-prison-in-michigan-city .......................... 30, 35

Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 Buff. L.Rev. 461 (1995).................... 22

vi

## JURISDICTIONAL STATEMENT

The jurisdictional statement of the Associated Press, State's Newsroom d/b/a Indiana Capital Chronicle, Gannett Company Incorporated, Circle City Broadcasting LLC, and Tegna Incorporated (collectively "the Media Plaintiffs") is complete and correct.

## STATEMENT OF THE ISSUES

Approximately 10 months after the State of Indiana announced its intention to resume executions after a lengthy pause and only 13 days before an impending execution, the Media Plaintiffs filed suit and claimed that Indiana's statutory limitation on who are eligible witnesses to an execution was unconstitutional. Despite these limitations being law for years and decades after one circuit court extended a First Amendment free-press right to executions, the Media Plaintiffs sought a preliminary injunction just days before a pending execution in this case. The district court denied that request, holding that the Media Plaintiffs had no qualified right of access to the execution chamber at the Indiana State Prison and had no independent right of access emanating from the Free Press Clause itself. The issues on appeal are:

I.     Did the district court err in holding that an execution is not a judicial proceeding such that the Media Plaintiffs could not be found to have a qualified right of access to Indiana executions.

II.     Even if the Media Plaintiffs could be found to have a qualified right of access to view Indiana executions, did the district court err in holding that they failed to prove that they are entitled to that qualified right?

III.     Outside of the question of whether the press has a qualified right of access to an execution chamber, does the Free Press Clause of the First Amendment itself require Indiana to allow allotments of execution witnesses specifically for the press to the exclusion of other interested members of the public?

## STATEMENT OF THE CASE

Indiana does not conduct public executions of inmates sentenced to death. As early as 1852, Indiana moved executions out of the public forum and regulated the class of witnesses who could view the execution. Since 1983, the people permitted to view executions has been limited by Indiana Code Section 35-38-6-6. The law originally permitted—other than necessary prison personnel—only invitees of the condemned inmate to attend as witnesses. Ind. Code § 35-38-6-6 (1983), as added by P.L. 311-1983, Sec. 3. That list has only been expanded once, in 2006, to allow some of the victim's immediate family members to be witnesses. Ind. Code § 35-38-6-6(a)(8), -6(b), as added by P.L. 56-2006, Sec. 1. Other than the narrow categories of witnesses listed in the statute, the public is excluded from witnessing executions within the Indiana State Prison, where the state's execution chamber is housed (Tr. 9).

The Indiana Department of Correction has created and implemented a policy that lays out an array of rules and procedures about the conduct of executions including what drug protocol is used, the various lines of communication from the chamber to the prison's command center and out to the Governor's and Attorney General's offices, the fact that the identities of all persons assisting the Warden with the execution are confidential, and also the admission and transportation of

the witnesses to the execution (R. 9-1).[1] The policy, entitled "ISP 06-26: Execution of Death Sentence," incorporates Section 35-38-6-6's limitations on who can witness an execution (R. 9-1 at 2–3). The Department's policy also speaks specifically to press attendance: Consistent with the statute, members of the press—like almost every other public person—are not permitted to witness the execution *unless* they are one of the condemned inmate's designated witnesses (R. 9-1 at 4). Thus, the statute and Department policy do not ban members of the press from attending; the policy specifically speaks to the condition required for a member of the press to attend.

After a lengthy pause in its ability to conduct executions after 2009, the State filed a motion to set an execution date for quadruple murderer Joseph Corcoran in the summer of 2024. *Corcoran v. State*, 246 N.E.3d 782, 793 (Ind. 2024). That motion was granted, and Corcoran's execution date was set for December 18, 2024. *Id.* at 793–94. No lawsuit was brought to contest the exclusion of the general public and press to view that execution. One member of the press—a reporter for one of the Media Plaintiffs' agencies—did view the execution because Corcoran placed her on his list of witnesses, consistent with the Department's policy (R. 36 at 4).

While litigation in *Corcoran* was pending, the State filed a motion to set another execution date in the fall of 2024; this time for Benjamin Ritchie, who had been convicted of murdering a police officer. *Ritchie v. State*, 254 N.E.3d 1064, 1065 (Ind. 2025) (mem.). The Indiana Supreme Court granted that motion on April 15, 2025, setting an execution date for May 20, 2025. *Id.* Not until May 7, 2025—13

---

[1] Page numbers in citations to R. 9-1—the text of the challenged policy—are citations to the ECF-assigned page number, i.e., the PDF page number.

days before the set execution—did the Media Plaintiffs file suit claiming that Indiana's law and the Department of Correction's implementing policy were unconstitutional under the First Amendment (R. 7). And not until May 12, 2025—eight days before the execution—did the Media Plaintiffs file a motion for a preliminary injunction (R. 19).

The Media Plaintiffs claimed that they were entitled to relief under *Press-Enterprise Co. v. Super. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1 (1986) ("*Press-Enterprise II*") because, according to them, an execution held within the prison's walls and conducted by an executive-branch agency was the equivalent of a criminal adjudicative proceeding, which meant they had a qualified right of access to the Indiana State Prison's execution chamber (R. 20 at 7–19). Under the experience-and-logic test from that case, the Media Plaintiffs argued that history showed executions should be open to the public and that public access to executions would assist in the performance of those executions (R. 20 at 7–19). They also raised an independent claim under the Free Press Clause that members of the press specifically should be entitled to their own designated seats within the execution chamber's witness rooms (R. 20 at 17–22).[2]

After holding an emergency hearing on the request for a preliminary injunction, the district court denied the request (R. 35, 36). While the district court

---

[2] The district court had "serious questions as to the shape and scope of the injunctive relief" that the Media Plaintiffs were requesting, even after the hearing on the preliminary-injunction request (R. 36 at 4 n.1). Of those, the district court could not determine the answers to these questions: "Would these media members take the place of the victim's family? Or are they added in addition to those permitted by Indiana statute?" (R. 36 at 4 n.1). The Media Plaintiffs provide no clear answers to these questions in their brief in this Court.

4

found the timing of the Media Plaintiff's suit "perplexing," it decided that they had had failed to prove a likelihood of success on the merits (R. 36). It recognized that *Press-Enterprise II* and its progenitors, such as *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980), *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596 (1982), and *Press-Enterprise Co. v. Super. Ct. of Cal. for Riverside Cnty.*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"), held that the public—including members of the press—had a qualified right of access to criminal judicial proceedings (R. 36 at 5–7). But, the district court held, neither this Court nor any other binding authority had "extended the *Press-Enterprise II* framework to an event beyond a judicial proceeding, let alone something after the imposition of a judgment in a case, such as an execution" (R. 36 at 7). In the alternative, the district court found that the Media Plaintiffs had failed to pass the experience-and-logic test under *Press-Enterprise II* (R. 36 at 9–12), and it also rejected the claim that the press was being singled out for discriminatory treatment in violation of the Free Press Clause, relying on Supreme Court and this Court's precedent: "At bottom, Indiana law treats members of the press the same as members of the public at large" (R. 36 at 12–14) (citing *Pell v. Procunier*, 417 U.S. 817, 832 (1974); *John K. MacIver Inst. For Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2021)) ("*MacIver Inst.*"). The proceedings below

have been stayed (R. 51), and the Media Plaintiffs have asked this Court to enjoin Indiana law so certain of their members can attend any future executions.[3]

## SUMMARY OF THE ARGUMENT

I.     Executions are not judicial or courtroom proceedings, and therefore, the Supreme Court's analysis from *Press-Enterprise II* does not apply. Executions are performed, not before or by judges, but by the executive branch. They do not take place in the paradigmatically public setting of a courthouse or courtroom but behind prison walls with the attendant safety, security, and confidentiality concerns. And executions involve none of the adjudicatory or adversarial processes that accompany criminal trials, to which the Supreme Court has granted the press a qualified right of access, or civil proceedings, to which this Court has granted the press a qualified right of access. This Court should not follow the Ninth Circuit—the only court to do so—and extend that precedent to executions. For this reason alone, the Media Plaintiffs have not shown a substantial likelihood of success on the merits, and the district court did not abuse its discretion when denying their motion for a preliminary injunction.

II.     Even if the Media Plaintiffs could overcome this insuperable obstacle, they have not proved that they could pass the experience-and-logic test from *Press-Enterprise II* and gain a qualified right of access to executions. No state in this

---

[3] On July 7, 2025, the Indiana Supreme Court set a "tentative" date for the execution of Roy Lee Ward for October 10, 2025. *See Ward v. State*, No. 25S-SD-167, Docket, *available at* https://mycase.in.gov. Briefing on the State's motion to have that tentative date become a final execution date has been fully completed. *Id.* As of the date of the filing of this brief, the Indiana Supreme Court has not come to a final decision on Ward's execution date.

nation that conducts executions does them in public. While executions were, at one time, public, the advance of evolving standards of decency and the practices of the states do not show unbroken public access to executions like that seen for criminal trials or civil proceedings. And while it could be said that there are generic public-policy benefits to some disinterested persons (like the press) observing executions, generic benefits do not equate to constitutional mandates such that Indiana's legislature acted unlawfully in setting limits on who could observe executions. The Media Plaintiffs have failed in making a substantial showing that they are entitled to access executions. Their request for a preliminary injunction was rightly denied.

III.     Because *Press-Enterprise II* does not apply, the Media Plaintiffs have also tried to find a right of access to the Indiana State Prison's execution chamber directly within the Free Press Clause of the First Amendment. This argument must fail because the argument, at bottom, is that the Free Press Clause gives the press a greater right of access to observe executions than that granted to the general public. Supreme Court precedent directly refutes this notion because it holds that the press are not gifted more access to observe governmental processes than that granted to the public. This Court has held the same. The Media Plaintiffs have given this Court no good reason to stray from this precedent. The denial of injunctive relief should be affirmed.

## ARGUMENT

### Indiana Code Section 35-38-6-6 and ISP 06-26
### do not violate the First Amendment.

The district court did not abuse its discretion by denying the Media Plaintiffs'
motion for a preliminary injunction. A preliminary injunction is an "extraordinary"
remedy. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking
a preliminary injunction must establish that he is likely to succeed on the merits,
that he is likely to suffer irreparable harm in the absence of preliminary relief, that
the balance of the equities tips in his favor, and that an injunction is in the public
interest." *Id.* at 20.[4] The denial of a preliminary injunction is reviewed for an abuse
of discretion. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). "The district
court 'abuses its discretion when it commits a clear error of fact or an error of law.'"
*Id* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992)).

The district court did not abuse its discretion by denying Media Plaintiffs'
motion for preliminary injunction because they failed to establish any likelihood of
success on the merits. "The First and Fourteenth Amendments bar government
from interfering in any way with a free press." *Houchins v. KQED, Inc.*, 438 U.S. 1,
9 (1978). However, the First Amendment does not "mandate[ ] a right of access to
government information or sources of information within the government's control."
*Id.* at 15. Nor does it "guarantee the press a constitutional right of special access to

---

[4] The district court's only basis for denying the Media Plaintiffs' injunction request was that
it found they had failed to prove a likelihood of success on the merits (R. 36 at 5 n.2). In this
Court, they have made no argument about how they met their burden on the remaining
three factors. Because of this posture, Respondents will only address the success-on-the-
merits factor.

8

information not available to the public generally." *Pell,* 417 U.S. at 833 (citing

*Branzburg v. Hayes*, 408 U.S. 665 (1972)). "There is an undoubted right to gather

news 'from any source by means within the law,' but that affords no basis for the

claim that the First Amendment compels others—private persons or governments—

to supply information." *Houchins*, 438 U.S. at 11 (quoting *Branzberg*, 408 U.S. at

681–82). Therefore, "the media have 'no constitutional right of access to prisons or

their inmates beyond that afforded the general public[.]'" *Id.* (quoting *Pell*, 417 U.S.

at 834). And prison-access policies are constitutional so long as they do "not deny

the press access to sources of information available to members of the general

public." *Pell*, 417 U.S. at 835.

The Media Plaintiffs have no First Amendment right to access the Indiana

State Prison or executions conducted therein. The Supreme Court has established a

two-part test for determining whether there is a qualified First Amendment right of

public access to a particular proceeding, often referred to as the experience-and-

logic test. *Press-Enterprise II*, 478 U.S. at 8–9. But access to executions is simply a

subset of access to prisons: Executions in Indiana are held within the walls of the

Indiana State Prison in a building designated for that purpose (Tr. 9). Because the

Supreme Court has already determined that the press has no special right of access

to prisons or their inmates, *Houchins*, 438 U.S. at 11; *Pell*, 417 U.S. at 835, the

Media Plaintiffs' argument rests on the flawed premise that executions are court

proceedings within the *Press-Enterprise II* framework to which the general public

and the press have a right to access (Doc. 11 at 16–47).

This is not so. Neither this Court nor the Supreme Court have gone so far as to consider executions a court proceeding. Nor should they. Executions are the implementation of a sentence carried out by the executive branch. *See* Ind. Code §§ 11-8-2-1 (establishing the Department of Correction as an arm of the executive branch); 35-50-2-9 (establishing that the State may seek a sentence of death under certain circumstances). The enforcement of a lawfully imposed sentence is not a court proceeding: No legal decisions or holdings are made; no adjudicative process is performed; and no adversarial proceedings are held. Otherwise, the press and public would have a right of access to view all lawfully imposed sentences. Because executions are not court proceedings, the framework used to determine whether a qualified right of access to criminal proceedings exists is inapplicable to Media Plaintiffs' claim. The district court did not abuse its discretion in so finding.

Even if this Court were to extend precedent so far to find executions to be court proceedings, Media Plaintiffs still cannot establish a right of access under the First Amendment. Executions have not been historically open to the public. The Media Plaintiffs' argument otherwise ignores over 100 years of history where executions were routinely shielded from public view. The more recent practice of permitting designated witnesses to view an execution does not transform private executions into public ones. Designating a limited number of witnesses is a far cry from the openness of a criminal trial or courthouse where any member of the general public may walk in and observe freely. Nor does this designation practice erase the century of closed executions to create the requisite "unbroken,

10

uncontradicted history" of access. *Richmond Newspapers*, 448 U.S. at 573. This alone should end this Court's inquiry. *See Press- Enterprise II*, 478 U.S. at 9.

Even so, the Media Plaintiffs cannot show that their claims meet the second prong under the *Press-Enterprise II* framework. While the Media Plaintiffs identify important policy considerations, their claim fails under this prong for two main reasons. First, these policy considerations are still met under the current statute. Members of the press are currently able to gather information to accomplish the identified goals by means other than public access: The press receive updates—pursuant to policy—by the prison; they may request to be listed as one of the condemned person's witnesses; and they may interview any witnesses willing to speak with them. Second, there is no constitutional right of access based solely on policy considerations. Should this Court apply the framework established in *Press-Enterprise II*, the Media Plaintiffs' claims fail that test.

Furthermore, the challenged statute and policy do not discriminate against the press or impose more than an incidental burden on the press's ability to provide coverage of Indiana's executions. The policy expressly permits any member of the press to view an execution if they are designated as one of the condemned inmate's witnesses. And the challenged statute is generally applicable because it burdens the press no more than almost every other citizen of the State of Indiana. Media Plaintiffs do not seek equal treatment but a privileged position above members of the public when it comes to attending executions. But that privileged position is not demanded by the First Amendment, and the district court rightly held as much.

**I.**

### The *Press-Enterprise II* framework does not apply to executions because they are not court proceedings.

The district court correctly determined that the *Press-Enterprise II* framework does not apply to executions. The First Amendment implicitly guarantees the press a right of access to criminal trials. *Richmond Newspapers*, 448 U.S. at 580. This right of access includes various parts of the trial process. *See Press-Enterprise II*, 478 U.S. at 8–15 (concluding "that the qualified First Amendment right of access to criminal proceedings applies to preliminary hearings"); *Press-Enterprise I*, 464 U.S. at 511 ("Absent consideration of alternatives to closure, the trial court could not constitutionally close the voir dire."); *Globe Newspaper Co.*, 457 U.S. at 610 (1982) (finding a state statute "exclud[ing] the press and general public from the courtroom during the testimony of [a minor] victim" of a sex offense was unconstitutional under the First Amendment). This Court has extended the right of access to civil proceedings. *See Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1070 (7th Cir. 2018) (recognizing the *Press-Enterprise II* test as "the framework for analyzing restrictions on the press's right of access to court proceedings and documents"); *Matter of Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) ("[T]he policy reasons for granting public access to criminal proceedings apply to civil cases as well.). But neither the Supreme Court nor this Court have suggested that the *Press-Enterprise II* framework applies outside the adjudicative process.

Neither this Court nor the Supreme Court have extended this right of access beyond court proceedings. "Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, [Supreme Court] conferences, the meetings of other official bodies gathering in executive session, and the meetings of private organizations." *Pell*, 417 U.S. at 833–34; *see also United States v. Franklin*, 546 F. Supp. 1133, 1139 (N.D. Ind. 1982) (declining to find the press had a right of access to perform "post-verdict inquiry into the contents of jury deliberations"). And the press has "no constitutional right of access to the scenes of crime or disaster when the general public is excluded." *Pell*, 417 U.S. at 833–34. These cases demonstrate that the access required by the First Amendment is limited. *See Press-Enterprise II*, 478 U.S. at 9 (acknowledging that even if the right attaches, "it is not absolute"). Just as the public may witness a defendant be convicted in open court but not jury deliberations or matters occurring in a judge's chambers, the public has no right to observe defendants as they serve their sentences. *See Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 463–65 (1989) (affirming a regulation setting forth categories of visitors that may be excluded from visitation).

The First Amendment right of access applies only to court proceedings. In *Press-Enterprise II*, the Supreme Court established the framework for determining whether a right of access attached to a particular proceeding. 478 U.S. at 8–9. But the Court limited this framework to the "right of access to *criminal proceedings*[.]" *Id.* at 8 (emphasis added); *see also Okla. Observer v. Patton*, 73 F. Supp. 3d 1318,

13

1324 (W.D. Okla. 2014) (finding that *Press-Enterprise II* "defines the scope of this exception as 'criminal proceedings'"). Therefore, at the outset, this Court must necessarily determine whether an execution within a prison's walls is, in fact, a court proceeding. *See id*; *Matter of Cont'l Illinois Sec. Litig.*, 732 F.2d at 1308 (extending public access from criminal proceedings to civil proceedings). If it is not, *Press-Enterprise II* is inapplicable, and there is no qualified right of access.

It is this preliminary step that the Media Plaintiffs ignore. They presume without establishing, let alone arguing, that executions are court proceedings (Doc. 11 at 16–27). This flawed presumption is the basis of their argument. But the district court properly made this initial determination and correctly concluded that *Press-Enterprise II* did not apply because executions are not court proceedings (R. 36 at 5–9).[5] *See also Okla. Observer*, 73 F. Supp. 3d at 1324 (stating "there is considerable doubt that the *Press-Enterprise* exception even potentially applies to the circumstance present here" because "the Supreme Court has not applied the

---

[5] The proper question is whether the government must provide the Media Plaintiffs access to Indiana State Prison for First Amendment activities, *see MacIver Inst.*, 994 F.3d at 609, the answer to which depends on the nature of the forum at issue. *Id.* But Media Plaintiffs failed to raise this particular issue, and it is therefore forfeited. *See Love v. Vanihel*, 73 F.4th 439, 449 (7th Cir. 2023) ("Arguments inadvertently not raised in the district court are forfeited and, in the civil context, ordinarily unreviewable on appeal[.]"). Forfeiture aside, this argument also has no merit. When the government controls property which is not, by tradition or designation a forum for public communication, it has not created a public forum. *MacIver Inst.*, 994 F.3d at 609. "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 610 (internal quotations omitted). Because Indiana State Prison is a nonpublic forum, the Department of Correction may reasonably control access to the facility. *Id.* Because all members of the press are treated equally and the same as the general public, *see* Ind. Code § 35-38-6-6, the distinctions are reasonable for the safety and security of the facility and viewpoint neutral.

exception outside the criminal adjudication process."); *Smith v. Plati*, 258 F.3d 1167, 1178 n.10 (10th Cir. 2001) (finding *Press-Enterprise II* not "particularly relevant" to the plaintiff's First Amendment claim regarding access to information about a state university's athletic programs because those claims did not involve a claim of denial of access to "a criminal trial" or "any trial proceeding in general").

Executions are not court proceedings. They are not held before a judge. No adjudications occur during them. And they do not take place within a courtroom; they are held within a prison's walls. The Supreme Court has distinguished access to penal institutions from courtrooms by explaining, "[*Pell*] and *Saxbe* are distinguishable in the sense that they were concerned with penal institutions which, by definition, are not 'open' or public places." *Richmond Newspapers*, 448 U.S. at 577 n.11. The Court further explained, "Penal institutions do not share the long tradition of openness, although traditionally there have been visiting committees of citizens, and there is no doubt that legislative committees could exercise plenary oversight and 'visitation rights.'" *Id.* This differentiation between penal facilities and courtrooms was essential to *Richmond Newspapers*'s holding that the First Amendment implicitly guarantees the press a right of access to criminal trials, *id.* at 580, and bars applying a general right of access to penal institutions.

The Supreme Court has further recognized that the circumstances under which executions should be carried out are "regulations which the legislature, in its wisdom, and for the public good, could legally prescribe." *Holden v. State of*

15

*Minnesota,* 137 U.S. 483, 491 (1890). This includes determining the time and location of the execution as well as "the number and character of those who may witness the execution, and the exclusion altogether of reporters or representatives of newspapers." *Id.* While *Holden* primarily concerned an *ex post facto* challenge to a statute, the Supreme Court has never held otherwise regarding the power of states to legislate the conditions under which executions are carried out and penal facilities are accessed. *See Houchins*, 438 U.S. at 12 (stating that decisions regarding access to a penal facility are "clearly a legislative task which the Constitution has left to the political processes"). The Media Plaintiffs' attempt to transform Indiana's exercise of this essential legislative authority to regulate the manner of conducting executions into a court proceeding must fail.

While the execution, or any punishment for that matter, is a part of the criminal-justice system generally, *see Houchins*, 438 U.S. at 8, it is not a court proceeding. "In the legal sense, a [criminal] prosecution terminates [ ] when [the] sentence is imposed." *Bradley v. United States*, 410 U.S. 605, 609 (1973) (citations omitted, alterations supplied). In other words, once the judge presiding over the criminal case imposes a sentence, the criminal proceeding is concluded, and the individual is committed to the executive for execution of the sentence. *See* Ind. Code § 11-8-2-1 (establishing the Department of Correction as part of the executive branch); *Barnes v. State*, 435 N.E.2d 235, 242 (Ind. 1982) ("After sentencing, the custody of the defendant is with the Executive branch, represented by the Department of Correction[ ]."); *see also Morrissey v. Brewer*, 408 U.S. 471, 480

16

(1972) ("revocation of parole is not part of a criminal prosecution"); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) ("[p]robation revocation, like parole revocation, is not a stage of a criminal prosecution"); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) ("[p]rison disciplinary proceedings are not part of a criminal prosecution"). And the Media Plaintiffs acknowledge that executions are not court proceedings (Doc. 11 at 26) (acknowledging that the legislature statutorily permits the executive to govern executions).

That executions are part of the criminal-justice system generally does not transform them into court proceedings or grant the Media Plaintiffs a constitutional right of access. The government regularly engages in various types of actions that are not court proceedings or accessible to the public. *See MacIver Inst.*, 994 F.3d at 609 (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981)) ("[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government.") (alteration in original). In addition, the Media Plaintiffs have no right of access to crime scenes, *Pell*, 417 U.S. at 833–34, even though crime scenes are part of criminal investigations that lead to criminal proceedings. They have no right to the contents of jury deliberations even though those are integral to a criminal proceeding. *Franklin*, 546 F. Supp. at 1139. They have no right of access to view lawfully imposed sentences. *See Thompson*, 490 U.S. at 463–65 (Department of Correction could constitutionally limit visitation); *Houchins*, 438 U.S. at 12 (stating that decisions regarding access to a penal facility are "clearly a legislative task which the Constitution has left to the political

processes."); *Pell*, 417 U.S. at 834 ("[N]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public.").

Implicit in the Media Plaintiffs' argument is that the press and public have a right of access to all inmates serving a lawfully imposed sentence because that sentence is a court proceeding. Transforming the imposition of a lawfully imposed sentence—an execution—into a court proceeding with a right of access would transform all lawfully imposed term-of-years and life-without-parole sentences into court proceedings with a right of access. This cannot be. Executions take place long after judgment of conviction is entered and sentence is handed down. *See Okla. Observer*, 73 F. Supp. 3d at 1324 (executions are the "process of *implementing* a court's judgment" not "the criminal *adjudication* process") (emphasis in original). There is a profound difference, in both history and purpose, between the adjudicative process that determines when and based on what evidence the government may impose upon the liberty of its citizens and the administrative process of carrying out the resulting orders. *See BH Media Grp., Inc. v. Clarke*, 466 F. Supp. 3d 653, 663 (E.D. Va. 2020) (explaining that the criminal adjudication process occurs in a courtroom before the entry of a judgment and that judgment ends the criminal-adjudication process). Executions are not adjudicative court proceedings within the meaning of *Press-Enterprise II*; therefore, the framework established in *Press-Enterprise II* is inapplicable.

The Media Plaintiffs' reliance on *Cal. First Amend. Coal. v. Woodford* and its progeny is unpersuasive. 299 F.3d 868 (9th Cir. 2002). First, *Woodford* is non-

binding precedent from the only circuit to find a right to access executions. *Id.* at 874. Since *Woodford*, every court outside of the Ninth Circuit to address whether there is a right to access executions at penal institutions has concluded that no right of access exists.[6] *See BH Media Grp., Inc.*, 466 F. Supp. 3d at 662 (dismissing right-of-access claim and declining to extend Supreme Court precedent to executions because it would be "quite a reach" as executions "do not occur in the adjudicatory process"), *vacated and remanded on other grounds*, 851 F. App'x 368 (4th Cir. 2021) (case became moot when Virginia abolished executions); *Okla. Observer*, 73 F. Supp. 3d at 1325 (declined to extend the *Press-Enterprise II* framework to executions because they are "outside the criminal adjudication process"); *Ark. Times, Inc. v. Norris*, No. 5:07-cv-00195 SWW, 2008 WL 110853 (E.D. Ark. Jan. 7, 2008) (applying *Press-Enterprise II* framework in arguendo and holding executions did not satisfy the test). This alone should call into question *Woodford's* analysis.

Second, *Woodford's* rationale for finding a right of access to executions is flawed. *Woodford* recognized a constitutional right of access to executions merely because of their import. *Id.* at 874–76. But that reasoning is underwhelming and

---

[6] *Philadelphia Inquirer v. Wetzel* found a right to access executions because executions in Pennsylvania are not conducted inside penal institutions; therefore, the court's analysis was not controlled by *Houchins*. 906 F. Supp. 2d 362, 369 (M.D. Pa. 2012). *Wetzel* distinguished between the press seeking access to a medical complex and the inside of a prison. *Id.* And it noted that Pennsylvania statutes permitted up to six media members to witness the execution. *Id.* at 370. Such is not the case here. Executions are conducted at the Indiana State Prison, and the media is only permitted if designated by the condemned as a witness. *See* Ind. Code § 35-38-6-6. *Houchins* controls this Court's analysis. *See Houchins*, 438 U.S. at 12 (stating that decisions regarding access to a penal facility are "clearly a legislative task which the Constitution has left to the political processes.")

still fails to address exactly how executions are themselves a court proceeding. This is particularly problematic when the Supreme Court specifically distinguished access to penal institutions from courtrooms to find that the press has a right of access to criminal trials and has never extended the right of access beyond criminal proceedings. *Richmond Newspapers*, 448 U.S. at 577 n.11; *see also Press-Enterprise II*, 478 U.S. at 6; *Press-Enterprise I*, 464 U.S. at 511; *Globe Newspaper Co.*, 457 U.S. at 610.

Finally, *Woodford* conflicts with its own binding precedent and unconvincingly attempted to distinguish Supreme Court precedent. Before *Woodford*, the Ninth Circuit addressed the same policy at issue in *Woodford* and held that the policy did "not violate the First Amendment rights of either the press or the public." *Cal. First Amend. Coalition v. Calderon*, 150 F.3d 976, 982 (9th Cir. 1998). *Calderon* concluded that "whatever First Amendment right might exist to view executions, the 'right' is severely limited." *Id. Calderon* was binding on the *Woodford* court, yet it ignored *Calderon. See Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015) (explaining that a published panel decision is binding on other panels).

In addition to ignoring its own binding precedent, *Woodford* feebly tried to distinguish Supreme Court precedent. While recognizing that the Supreme Court upheld a regulation prohibiting reporters and the public from observing an execution in *Holden*, the *Woodford* court claimed that *Holden* was "inconsistent with more modern Supreme Court jurisprudence[.]" 299 F.3d at 875 n.3. But the precedent *Woodford* relied on to distinguish *Holden* was itself distinguishable. That

case involved a statute enjoining the publication of certain topics, not the press's ability to access information. *See id.* (citing *Near v. Minnesota*, 283 U.S. 697 (1931)). But First Amendment protections distinguish between the right to publish information without government restraint and the acquisition of the information in the first place. *See Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965). *Woodford* then failed to consider how more modern Supreme Court precedent supports the rejection of the right to access executions. *See e.g. Richmond Newspapers*, 448 U.S. at 577 n.11; *Thompson*, 490 U.S. at 463–65; *Houchins*, 438 U.S. at 12, 15; *Pell*, 417 U.S. at 834. *Woodford* rests on shaky ground, at best, and this Court should decline to follow it. The district court correctly concluded that the *Press-Enterprise II* framework does not apply to executions because they are not court proceedings (R. 36 at 9). This alone should end this Court's inquiry and lead it to affirm the denial of the Media Plaintiff's motion for a preliminary injunction.

## II.
### The district court properly found that even if *Press-Enterprise II* applied to executions, the Media Plaintiffs have failed to establish that executions pass the experience-and-logic test.

Even if this Court were to find that executions constitute court proceedings within the meaning of *Press-Enterprise II*, the Media Plaintiffs' claim still fails. In *Press-Enterprise II*, the Supreme Court emphasized two "complementary" factors courts should evaluate in determining whether there is a First Amendment right of access to criminal proceedings: The "experience" element, which considers whether the place and process have historically been open to the public; and the "logic" element, which considers whether public access plays a significant positive role in

the functioning of the particular process in question. 478 U.S. at 8–9. If the particular proceeding passes the "experience" and "logic" tests, a qualified First Amendment right of public access attaches. *Id.* at 9. The district court correctly determined that even if *Press-Enterprise II* applied, executions do not pass the experience-and-logic test (R. 36 at 9–12).

## A. Executions have not historically been open to the press and general public.

A place and process have historically been open to the press and public when there is an "unbroken, uncontradicted history, supported by reasons as valid today as in centuries past[.]" *Richmond Newspapers*, 448 U.S. at 573. *Richmond Newspapers* found this prong satisfied even though trials moved from a "town meeting" form of trial to courtrooms because "the community did not surrender its right to observe the conduct of trials" and "[t]he people retained the rights of visitation[.]" *Id.* at 572. Such is not the case with executions. *See Okla. Observer,* 73 F. Supp. 3d at 1326 (explaining that it is "quite clear" that the history of executions discussed in *Woodford* "is not the same 'unbroken, uncontradicted history' of access that the Supreme Court found persuasive in *Richmond* and its progeny"). "In contrast to the unbroken, uncontradicted history of public access to criminal trials, in the 1830s, executions in the United States became private events and moved from the public square to inside prison walls." *Arkansas Times, Inc.*, 2008 WL 110853, at *4 (citing Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 Buff. L.Rev. 461, 557 (1995)).

Executions have not historically been open to the public and the press. Indiana removed executions from the public in 1852. 1852 Ind. Acts, vol. II, 379 § 134 (requiring that "[t]he sentence of death shall be executed in some private enclosure as near to the jail as possible"). And since 1897, all executions have taken place at the Indiana State Prison. *See* Dawn Mitchell, *A History of Executions in Indiana*, Indianapolis Star, Dec. 11, 2019, https://www.indystar.com/ story/news/2019/12/11/indiana-executions-full-list-peopleexecuted-since-1897/4357164002/. But Indiana is not alone. Connecticut removed executions from the public in 1830. 1830 Conn. Laws, 284 § 147 (requiring executions to occur "within the jail, or within an enclosed yard, so as to prevent public observation"). Numerous other states followed suit, for example: Rhode Island in 1833;[7] Pennsylvania in 1834;[8] New Jersey in 1834;[9] New York in 1835;[10] New Hampshire in 1836;[11] Mississippi in 1839;[12] Ohio in 1843;[13] Delaware in 1849;[14] the Kansas

---

[7] 1833 R.I. Laws, 50–51.

[8] 1833–34 Pa. Laws, 234–35.

[9] 1834 N.J. Laws 170.

[10] 1835 N.Y. Laws 299 § 1.

[11] 1835 N.H. Laws, 241–42 § 5.

[12] 1839 Miss. Laws, 110 § 25.

[13] 1843 Ohio Laws, 71 § 1.

[14] 1849 Del. Laws, 366–67 § 1.

Territory in 1858;[15] the Colorado Territory, Georgia, and Illinois in 1859;[16] the

Montana Territory in 1864;[17] Oregon in 1874;[18] Nevada in 1875;[19] the Wyoming

Territory in 1876;[20] the Utah Territory in 1878;[21] Maryland in 1882;[22] Tennessee in

1883;[23] Louisiana in 1884;[24] Missouri in 1887;[25] Minnesota in 1889;[26] California in

1891;[27] Nebraska and Washington in 1901;[28] New Mexico in 1903;[29] and the Arizona

Territory in 1909.[30] In fact, one of the last public executions was the hanging of

---

[15] 1858 Kan. Terr. Laws, 190.

[16] 1859 Colo. Terr. Laws, 57 § 365 (judicial discretion was removed in 1889, 1889 Colo. Laws, 118 § 1); 1859 Ga. Laws, 62–63 § 1 (judicial discretion was removed in 1893, 1893 Ga. Laws, 41–42); 1859 Ill. Laws, 17 § 1.

[17] 1864 Mont. Terr. Laws, 250 § 222.

[18] 1874 Or. Laws, 115–116.

[19] 1875 Nev. Stat., 53 Ch. X.

[20] 1876 Wyo. Terr. Laws, 161 § 170.

[21] 1878 Utah Terr. Laws, 136 § 356.

[22] 1882 Md. Laws, 630–31 § 31.

[23] 1883 Tenn. 139–40.

[24] 1884 La. Laws, 102 No. 79.

[25] 1887 Mo. Laws, 169.

[26] 1889 Minn. Laws, 66 § 5.

[27] 1891 Cal. Laws, 274 § 1229.

[28] 1901 Neb. Laws, 506 § 2; 1901 Wash. Laws, 101.

[29] 1903 N.M. Laws, 141 Ch. 76 § 1.

[30] 1909 Ariz. Terr. Laws, 96–97.

Rainey Bethea in Kentucky in 1936. Dane A. Drobny, *Death TV: Media Access to Executions Under the First Amendment*, 70 Wash. U. L.Q. 1179, 1187 (1992).

Specifically, in Oklahoma, executions were not open to the general public and were required to take place in "some convenient private place in the county." *Okla. Observer*, 73 F. Supp. 3d at 1326–27. Idaho has long shielded executions from the public. *See* Idaho Rev. St. §§ 8005–21 (1899) (requiring that executions be conducted in a "suitable room or place, closed from public view within the walls of the State Penitentiary"); *see*, *e.g.*, Kathy Deinhardt Hill, *Hanged—A History of Idaho's Executions*, 26, 81, 93, 127, 170, 194, 207, 235 (2010) (detailing executions in Idaho that were closed to the public and/or press). Similarly, Arkansas has long provided that executions carried out by the State will be private. *Arkansas Times, Inc.*, 2008 WL 110853, at *4 (citing Act of Mar. 1, 1887, Pub.L. No. 24, § 1, 1887 Ark. Acts 29; Ark. Code § 16-90-502(d)(1))("No execution of any person convicted in this state of a capital offense shall be public, but shall be private.")). Minnesota required that executions take place "in an inclosure from which the public are excluded[.]" *Minnesota v. Pioneer Press Co.*, 110 N.W. 867, 867 (Minn. 1907). In 1890, the Supreme Court acknowledged the private nature of executions and that legislatures may determine who may witness an execution, including "the exclusion altogether of reporters or representatives of newspapers." *Holden*, 137 U.S. at 491.[31]

---

[31] The district court properly found that the Supreme Court's "recognition that a state could regulate attendance at an execution is a good clue that executions do not have the same 'unbroken, uncontradicted history' of public access as criminal trials" (R. 36 at 11) (citing *Richmond Newspapers*, 448 U.S. at 573).

Many states went even further than merely shielding executions from the public. While some states have eventually adopted statutes permitting limited numbers of the press to attend executions (Doc. 11 at 32–33), many states enacted statutes banning the press from reporting the details of executions. New York enacted the first of these laws in 1888. *See* 1888 N.Y. Laws, 780 § 507. New York was followed shortly by Colorado, Minnesota, Virginia, Washington, and Arkansas.[32] Minnesota's statute included an outright ban on press attendance at executions, which the Minnesota Supreme Court upheld against constitutional challenges. *See* 1889 Minn. Laws, 66–67 § 5; *Pioneer Press Co.*, 110 N.W. at 867–69 (upholding statute against state constitutional attacks and noting that "the extent of the limitation must be left to the wisdom of the Legislature").

Simply because executions were once public does not demonstrate an "unbroken, uncontradicted history" of public access to executions. This is especially true in light of nearly 200 years of history moving toward more private or closed executions. *See Furman v. Georgia*, 408 U.S. 238, 297 (1972) (Brennan, J., concurring) ("No longer does our society countenance the spectacle of public executions, once thought desirable as a deterrent to criminal behavior by others. Today we reject public executions as debasing and brutalizing to us all."); *id.* at 340 (Marshall, J., concurring) (acknowledging that "executions which had once been frequent public spectacles, became infrequent private affairs."). The Media

---

[32] 1889 Colo. Laws, 119; 1889 Minn. Laws, 66–67 § 5; 1908 Va. Laws, 686; 1909 Wash. Laws, 952; 1913 Ark. Laws, 174 § 10.

Plaintiffs even acknowledge the movement from public to private executions in the 1800s (Doc. 11 at 30–31).

It is this more recent history of moving toward more private executions that undermines the Media Plaintiffs' arguments and negates the allegation that executions have historically been open to the public. *See* Drobny, *Death TV*, 70 Wash. U. L.Q. at 1187–94, 1201 (detailing the transition from public to private executions and explaining that although the public and the press initially had the right to attend executions, "they lost this right" when "public executions ceased in America in the latter part of the nineteenth century[;]" therefore, "history does not demonstrate an unbroken tradition of press and public access to executions"). The district court correctly concluded that "while many states allowed for some representatives of the public to attend executions, no comparable right of *general access* exists" (R. 36 at 11) (contrasting the transition of public to private executions with the transition of public town-meeting trials to public courtrooms) (citing *Ark. Times, Inc.*, 2008 WL 110853, at *4) (emphasis in original).

Neither does the more recent practice of permitting designated witnesses, including members of the press, to view executions create the requisite "unbroken, uncontradicted history" of public access. First, as explained by the district court in *Oklahoma Observer*, "[W]hile the practice of allowing twelve reputable citizens to attend an execution has superficial similarity to the 'representative' function of a twelve person jury, the situations are not parallel." 73 F. Supp. 3d at 1327 (citing *Ark. Times*, 2008 WL 110853 at *4 ("However, the presence of six to twelve citizen

witnesses does not transform a private execution into a public proceeding comparable to a criminal trial.")). "Members of the general public—not just designated representatives—retained a right to attend criminal trials." *Okla. Observer*, 73 F. Supp. 3d at 1327; *see also Richmond Newspapers*, 448 U.S. at 572 (explaining that citizens always retained the right to view criminal trials). Second, the more recent practice of designating witnesses to view executions and public execution in a town square are separated by over 100 years of states shielding executions from the public. The question under *Press-Enterprise II* is not whether there is a "well-established tradition of access to executions for official witnesses and members of the press" (Doc. 11 at 38), but whether the "place and process have historically been open to the public." *Press-Enterprise II*, 478 U.S. at 8. Executions have not. Being open to official witnesses and limited members of the press is a stark difference from being open to the public. Therefore, there has not been an unbroken, uncontradicted history of public access to executions.

The Media Plaintiffs cannot demonstrate that executions have historically and continuously been open to the press and general public. *See Okla. Observer*, 73 F. Supp. 3d at 1326 (explaining that unlike the historical record in *Richmond Newspapers*, "[n]o comparable right exists … as to executions"); *Ark. Times, Inc.*, 2008 WL 110853, at *4 (holding that there is not a history of public access to executions). Because the Media Plaintiffs cannot prove their case under the experience prong of *Press-Enterprise II*, they have not proved a qualified right of access to Indiana's executions. *See Press-Enterprise II*, 478 U.S. at 9 (requiring the

proceeding in question to pass both tests to demonstrate a qualified right of access);

*Okla. Observer*, 73 F. Supp. 3d at 1328 (finding that *Press-Enterprise II* requires "a

showing as to both 'experience' *and* 'logic.'").

## B. Public access to executions would not play a significant positive role in their functioning.

The Media Plaintiffs' case fails on the logic prong under *Press-Enterprise II* as

well. The logic inquiry asks whether public access plays a significant positive role in

the functioning of the process in question. *Press-Enterprise II*, 478 U.S. at 8. The

Supreme Court has stated that capital punishment serves three purposes:

retribution, deterrence. and incapacitation. *Gregg v. Georgia*, 428 U.S. 153, 183 n.28

(1976). Logic does not support the Media Plaintiffs' argument that they have a right

of access to executions.

The Media Plaintiffs contend that several policy considerations support

having executions be open to the public, including "providing an outlet for

community concern, hostility, an emotion," "facilitat[ing] the deterrent goal of the

death penalty," encouraging greater accountability, and providing informed public

debate (Doc. 11 at 41–47). While these policy considerations may have a certain

appeal, they are not absolute and do not demand accommodation on a constitutional

scale. *See Houchins*, 438 U.S. at 9, 12–14 ("The public importance of conditions in

penal facilities and the media's role of providing information afford no basis for

reading into the Constitution a right of the public or the media to enter these

institutions" because the access sought by plaintiffs there was "clearly a legislative

choice."). And other considerations weigh against making executions public,

including protecting the anonymity of staff involved in the execution, the dignity of the individual being executed, and the security and order of the prison. *See Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012) (stating that permitting strangers to watch as a person is put to death "offends the dignity of condemned inmates and the sensibilities of their families"); *see also Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (recognizing the legitimate "governmental interests of security, order, and rehabilitation"). This is especially true when the Media Plaintiffs' alleged goals can be accomplished without a general right of access to executions.

Media Plaintiffs can currently accomplish their goals in any number of ways. First, the press receives information from the facility itself per required policy (R. 9-1 at 4). They may also request that the condemned designate a member of the press to be a witness, as was done for the execution of Joseph Corcoran in December 2024. *See e.g.*, Casey Smith, *Death row inmate Joseph Corcoran executed for quadruple murder*, Ind. Capital Chronicle, Dec. 18, 2024, https://indianacapitalchronicle.com/2024/12/18/death-row-inmate-jospeh-corcoran-executed-for-quadruple-murder/ (containing account of reporter who witnessed Corcoran's execution). Members of the press could also interview any of the offender's witnesses, as they did after Benjamin Ritchie's execution in May 2025. *See, e.g.*, Fox 59, *Benjamin Ritchie executed at prison in Michigan City*, May 20, 2025, https://fox59.com/indiana-news/benjamin-ritchie-executed-at-prison-in-michigan-city (containing clip of video interview with one of Ritchie's designated witnesses). The press could even interview the victim's family's witnesses if those witnesses would be willing to

speak with them. The Media Plaintiffs have the ability to gather the information they seek and report on executions.

Granting public access also would not have a significant positive role in the functioning of executions. First, "the role that executions played in 'the judicial process and the government as a whole' changed." Drobny, *Death TV*, 70 Wash. U. L.Q. at 1202 (quoting *Globe Newspapers*, 457 U.S. at 606). Society now executes prisoners to achieve goals of deterrence and retribution rather than to convey outdated civic and religious messages. *See id.* "Therefore, the presence of the public [i]s no longer necessary to facilitate the role that executions played earlier" of demonstrating that the new republic would not tolerate unlawful action by its citizens and the ritual of the prisoner seeking repentance. *Id.* Second, the Media Plaintiffs are currently able to accomplish the contemporary goals by means other than public access; therefore, granting such would not *significantly* increase the positive role the Media Plaintiffs could potentially contribute to the functioning of executions. Because the Media Plaintiffs are currently able to provide robust reporting on executions, *see e.g.*, Smith, *Death row inmate*; Fox59, *Benjamin Ritchie executed*, the public is provided the necessary information to spur informed public discourse, encourage accountability, deliver the cathartic effect of seeing justice done, and promote the intended deterrent effect of capital punishment.

And the district court appropriately cautioned against confusing policy goals with constitutional requirements (R. 36 at 12) (citing *Houchins*, 438 U.S. at 13) ("We must not confuse what is good, desirable, or expedient with what is

constitutionally commanded by the First Amendment."). *See also Ark. Times, Inc.*, 2008 WL 110853, at *5. "Proceeding on the basis of some generalized right of access in these circumstances would be tantamount to turning the First Amendment into a sort of court-ordered freedom of information act, a result inconsistent with Supreme Court precedent." *Okla. Observer*, 73 F. Supp. 3d at 1328 (citing *McBurney v. Young*, 569 U.S. 221, 232 (2013) ("This court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws.")). The district court correctly concluded that the Media Plaintiffs' claim did not pass the logic test (R. 36 at 12). The district court did not abuse its discretion by finding that Media Plaintiffs were unlikely to succeed on the merits of their claim to a qualified right of access. This Court should affirm the denial of injunctive relief.

## III.
## The district court correctly determined that Indiana Code § 35-38-6-6 and ISP 06-26 do not violate the Free Press Clause of the First Amendment.

The challenged statute and policy do not discriminate against the press or impose more than an incidental burden on the press's ability to provide coverage of Indiana's executions. The Supreme Court has held that it is "clear" that the First Amendment's protections for press freedom "do[ ] not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Branzburg*, 408 U.S. at 682. It then follows that a law restricting access to certain information does not violate the First Amendment because "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Id.* (citing

*Zemel*, 381 U.S. at 16–17; *New York Times Co. v. United States*, 403 U.S. 713, 728–30 (Stewart, J., concurring); *Tribune Review Publ'g Co. v. Thomas*, 254 F.2d 883, 885 (3d Cir. 1958); *In re United Press Ass'ns v. Valente*, 308 N.Y. 71, 77 (1954)). Against First Amendment challenges, the Supreme Court has upheld travel restrictions to a whole country, and this Court has upheld neutral factors used to determine which members of the press had access to a government office. *Zemel*, 381 U.S. at 16–17 (upholding the refusal to validate passports for travel to Cuba) ("The right to speak and publish does not carry with it the unrestrained right to gather information."); *MacIver Inst.*, 994 F.3d at 605–15 ("[R]eporters are not cloaked with automatic 'strict scrutiny protection' merely because they are members of the press.").

The challenged law and policy do not unlawfully discriminate against the press. In fact, the Indiana Department of Correction's policy that is challenged here expressly speaks to the condition under which any member of the press (or public, subject to security restrictions) may be permitted to view an execution in Indiana: The policy states that a member of the press can attend if they are designated as one of the condemned inmate's five designated witnesses (Doc. 9-1 at 4). The Media Plaintiffs are simply wrong when they claim that the "press has no access at all" to executions in Indiana (Doc. 11 at 51).

And this generally applicable law burdens the press no more than almost every other citizen of the State of Indiana. Excepting necessary staff, only 15 of the approximately 6.8 million citizens of Indiana can be permitted to view an execution.

Ind. Code § 35-38-6-6(a). Less of a burden could hardly be imagined when the restriction affects 0.00022 percent of the state's population, let alone one that would be more than incidental and justify the application of strict scrutiny. The challenged law and policy is one of general application that imposes a negligible burden on press freedom.

This Court has upheld generally applicable criteria for exclusion from newsworthy public people and areas, which Indiana law provides. The Court found no First Amendment problem when the Wisconsin's Governor's Office applied objective criteria to determine which members of the press would be allowed access to certain briefings. *MacIver Inst.*, 994 F.3d at 605–15. In doing so, the Court expressly rejected the argument being made here, namely, that the First Amendment imbues the press with special rights of access to government workings and facilities. *Id.* at 611–12 (characterizing the reporters' arguments as "really an argument that any restriction on someone acting as a member of the press must be subject to strict scrutiny"). This argument failed "for several reasons," but one of which was that "[m]embers of the press are routinely excluded from places that other members of the public may not access[,]" and the Court could "imagine the havoc that might ensue if government entities could not exclude members of the press from any non-public part of a government building … without demonstrating that the restriction is necessary to serve a compelling interest and narrowly drawn to meet that interest." *Id.* at 612.

34

The restriction on who can be within a prison's walls and inside of an execution chamber is far more reasonable than the valid limitations upheld in *MacIver Institute*. Those restrictions are not only created by Indiana's legislature, which the Supreme Court has held is its right, *Houchins*, 438 U.S. at 12, but also the policy of the Indiana Department of Correction to protect its employees and ensure that the death sentence is performed ethically and constitutionally. The "media … are 'ill equipped' to deal with the problems of prison administration," and execution chambers are about the furthest from a public or semi-public forum that one could imagine. *Id.* at 8; *see Zemel*, 381 U.S. at 16–17 ("For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right."); *Pell*, 417 U.S. at 834 ("[N]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public.").

The Media Plaintiffs' contrary factual case presumes that members of the press are entirely excluded from any ability to gather news about Indiana's execution. That is incorrect. First, as pointed out above, the Department's policy expressly allows for press to be witnesses when an offender designates them to be a witness. Second, the press has other means to gather information about what occurred in an execution. Newsgatherers can interview one of the offender's witnesses, as they did after Benjamin Ritchie's execution in May 2025. *See, e.g.*, Fox 59, *Benjamin Ritchie executed* (containing clip of video interview with one of

Ritchie's designated witnesses). The press can interview the victim's witnesses if those witnesses should want to speak with them. The press receives information from the facility itself per required policy (R. 9-1 at 4). Far from Indiana's executions being done in the dark with no ability for the press to report on them, multiple methods of newsgathering are possible under Indiana law—another point proving that Indiana's generally applicable prohibition on public executions imposes only an incidental burden on the press.

The Media Plaintiff's contrary legal case fares no better. They ask this Court to disregard *MacIver Institute*'s holding because that case's "public forum analysis … is not press-specific" (Doc. 11 at 50). True enough, but that attempt to distinguish *MacIver Institute* reveals that the Media Plaintiffs want this Court to defy established precedent that the press does not have access above and beyond that of ordinary citizens. *See Pell*, 417 U.S. at 834 ("The Constitution does not … require government to accord the press special access to information not shared by members of the public generally."). And while the Media Plaintiffs attempt to throw aside the Supreme Court's unequivocal holding in *Pell* (Doc. 11 at 52–53), they provide no salient point of distinction between their claim of higher-than-public status here and that rejected in *Pell*; their whole argument to ignore *Pell* is actually just a description of its holding with no substantive argument why this Court is not bound by it (Doc. 11 at 52–53). The Media Plaintiffs' legal case has almost squarely been rejected by Supreme Court precedent and this Court's previous holdings.

As for the Media Plaintiffs' reliance on *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), the First Amendment burden there was inarguably greater than the almost non-existent one here. The Illinois statute challenged in *ACLU* potentially criminalized the recording of what police officers said while performing their duties in traditional public fora. *Id.* at 594–95. In fact, the challenged prohibition in *ACLU* would have "bann[ed] *all* audio recording of *any* oral communication absent consent of the parties regardless of whether the communication is or was intended to be private." *Id.* at 595 (emphasis in original). This Court held that the "expansive reach of this statute [was] hard to reconcile with basic speech and press freedoms[,]" and then proceeded to discuss "the extent to which Illinois may restrict audio and audiovisual recording of utterances that occur *in public*." *Id.* (emphasis supplied).

*ACLU* is readily distinguishable. Again, the challenged Indiana statute and related policy does not absolutely prohibit the press from attending an execution (Doc. 9-1 at 4). But even if it did, that would go along with the almost absolute prohibition against all Indiana citizens from viewing an execution, and "the First Amendment provides no special solicitude for members of the press." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 946 (7th Cir. 2015) (citing *Branzburg*, 408 U.S. at 707). In fact, the Media Plaintiffs are using *ACLU* to prove that the laws they are challenging cut off all access to information to the press about executions (Doc. 11 at 53), which is factually untrue, but again shows that they want a privileged position above members of the public when it comes to attending

executions. That privileged position is not demanded by the First Amendment.

*Associated Press v. Nat'l Labor Relations Bd.*, 301 U.S. 103, 132 (1937) ("The publisher of a news paper has no special immunity from the application of general laws."). The Media Plaintiffs have not proved a substantial likelihood of success on this claim or any other. They are not entitled to an injunction. This Court should affirm the denial of their request for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order denying Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

THEODORE E. ROKITA
Indiana Attorney General

/s/ Tyler Banks
TYLER BANKS
Supervising Deputy Attorney General

/s/ Megan M. Smith
MEGAN M. SMITH
Deputy Attorney General

*Counsel for Appellees*

OFFICE OF INDIANA ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South
302 West Washington Street, Fifth Floor
Indianapolis, Indiana 46204-2770
(317) 234-7016
Tyler.Banks@atg.in.gov

Dated: August 27, 2025

## FED. R. APP. P. 32(g) WORD COUNT CERTIFICATE

1.      Pursuant to Fed. R. App. P. 32(g), the undersigned counsel for the Appellee certifies that this brief complies with the type-volume limitations of Circuit Rule 32(c) because the brief contains approximately 10,652 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief has been prepared in a proportionally spaced typeface using Microsoft Word Century Schoolbook typeface in font size 12 for the text and font size 11 for the footnotes. *See* Cir. R. 32(b).

/s/ Tyler Banks
TYLER BANKS
Supervising Deputy Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system to all parties.

/s/ Tyler Banks
TYLER BANKS
Supervising Deputy Attorney General

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South
302 West Washington Street, Fifth Floor
Indianapolis, Indiana 46204-2770
(317) 234-7016
Tyler.Banks@atg.in.gov