No. 25-2025

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

**THE ASSOCIATED PRESS,
STATES NEWSROOM d/b/a Indiana Capital Chronicle,
GANNETT CO., INC., CIRCLE CITY BROADCASTING I, LLC, and
TEGNA INC.,**

*Plaintiffs-Appellants*,

v.

**RON NEAL and LLOYD ARNOLD *in their official capacities*,**

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:25-cv-00872-MPB-MJD
Hon. Matthew P. Brookman, U.S. District Judge

_____

## APPELLANTS' REPLY BRIEF

_____

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
P.O. Box 150
Fishers, IN 46038
(463) 271-4676
kcundiff@rcfp.org

Lin Weeks
  *Counsel of Record*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
lweeks@rcfp.org

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

ARGUMENT ..................................................................................................2

I.      The *Press-Enterprise II* framework applies to executions. ............................2

    A.      The *Press-Enterprise II* framework is not limited to "court proceedings." ......................................................................2

    B.      The *Press-Enterprise II* framework is not limited to adjudicative or adversarial proceedings. ..............................5

    C.      The *Press-Enterprise II* analysis applies to proceedings that take place in IDOC facilities. ..............................9

II.     The experience and logic factors of *Press-Enterprise II* are satisfied with respect to executions. ..........................................11

    A.      Executions have historically been open to neutral observers. ............11

    B.      Permitting neutral observers at executions plays a significant positive role in their functioning. .....................................21

III.    Section 6(a) and ISP 06-26 place more than an incidental burden on the press and are not generally applicable. ...................................25

CONCLUSION ..............................................................................................27

CERTIFICATE OF COMPLIANCE ..................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Am. C.L. Union of Ill. v. Alvarez*,
 679 F.3d 583 (7th Cir. 2012)........................................................................10, 27

*Associated Press v. Otter*,
 682 F.3d 821 (9th Cir. 2012).................................................................................23

*Associated Press v. Otter*,
 No. 1:12-CV-00255-EJL, 2012 WL 12977323, (D. Idaho June 5, 2012)............16

*Associated Press v. Tewalt*,
 780 F.Supp.3d 1052 (D. Idaho 2025)....................................................................16

*Bantam Books*, *Inc. v. Sullivan*,
 372 U.S. 58 (1963)...................................................................................................3

*California First Amendment Coalition v. Woodford*,
 299 F.3d 868 (9th Cir. 2002)........................................................................ *passim*

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
 508 U.S. 520 (1993)...............................................................................................26

*Cohen v. Cowles Media Co.*,
 501 U.S. 663 (1991)...............................................................................................26

*Courthouse News Serv. v. Brown*,
 908 F.3d 1063 (7th Cir. 2018)...............................................................................20

*Dahlstrom v. Sun-Times Media, LLC*,
 777 F.3d 937 (7th Cir. 2015).................................................................................27

*Detroit Free Press v. Ashcroft*,
 303 F.3d 681 (6th Cir. 2002)...................................................................................5

*El Vocero de Puerto Rico v. Puerto Rico*,
 508 U.S. 147 (1993).........................................................................................12, 20

*First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*,
 784 F.2d 467 (3d Cir. 1986)...................................................................................12

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021).................................................................25

*Garrett v. Estelle*,
    424 F.Supp.468 (N.D. Tex.), ..............................................18

*Globe Newspaper Co. v. Superior Court*,
    457 U.S. 596 (1982)........................................................2, 10

*Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*,
    24 F.3d 893 (7th Cir. 1994)..................................................21

*Holden v. Minnesota*,
    137 U.S. 483 (1890)...............................................................5

*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978)....................................................................9

*Ill. Repub. Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020)................................................20

*In re Cont'l Ill. Sec. Litig.*,
    732 F.2d 1302 (7th Cir. 1984)............................................5, 7

*Index Newspapers LLC v. United States Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020)..................................................8

*Johnson Newspaper Corp. v. Melino*,
    564 N.E.2d 1046 (N.Y. 1990) ...............................................4

*Ky. Dept. of Corr. v. Thompson*,
    490 U.S. 454 (1989)...............................................................6

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012).............................................7, 10

*MacIver Inst., Inc. v. Evers*,
    994 F.3d 602 (7th Cir. 2021)................................................10

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
    460 U.S. 575 (1983)..............................................................26

*Near v. Minnesota,*
   283 U.S. 697 (1931) ...........................................................................3

*Nebraska Press Ass'n v. Stuart,*
   427 U.S. 539 (1976) .......................................................................3, 19

*New York C.L. Union v. New York City Transit Auth.,*
   684 F.3d 286 (2d Cir. 2012) ............................................................7

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ...........................................................................3

*Pell v. Procunier,*
   417 U.S. 817 (1974) ...............................................................6, 8, 9, 27

*Philadelphia Inquirer v. Wetzel,*
   906 F.Supp.2d 362 (M.D. Pa. 2012) ........................................9, 16, 22

*Press-Enterprise Co. v. Superior Court,*
   478 U.S. 1 (1986) ....................................................................*passim*

*Ramos v. Louisiana,*
   590 U.S. 83 (2020) ..........................................................................11

*Richmond Newspapers, Inc. v. Virginia,*
   448 U.S. 555 (1980) ...............................................................2, 8, 24, 27

*Smith v. Cleveland,*
   641 N.E.2d 828 (Ohio Ct. App. 1994) ..............................................4

*Tandon v. Newsom,*
   593 U.S. 61 (2021) .......................................................................25, 26

*Uniontown Newspapers, Inc. v. Roberts,*
   839 A.2d 185 (Pa. 2003) ...................................................................4

*United States v. Franklin,*
   546 F.Supp.1133 (N.D. Ind. 1982) ...................................................6

*United States v. Miami Univ.,*
   294 F.3d 797 (6th Cir. 2002) ............................................................4

*Whiteland Woods, L.P. v. Twp. of W. Whiteland*,
  193 F.3d 177, 181 (3d Cir. 1999) ................................................7, 10, 11

**Statutes**

1833–34 Penn. Laws 234 ........................................................16

1835 N.Y. Laws 299 .............................................................12

1836 N.H. Laws 241 .............................................................13

1843 Ohio Laws 71 ..............................................................16

1849 Del. Laws 366 .............................................................13

1858 Cal. Laws 192 .............................................................13

1858 Kan. Terr. Laws 190 ....................................................13

1859 Ga. Laws 62 ...............................................................17

1859 Ill. Laws 17 ..............................................................13

1864 Mont. Terr. Laws 250 ..................................................16

1875 Nev. Stat. 53 ............................................................14

1882 Md. Laws 630 .............................................................13

1884 La. Laws 102 .............................................................13

1885 Ohio Laws 170 ...........................................................14

1887 Ariz. Terr. Laws 807 ..................................................13

1887 Ark. Laws 29 .............................................................13

1887 Mo. Laws 169 .............................................................13

1888 N.Y. Laws, 780 ..........................................................18

1889 Colo. Laws 119 ..........................................................18

1889 Minn. Laws 66 ...........................................................18

1891 Cal. Laws 274..............................................................................13

1892 N.Y. Laws 36..............................................................................19

1893 Conn. Laws 282..........................................................................15

1898 N.J. Laws 913............................................................................15

1901 Nev. Laws 68.............................................................................14

1903 N.M. Terr. Laws 141..................................................................14

1908 Va. Laws 686.............................................................................18

1909 Ariz. Terr. Laws 96...................................................................13

1909 Wash. Laws 952........................................................................18

1910 Ky. Acts 112.............................................................................14

1912 S.C. Laws 703...........................................................................16

1913 Ark. Laws 173...........................................................................13

1913 Ark. Laws 174...........................................................................18

1923 Ala. Laws 760...........................................................................15

1939 Fla. Laws 1373..........................................................................15

1951 Okla. Laws 64............................................................................15

1954 Miss. Laws 246..........................................................................15

1979 S.D. Laws 206............................................................................15

1980 Utah Laws 146...........................................................................15

1982 Wash. Laws 759.........................................................................19

1994 Tenn. Laws 346..........................................................................15

1995 Ark. Laws 794............................................................................19

1997 S.C. Laws 565............................................................................15

1999 Mont. Laws 1440................................................................................15

2001 Ore. Laws 488 ................................................................................15

2009 Neb. Laws 53................................................................................15

2009 Pa. Laws 223 ................................................................................15

3 Ga. Code of 1895................................................................................17

Ga. Code Ann. § 17-10-41................................................................................18

Indiana Code § 35-38-6-6(a) ................................................................*passim*

Tex. Code Crim. Proc. Ann. art 43.20 ................................................................18

Va. Code § 53.1-234 (1982 Rep. Vol.) ................................................................19

Va. Code § 53-522 (1978 Rep. Vol.) ................................................................19

**Other Authorities**

*1 Hour, 21 Minutes Taken for Largest Ga. Mass Execution*,
    Atlanta Daily World, Dec. 10, 1938, https://perma.cc/FWK2-3RAT ................17

*Bullard Hanged; No Mercy Shown*, Atlanta Georgian (and News),
    Mar. 2, 1907, https://perma.cc/QY4P-KZNU ................................................17

Capital Punishment, Wash. Dep't Corr. (October 25, 2006),
    http://bit.ly/46nyAMR ................................................................20

Capital Punishment/Execution by Lethal Injection, Colo. Dep't of Corr.
    (June 1, 2011), https://perma.cc/E3M7-ACN6 ................................................19

Deborah W. Denno, *Is Electrocution an Unconstitutional Method of
    Execution? The Engineering of Death over the Century*,
    35 Wm. & Mary L. Rev. 551 (1994)................................................................19

Elliott Minor, *Georgia Conducts First Execution by Injection*, Rome News-
    Trib. (Oct. 25, 2001), https://perma.cc/MHJ3-2F5U. ........................................17

*For Media – Access for Scheduled Executions*, Ga. Dep't of Corr.,
    https://perma.cc/P75U-HG69 (last visited July 10, 2025)................................18

Idaho Dep't of Corr., Execution Procedures (Oct. 11, 2024),
    https://perma.cc/3NDW-7LP9. ...................................................................17

John D. Bessler, *Televised Executions and the Constitution: Recognizing A
    First Amendment Right of Access to State Executions*,
    45 Fed. Comm. L.J. 355, 365 (1993) ......................................................19

John D. Bessler, *The "Midnight Assassination Law" and Minnesota's Anti-
    Death Penalty Movement*, 1849-1911,
    22 Wm. Mitchell L. Rev. 577 (1996) ......................................................21

John W. Hammond, *Electric Chair Takes Its First Life in Georgia*,
    Macon Daily Telegraph, Sept. 14, 1924,
    https://perma.cc/FTM7-ZN9L & https://perma.cc/65XS-RL89 .........17

Local and Otherwise, Greensboro Herald, Oct. 13, 1881,
     https://perma.cc/CTR9-Q3Q7 ...............................................................17

Michael Radelet, The History of the Death Penalty in Colorado (2017) ...............19

*Murderer Electrocuted in Georgia After Appeals Fail*,
    N.Y. Times (Dec. 13, 1984), https://perma.cc/45K8-3BCE................................17

Operating Procedure: Execution Manual, Va. Dep't Corr. (Feb. 7, 2017),
    https://perma.cc/Z2TM-5WXU ...........................................................20

*Robinson Dies on the Gallows*, Marietta J., Sept. 6, 1900,
    https://perma.cc/9AFK-9BBM...............................................................17

*Viewing Executions,* Tex. Dep't of Crim. Just.,
    https://perma.cc/P3UR-3VBZ (last visited July 10, 2025). ................................18

*What Does the Word 'Witness' Mean in an Arkansas Execution?*,
    AP (Apr. 26, 2017), https://perma.cc/8SAU-PTS3 ..............................................20

## INTRODUCTION

Appellees (collectively, "Indiana") carry a constitutional burden for justifying the closure of executions in Indiana Code § 35-38-6-6(a) ("Section 6(a)") and Indiana State Prison Facility Directive ISP 06-26: Execution of Death Sentence, Sec. C (June 17, 2024) ("ISP 06-26").  Indiana makes three arguments in opposition to this appeal from the district court's denial of Appellants' (collectively the "Media Coalition") motion for preliminary injunction, which erroneously failed to assess whether Indiana was likely to meet that burden.  None have merit.

*First*, Indiana incorrectly claims that no government proceeding other than "court proceedings" may be subject to the Supreme Court's 40-year-old framework, set forth in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986) ("*Press-Enterprise II*"), for determining the public's qualified First Amendment right to observe government proceedings.  Indiana instead argues for this Court to rewrite the "logic" prong of the *Press-Enterprise II* framework in favor of a test that asks whether a proceeding is "adjudicatory."

*Second*, Indiana argues that even applying the *Press-Enterprise II* framework, neither the experience nor the logic factor favors a conclusion that the public has a qualified right of access to executions.  But while Indiana collects various historical statutes from the nineteenth century to address the experience prong, nearly all of

1

them explicitly preserved public access by providing for public observers to attend executions.

And *third*, Indiana argues that the Media Coalition's Press Clause claim seeks a special exception for the media from a generally applicable law. But Section 6(a) and ISP 06-26 are not generally applicable; further, they impose a greater than incidental burden on a core press function.

## ARGUMENT

### I.    The *Press-Enterprise II* framework applies to executions.

#### A.    The *Press-Enterprise II* framework is not limited to "court proceedings."

Like many constitutional rights, the First Amendment qualified right of access is, at base, a limitation on state action. Specifically, it is a rebuttable limitation on state actors who seek to close certain government processes (or seal records of those processes) to disinterested public observers—the goal of which is to promote an informed citizenry. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–05 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (plurality opinion). Indiana's primary theory of this case—that a "preliminary step" before reaching the *Press-Enterprise II* analysis involves asking whether the proceeding at issue is a "court proceeding"—deviates from Supreme Court precedent by constricting the qualified right of access to apply only to state actors in the judiciary. Appellees' Br. 13–14.

2

Indiana's theory is an unwarranted departure from how First Amendment rights normally function, and the Court should reject it.  For instance, state actors are limited from issuing prior restraints whether they do so from the judicial, executive, or legislative branch.  *E.g. Near v. Minnesota*, 283 U.S. 697, 723 (1931) (state statute imposed an unconstitutional restraint on publication); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 & n.1, 72 (1963) (Governor-appointed commission engaged in unconstitutional "system of prior restraints of expression"); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 543–44, 569 (1976) (state trial judge's order enjoining pretrial publicity was an unconstitutional prior restraint).  First Amendment rights can be infringed by state actors of any stripe; the question "is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964).

This does not mean *Press-Enterprise II* is an open door for the public to invade rightfully closed government processes—or even to demand that the government provide a constitutional justification for their closure.  A court applying the *Press-Enterprise II* factors to a student disciplinary proceeding at a public university concluded that the government need not overcome a qualified right of access to close that proceeding; there was no tradition of public observers in those meetings and public access would have made them prohibitively costly and undermined their

teaching function. *United States v. Miami Univ.*, 294 F.3d 797, 823 (6th Cir. 2002); *see also Johnson Newspaper Corp. v. Melino*, 564 N.E.2d 1046, 1048–50 (N.Y. 1990) (applying *Press-Enterprise II* factors and finding no qualified right of access to dentist disciplinary proceedings); *Smith v. Cleveland*, 641 N.E.2d 828, 833 (Ohio Ct. App. 1994) (applying *Press-Enterprise II* factors and finding no qualified right of access to police disciplinary proceedings). Similarly, a court applying the *Press-Enterprise II* factors to records of calls made by a state legislator found no constitutional presumption of access; the government could withhold those records without an enhanced constitutional showing. *Uniontown Newspapers, Inc. v. Roberts*, 839 A.2d 185, 189 (Pa. 2003). But the *ratio decidendi* of those cases, like that of *Globe Newspaper Co.*, *Press-Enterprise I*, and *Press-Enterprise II*, was not whether a "court proceeding" had been closed. Instead, the courts asked whether the "complementary considerations" of experience and logic conferred a presumption of access, such that government actors had to show that closure or sealing was constitutionally permissible. *See also* Appellants' Principal Br. 17–20.

In any event, the line Indiana hopes to draw is illusory. Indiana's executions are formalized administrative proceedings, and they are initiated by the courts. Appellants' Principal Br. 26–27. Attempting to sort proceedings into categories on the bases suggested by Indiana is ill-advised, as "[d]rawing sharp lines between administrative and judicial proceedings would allow the legislature to artfully craft

4

information out of the public eye." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 696 (6th Cir. 2002). And while Indiana plainly desires that result, Appellees' Br. 15–16 (arguing that the power to close executions is an "essential legislative authority"), it finds no support in Supreme Court precedent. Indeed, as the Media Coalition demonstrated previously, the Supreme Court's holding in *Holden v. Minnesota*, 137 U.S. 483 (1890), upon which Appellees and the district court relied, did not limit press access to an execution and the opinion certainly does not override the *Press-Enterprise II* analysis. Appellants' Principal Br. 39.

### B. The *Press-Enterprise II* framework is not limited to adjudicative or adversarial proceedings.

Indiana also ignores the most obvious problem with its argument that the *Press-Enterprise II* framework does not apply except in matters that precisely match the facts of already-decided Supreme Court cases. Namely, its premise that the experience and logic factors apply only to criminal proceedings is foreclosed by the law of this Circuit. *Compare* Appellees' Br. 16–17, *with In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1309 (7th Cir. 1984).[1] In an attempt to square the circle, Indiana vacillates between its argument about "court proceedings," addressed *supra*, and an argument that the *Press-Enterprise II* framework does not apply "outside the

---

[1]    The cases IDOC cites involving a *defendant's* rights during a "criminal prosecution" do not bear on the *public's* qualified right of access. *See* Appellees' Br. 16–17.

adjudicative process." Appellees' Br. 12–13. In support of the latter proposition, Indiana contends that the public has "no right of access to crime scenes … jury deliberations … or lawfully imposed sentences," and, by extension, that the government may close any proceeding that is not "adjudicatory or adversarial" without regard for the tradition and function served by public observers. Appellees' Br. 8, 17 (citing *Pell v. Procunier*, 417 U.S. 817 (1974), *United States v. Franklin*, 546 F.Supp. 1133 (N.D. Ind. 1982), and *Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454 (1989)).

Indiana identifies no authority for its claim that the *Press-Enterprise II* framework is inapplicable when the government seeks to close a proceeding that is not "adjudicatory." Instead, its cases focus either on whether the government can prevent the press from entering its facilities to interview prisoners, as in *Pell*, 417 U.S. at 835, or enjoin jurors from speaking to the press, as in *Franklin*, 546 F.Supp. at 1139. Of course, application of the *Press-Enterprise II* factors to actual jury deliberations would doubtless confirm that the government carries no constitutional burden for their closure, due to the long history of jury secrecy and the need to ensure uninhibited discussion of a case prior to the jury issuing its verdict. But *Franklin*, which involves an injunction on jurors sharing information about a case after it ends has nothing to do with the observation of government processes. 546 F.Supp. at 1139.

More to the point, the Supreme Court did not instruct courts to ask whether a government process was adjudicatory or adversarial.  Instead, it instructed courts to ask whether "public access plays a significant positive role in the functioning of the *particular process* in question."  *Press-Enterprise II*, 478 U.S. at 8 (emphasis added).  Whether a process is adjudicatory or adversarial can be considered as *part of* that "logic" analysis.  *See, e.g.*, *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 296 (2d Cir. 2012) ("Courts and commentators have long recognized the centrality of openness to adjudicatory proceedings."); *see also In re Cont'l Ill. Securities Litig.*, 732 F.2d at 1308 n.11 (discussing ways in which lawsuits function better with open proceedings).  But it is not dispositive—in either direction.  An adjudicatory process like "our grand jury system depends upon the secrecy of grand jury proceedings." *Press-Enterprise II*, 478 U.S.  at 9 (citation omitted).  And a non-adjudicatory process, such as a town planning commission meeting or a wild horse round-up, might benefit from public observers.  *See, e.g.*, *Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 181 (3d Cir. 1999) (logic factor favored qualified public right of access to discussion of a real estate development proposal by a municipal commission with a strictly advisory function); *Leigh v. Salazar*, 677 F.3d 892, 901 (9th Cir. 2012) (remanding to "determine whether the public has a right of access to horse gathers by considering whether horse gathers have

historically been open to the general public and whether public access plays a positive role in the functioning of gathers").

Indiana also cites *Pell v. Procunier* for the Supreme Court's passing remark that the press does not have the right to access "the scenes of crime or disaster when the general public is excluded." 417 U.S. at 834 (citation omitted). It apparently believes this supports its argument that the *Press-Enterprise II* framework only applies to adjudicatory proceedings because, it says, "crime scenes are part of criminal investigations that lead to criminal proceedings." Appellees' Br. 17. But first, the cited *dicta* confirms that *Pell* is a Press Clause case; the Court's point was that the restriction in *Pell* is one of general applicability and thus did not uniquely burden the press. *Pell*, 417 U.S. at 834–35; *see Richmond Newspapers, Inc.*, 448 U.S. at 586 n.2 (Brennan, J., concurring in the judgment) (citing the same passage from *Pell* to assert that "[a] conceptually separate, yet related, question … whether the media should enjoy greater access rights than the general public" is not "at stake here."). And second, in fact, "crime scene" is a broad descriptor that does not easily lend itself to analysis; some "crime scenes" would fail the history and logic criteria, while others might not. *See, e.g.*, *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 821 (9th Cir. 2020) (applying *Press-Enterprise II* factors to protests on public property under dispersal order due to "incidents of vandalism,

destruction of property, looting, arson, and assault," and finding government defendant had not met its burden for dispersing press plaintiffs).

### C. The *Press-Enterprise II* analysis applies to proceedings that take place in IDOC facilities.

IDOC is not permitted to close every proceeding that takes place in its facilities simply because it is a corrections department. *See* Appellees' Br. 8, 15–16. The "difference between penal facilities and courtrooms," is not dispositive—or even instructive—here. Indeed, at the threshold, Indiana's argument is misplaced because its executions takes place not in a prison building that houses an inmate population, but instead in a *"*Support Services building," which contains "some offices in a conference room in front of the [execution] chamber." S.D. Ind. ECF 37 at 18:8–17; *see Philadelphia Inquirer v. Wetzel*, 906 F.Supp.2d 362, 369 (M.D. Pa. 2012) (finding the probative value of plurality opinion in *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), limited because Pennsylvania's executions were not held in a prison yard, but rather in a "purpose-built execution complex.").

Beyond that, Indiana fails to engage with the Media Coalition's discussion distinguishing *Pell*, 417 U.S. at 843, and *Houchins*, 438 U.S. at 15–16. *Compare* Appellees' Br. 14–16, *with* Appellants' Principal Br. 23–24. *Houchins* and *Pell* do not concern the public's right to observe formalized proceedings carried out in a corrections facility and thus neither limits the later-adopted experience and logic framework. *Pell*, 417 U.S. at 843; *Houchins*, 438 U.S. at 15–16; *see also California*

*First Amendment Coalition v. Woodford*, 299 F.3d 868, 874–75 (9th Cir. 2002) (discussing *Pell*). Appellants are not seeking to enter a prison to conduct interviews and take photographs, but rather to observe a specific proceeding.

Finally, Indiana is not correct that public forum analysis, rather than the *Press-Enterprise II* framework, is the appropriate measure of whether Appellants have asserted a cognizable First Amendment violation. *See* Appellees' Br. 14 n.5. Public forum analysis is one framework courts use to assess restrictions on expression *beyond* observation of a proceeding—for instance, conducting an interview or recording video. *See, e.g.*, *MacIver Inst., Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021) (applying public forum analysis to an interview request); *Am. C.L. Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) (applying public forum analysis to a law restricting video).

To illustrate this point, despite the public's unambiguous qualified right of access to observe criminal trials, *Globe Newspaper Co.*, 457 U.S. at 610, the right to record video of a criminal trial is not assessed the same way. Instead, the Courts of Appeals have applied other tests—including public forum analysis—when the right to broadcast or record criminal proceedings is asserted. *See generally Whiteland Woods, L.P.*, 193 F.3d at 182–83 (collecting cases). On the other hand, public forum analysis is not implicated when the First Amendment right asserted is the public's right to observe a government process. *See, e.g. Leigh*, 677 F.3d at 898 n.3 (*Press-*

10

*Enterprise II* framework, rather than public forum doctrine, utilized because "no one can have a conversation with a horse"); *see also Whiteland Woods, L.P.*, 193 F.3d at 180–83 (first using *Press-Enterprise II* framework to establish public's qualified presumption of access to planning commission meetings, then using a time, place, manner analysis to determine whether a ban on video recording the same meeting is constitutional).

*    *    *

As Justice Gorsuch recently noted, it is the *ratio decidendi* of a case—the reasoning underpinning a holding—that "allows [a case] to have life and effect in the disposition of future cases." *Ramos v. Louisiana*, 590 U.S. 83 (2020) (plurality opinion); *see also* Appellants' Principal Br. 19–20 (discussing precedential effect of rules like that in *Press-Enterprise II*). The Court should ensure that the *ratio decidendi* of *Globe Newspaper Co.*, *Press-Enterprise I*, and *Press-Enterprise II* is properly given life and effect in this case.

## II.    The experience and logic factors of *Press-Enterprise II* are satisfied with respect to executions.

### A.    Executions have historically been open to neutral observers.

There is a strong historical tradition of permitting public and press observers at executions throughout the United States. Appellants' Principal Br. 30–35. Up to the mid-to-late nineteenth century, public hangings which were open to all to attend were used by virtually every jurisdiction. *Id.* at 30–32. When states transitioned

11

from public hangings to prison executions more characteristic of the present day, they adopted statutes and practices that permitted members of the public or press to continue to attend to "act as representatives for the public at large." *Woodford*, 299 F.3d at 875–76. That tradition has carried over into present day: The unique tradition that has emerged for access to execution proceedings is to provide seating for pre-selected neutral observers. In evaluating the experience and logic factors of *Press-Enterprise II*, courts "may be guided by the unique history and function of" the particular proceedings at issue, *First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*, 784 F.2d 467, 472 (3d Cir. 1986), subject to the Supreme Court's instruction that they "look … throughout the United States," for their analyses, *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (citation and internal quotation marks omitted).

Indiana collects various historical statutes from the nineteenth century requiring executions be held within jail enclosures or at central prisons rather than at public gallows. But nearly all of the statutes on which Indiana relies explicitly preserved public access by providing for public observers to attend. New York's 1835 law, for example, required the sheriff to invite "twelve reputable citizens" to execution proceedings. 1835 N.Y. Laws 299 § 2. Delaware's 1849 law was similar, as was Kansas's 1858 law, Illinois' 1859 law, Maryland's 1882 law, Louisiana's

12

1884 law, and Missouri's 1887 law.[2]  When California eliminated public hangings in 1858, it protected public access by requiring sheriffs to invite "twelve respectable citizens, unless, in his discretion, a larger number be necessary."  1858 Cal. Laws 192 § 1.[3]  Arizona did the same in 1887.[4]  Also in 1887, Arkansas passed a law requiring up to "twenty-five persons" to witness executions that took place in enclosed jail yards.  1887 Ark. Laws 29 § 1.  Shortly thereafter in 1913, that law was supplanted by a statute requiring the superintendent of the state penitentiary to select "a number of respectable citizens numbering not less than six nor more than twelve" to attend.  1913 Ark. Laws 173 § 4.  Nevada's 1875 law provided that the punishment

---

[2]     1836 N.H. Laws 241–42 § 5 (sheriffs to request "other reputable citizens, not exceeding twelve" to attend); 1849 Del. Laws 366–67 § 2 (requiring sheriffs to summon at least twelve witnesses); 1858 Kan. Terr. Laws 190 § 13 (requiring sheriff to invite "twelve reputable citizens"); 1859 Ill. Laws 17 § 2 (same); 1882 Md. Laws 630–31 § 31 (allowing sheriffs to appoint "such other persons, not exceeding twenty" to attend); 1884 La. Laws 102 (requiring "at least four and not exceeding fifteen witnesses"); 1887 Mo. Laws 169 § 1 (requiring officers executing sentence to "request the presence of . . . twelve reputable citizens of the county").

[3]     IDOC cites a later law that moved executions to the California State Prison for the proposition that California privatized executions in 1891. 1891 Cal. Laws 274 § 1229.  That law also required the warden to invite "at least twelve reputable citizens."  *Id.*

[4]     1887 Ariz. Terr. Laws 807 § 1849 (requiring sheriffs to invite "at least twelve reputable citizens").  IDOC cites a later provision that moved executions to the Arizona Territorial Prison for the proposition that Arizona privatized executions in 1909.  1909 Ariz. Terr. Laws 96–97 § 1035.  That law also required the superintendent of that prison to invite "at least twelve respectable citizens."  *Id.*

13

of death was to occur "within the inclosed [sic] limits of the jail."  1875 Nev. Stat. 53.  That law was silent as to the number of witnesses permitted.  *Id.*  It was supplanted in 1901 with a statute requiring the warden to invite "at least twelve reputable citizens."  1901 Nev. Laws 68 § 11.

Consistent with modern-day practice, many states whose statutes did not specifically mention press witnesses nevertheless regularly allowed press to attend. As previously noted, for example, although Iowa, Illinois, and New York did not statutorily protect press access, members of the press were regularly invited to attend executions in those states.  Appellants' Principal Br. 32–33 & n.6 (collecting coverage of executions in those states).  And in California, "the press has been a constant presence since executions were moved into prisons."  *Woodford*, 299 F.3d at 876.

Several states have maintained statutory traditions specifically protecting *press* access to executions.  Appellants' Principal Br. 32.  Ohio enacted a law permitting press witnesses at executions in 1885.  1885 Ohio Laws 170.  Kentucky did so in 1910.  1910 Ky. Acts 112.  And when New Mexico required hangings to take place within enclosed jail yards in 1903, its statute allowed "twenty persons including … representatives of the press" to attend.  1903 N.M. Terr. Laws 141 § 2. To trace a few more:  Connecticut enacted a statute protecting press access to executions in 1893, New Jersey did so in 1898, Alabama in 1923, Florida in 1939,

Oklahoma in 1951, Mississippi in 1954, South Dakota in 1979, Utah in 1980,

Tennessee in 1994, South Carolina in 1997, Montana in 1999, Oregon in 2001,

Nebraska in 2009, and Pennsylvania in 2009.[5]  True enough, some of those statutes

came about more recently, but that does not mean there was no access before those

laws were enacted.  In Pennsylvania, for example, in the interim between abolishing

---

[5]      1893 Conn. Laws 282–83 § 3 (providing for "representatives of not exceeding five newspapers in the county where the crime was committed, and one reporter for each of the daily newspapers published in the city of Hartford"); 1898 N.J. Laws 913 § 132 (requiring sheriff to admit press representatives "not to exceed three in number"); 1923 Ala. Laws 760 § 7 (allowing "such newspaper reporters as may be admitted by the warden"); 1939 Fla. Laws 1373–74 § 272 ("Representatives of the press shall be permitted to be present at the execution."); 1951 Okla. Laws 64 Ch. 17a (providing "newspapermen from recognized newspapers, press, and wire services, and radio reporters will be admitted upon proper identification, application and approval of the warden"); 1954 Miss. Laws 246 Ch. 220 § 2 (requiring sheriff to "secure the presence at such execution of … bona fide members of the press, not to exceed eight (8) in number"); 1979 S.D. Laws 206 § 36 (requiring warden to select "not more than ten reputable adult citizens, including at least one member of the news media"); 1980 Utah Laws 146 § 77-19-11 ("The warden shall permit the attendance at the execution of a total of nine members of the press and broadcast news media … [to] serve as a pool for other members of the news media"); 1994 Tenn. Laws 346 § 1 (providing for selection of "[a] total of seven (7) members of the print, radio and television news media" and requiring those selected to "make available coverage of such execution to other news media members"); 1997 S.C. Laws 565–66 § 1 (providing for "a group of not more than three representatives of the South Carolina media …"); 1999 Mont. Laws 1440 (providing that group of "no more than 12 witnesses" "must, to the extent possible, include three persons from the news media"); 2001 Ore. Laws 488 Ch. 213 § 1 (requiring superintendent to invite "representatives from the media"); 2009 Neb. Laws 53 L.B. 36 § 15 (requiring that "[a]t least two" of up to six witness "shall be professional members of the Nebraska news media"); 2009 Pa. Laws 223 § 4305 (providing for attendance of "[n]ot more than six duly accredited representatives of the news media").

public hangings and adopting a press-access statute, the state "required the presence of twelve reputable witnesses to attend the executions." *Philadelphia Inquirer*, 906 F.Supp.2d at 371; *see also* 1833–34 Penn. Laws 234–35 § 1.  Similarly, Ohio, Montana, and South Carolina all provided for members of the public to attend executions before passing statutes specifically mentioning press.[6]

Moreover, in many states the press has enjoyed a right of access to executions as a matter of historical practice, even where state law would suggest otherwise. Idaho law, for example, has long provided that executions were to be "closed from public view," yet courts have repeatedly found "undisputed support in newspaper accounts of past executions and specific language used in IDOC's own execution procedures, that at least some portion of the public has historically been able to view executions occurring in Idaho." *See Associated Press v. Tewalt*, 780 F.Supp.3d 1052, 1064–65 (D. Idaho 2025); *see also Associated Press v. Otter*, No. 1:12-CV-00255-EJL, 2012 WL 12977323, at *4 (D. Idaho June 5, 2012) ("[T]he undisputed reality as supported by the newspaper accounts of past executions … is that some portion of the public has historically viewed the execution process in Idaho.").

---

[6]     1843 Ohio Laws 71 § 2 (providing for attendance of "such other persons as the sheriff may designate, not exceeding six in number"); 1864 Mont. Terr. Laws 250 § 222 (requiring sheriffs to invite "twelve reputable citizens"); 1912 S.C. Laws 703 § 4 (allowing executioners to designate "not less than twelve nor more than twenty-four respectable citizens of this State" to attend).

16

Consistent with its historical practice, Idaho's more recent protocol provides for four members of the media to attend and witness executions. Appellants' Principal Br. 34–35 n.11; *Idaho Dep't of Corr*., Execution Procedures, at 11 (Oct. 11, 2024), https://perma.cc/3NDW-7LP9.

So, too, in Georgia. Although an 1893 law purported to require executions to be done "in private" and "witnessed only by the executing officer, a sufficient guard, the relatives of the criminal, and such clergymen and friends as he may desire," *see* 3 Ga. Code of 1895 § 1043,[7] members of the media were permitted to attend executions in that state throughout the last century and into present day.[8] Consistent

---

[7]     1859 Ga. Laws 62–63 allowed judges to "order the execution of Criminals to take place in private as provided for in this bill, *or in public, in their discretion*." 1859 Ga. Laws § 3 (emphasis added); *e.g.*, Local and Otherwise, Greensboro Herald, Oct. 13, 1881, at 3, https://perma.cc/CTR9-Q3Q7 (noting "[t]here will be a public hanging in Taliaferro County soon").

[8]     *See, e.g.*, *Robinson Dies on the Gallows*, Marietta J., Sept. 6, 1900, at 1, https://perma.cc/9AFK-9BBM (describing "several newspaper men" in "the party within the enclosure" at 1900 hanging of Sam Robinson); *Bullard Hanged; No Mercy Shown*, Atlanta Georgian (and News), Mar. 2, 1907, at 1, https://perma.cc/QY4P-KZNU (describing condemned asking "newspaper men present to step closer so they could hear him" at 1907 hanging of John Bullard); John W. Hammond, *Electric Chair Takes Its First Life in Georgia*, Macon Daily Telegraph, Sept. 14, 1924, at 1 & 7, https://perma.cc/FTM7-ZN9L & https://perma.cc/65XS-RL89; *1 Hour, 21 Minutes Taken for Largest Ga. Mass Execution*, Atlanta Daily World, Dec. 10, 1938, at 1, https://perma.cc/FWK2-3RAT; *Murderer Electrocuted in Georgia After Appeals Fail*, N.Y. Times (Dec. 13, 1984), https://perma.cc/45K8-3BCE; Elliott Minor, *Georgia Conducts First Execution by Injection*, Rome News-Trib. (Oct. 25, 2001), https://perma.cc/MHJ3-2F5U.

with its historical practice, Georgia's protocol now allows for the attendance of five media witnesses, Appellants' Principal Br. 34–35 n.11; *For Media – Access for Scheduled Executions*, Ga. Dep't of Corr., https://perma.cc/P75U-HG69 (last visited July 10, 2025), even though its statute makes no mention of press.  Ga. Code Ann. § 17-10-41.

Likewise, although Texas law is silent as to media access, *see* Tex. Code Crim. Proc. Ann. art 43.20, "[s]ince 1924 when Texas determined that the electric chair should be the instrument of capital punishment, representatives of the print media have had access to executions and to condemned prisoners on 'death row.'" *Garrett v. Estelle*, 424 F.Supp.468, 470 (N.D. Tex.), *rev'd*, 556 F.2d 1274 (5th Cir. 1977).  Current Texas protocol provides for the attendance of five media witnesses at executions.  Appellants' Principal Br. 34–35 n. 11; *Viewing Executions,* Tex. Dep't of Crim. Just., https://perma.cc/P3UR-3VBZ (last visited July 10, 2025).

In the teeth of that history, Indiana points to several states that, in the late nineteenth century, passed laws purporting to gag the media from reporting details of executions, even where those proceedings were open to public observers.  True enough, New York passed such a law in 1888, *see* 1888 N.Y. Laws, 780 § 507, as did Minnesota in 1889, *see* 1889 Minn. Laws 66–67, Colorado in 1889, 1889 Colo. Laws 119, Virginia in 1908, 1908 Va. Laws 686, Washington in 1909, 1909 Wash. Laws 952, and Arkansas in 1913, 1913 Ark. Laws 174 § 10.  Setting aside the fact

18

that those laws would almost certainly be unconstitutional under modern jurisprudence, *cf. Nebraska Press Ass'n*, 427 U.S. at 559, they have little bearing on the issues to be decided here.  New York's and Minnesota's gag laws were repealed almost immediately; evidence that they were actually enforced is mixed.[9]  And though Colorado's, Virginia's, Washington's, and Arkansas's laws were longer-lived,[10] each of those states eventually adopted regulations that affirmatively protected the press's right to attend and report on executions as surrogates for the public.[11]  Because "the 'experience' test … does not look to the particular practice

---

[9]     New York, for its part, withdrew its law in 1892 after substantial criticism, and re-allowed press the same year.  See 1892 N.Y. Laws 36 § 507, see also Deborah W. Denno, Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century, 35 Wm. & Mary L. Rev. 551, 605 (1994).  Minnesota's law was "frequently ignored" in practice.  See John D. Bessler, The "Midnight Assassination Law" and Minnesota's Anti-Death Penalty Movement, 1849-1911, 22 Wm. Mitchell L. Rev. 577, 648 (1996).

[10]     Historical accounts suggest that Colorado's gag law was also not strictly enforced while in effect, Michael Radelet, The History of the Death Penalty in Colorado, 63–64 (2017), but in any event, it was not relaxed until 1955.  *See* 1955 Colo. Laws 280 § 1 (providing that witnesses were not permitted to divulge "the time of such execution" prior to the execution, but not forbidding other disclosure).  Virginia's nominally remained law until 1982.  Compare Va. Code § 53-522 (1978 Rep. Vol.) with Va. Code § 53.1-234 (1982 Rep. Vol.) (omitting language).  Washington's law remained on the books until 1982, 1982 Wash. Laws 759 § 11 (repealing law), and Arkansas until 1995.  1995 Ark. Laws 794 Act 206 § 1 (repealing law).

[11]     *See, e.g.*, Capital Punishment/Execution by Lethal Injection, Colo. Dep't of Corr. at 19 (June 1, 2011), https://perma.cc/E3M7-ACN6; Operating Procedure: Execution Manual, Va. Dep't Corr., at 5 (Feb. 7, 2017), https://perma.cc/Z2TM-

of any one jurisdiction, but instead to the experience in that type or kind of hearing throughout the United States," *El Vocero de Puerto Rico*, 508 U.S. at 150 (citation and internal quotation marks omitted), the fact that some outlier states attempted to flout the press and the public's right of access long ago does not alter the reality that the overwhelming majority of states have a deep-rooted tradition of protecting public and press access that remains protected to today.  Appellants' Principal Br. 35 & n.12.

The historical record detailed above amply demonstrates "some likelihood of success on the merits" that there is a "well-developed tradition of access" to execution proceedings.  *See Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068, 1070 (7th Cir. 2018).  At this stage in the proceedings, that is more than enough— this Court is not required to weigh the historical evidence to resolve that the Media Coalition "definitely will win the case."  *Ill. Repub. Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).  Instead, all it need decide is that the Media Coalition has met its burden of showing how it "proposes to prove the key elements of its case," *id*., keeping in mind that in cases seeking access to government proceedings, "[a]ny doubts must be resolved in favor of disclosure."  *Grove Fresh Distribs., Inc. v.*

---

5WXU; Capital Punishment, Wash. Dep't Corr. At 5–6 (October 25, 2006), available at http://bit.ly/46nyAMR (p. 68–69); What Does the Word 'Witness' Mean in an Arkansas Execution?, AP (Apr. 26, 2017), https://perma.cc/8SAU-PTS3.

*Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994).  Because the history of access to executions amply demonstrates that "there is a tradition of at least limited public access to executions," *Woodford*, 299 F.3d at 876, the district court's decision to the contrary must be reversed and the case remanded.

### B.  Permitting neutral observers at executions plays a significant positive role in their functioning.

"Independent public scrutiny—made possible by the public and media witnesses to an execution—plays a significant role in the proper functioning of capital punishment." *Woodford*, 299 F.3d at 876.  Indiana does not seriously dispute this.  Instead, it argues that (i) there are "other considerations weigh[ing] against making executions public," Appellees' Br. 29–30, and (ii) engaging with the logic prong "confus[es] policy goals with constitutional requirements," *id.* at 31–32. Neither of those contentions carries water.

First, Indiana's argument that there are "other considerations weigh[ing] against making executions public," *id.* at 29–30, confuses the *Press-Enterprise II* logic inquiry with whether the government can meet the burden it will shoulder on remand.[12]  The logic prong asks "whether public access plays a significant positive

---

[12]     The district court did not reach the question of whether the government can meet its burden.  The Media Coalition anticipates that it cannot.  Appellants' Principal Br. 47; S.D. Ind. ECF 20, Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 15–17.

role in the functioning of the particular process in question," *Press-Enterprise II*, 478 U.S. 1, 8 (1986), not whether the states' interest in secrecy outweighs the public interest in access. Indiana cannot avoid addressing its burden on remand by bootstrapping their arguments about why their policies are justified into the logic test.

In any event, none of the interests on which Indiana relies disturb the conclusion that public access to executions contributes positively to their functioning. While Indiana vaguely references the anonymity of the staff involved in the execution and the "security and order of the prison," Appellees' Br. 29–30, ready alternatives are available to protect staff anonymity while preserving public access, such as requiring staff to wear surgical garb. *Philadelphia Inquirer*, 906 F.Supp.2d at 373; *see also Woodford*, 299 F.3d at 884.

Indiana's off-hand reference to protecting "the dignity of the individual being executed," Appellees' Br. 30, fares no better. Public access facilitates the dignity of the condemned—not to mention their Eighth Amendment rights—by ensuring that their punishment is competently and humanely administered. Appellants' Principal Br. 42. In addition, Indiana cannot explain how allowing press to attend executions would "offend to a meaningfully greater degree" the condemned inmates' dignity interests more so than the execution itself, particularly where Indiana already permits relatives of the victim to watch them die. *Compare id.*, *with* Ind. Code § 35-38-6-

6(a), *with Associated Press v. Otter*, 682 F.3d 821, 824–25 (9th Cir. 2012) (rejecting dignity interest of the condemned as grounds for restricting access to earlier stages of execution proceeding where state already permitted "strangers to watch as they are put to death").

Indiana's argument that the Media Coalition could "accomplish their goals in any number of ways" under Indiana's current access procedures, Appellees' Br. 30–31, is best viewed as an aside about IDOC's view of the goals of journalism, not an argument about whether or not public access plays a positive role in IDOC's proceeding. But to respond, no alternative avenue for accessing information permits the kind of fulsome reporting achieved when multiple journalists attend and cover the proceeding first-hand. Relying upon IDOC statements on the execution proceeding is wholly insufficient, and less reliable, than eyewitness accounts. S.D. Ind. ECF 20-4, Tareen Decl. ¶¶ 16–21, 31 ("[A]t the AP, we would not quote the official 'last words' of an individual if the reporter was not there to witness them firsthand…. We might get a statement from the State, but the public wouldn't really know what was happening or if there was suffering."); S.D. Ind. ECF 20-9, Dits Decl. ¶ 15; S.D. Ind. ECF 20-12, Spears Decl. ¶¶ 18–22. And relying on a condemned prisoner selecting a reporter as a witness is not only an inconsistent and thus inadequate alternative, it can affect the reporter's performance of their role. "If a reporter is in the execution room as 'friend or family,' it can change the relationship

between the reporter and the subject, and it may change what a journalist can and can't report." S.D. Ind. ECF 20-4, Tareen Decl. ¶ 39. And "it is helpful to have multiple members of the press reporting on major events, not only because their coverage might include different information and observations, but because it is valuable to discuss what is happening and compare notes." S.D. Ind. ECF 20-7, Smith Decl. ¶ 30; *see also* S.D. Ind. ECF 20-10, Runevitch Decl. ¶ 15.

Finally, IDOC falls back on the argument that the logic prong "confus[es] policy goals with constitutional requirements," but that argument utterly confuses the nature of the *Press-Enterprise II* inquiry. *Compare* Appellees' Br. 31–32, *with Press-Enterprise II*, 478 U.S. at 8 (asking "whether public access plays a significant positive role in the functioning of the particular process in question"). Deterrence of crime and compliance with the Eighth Amendment's prohibition on cruel and unusual punishment are essential to the function of the death penalty. Informed public debate and the oversight of IDOC's activity and expenditure of public funds square with the principle that the First Amendment "has a structural role to play in securing and fostering our republican system of self-government" because "valuable public debate—as well as other civic behavior—must be informed." *Richmond Newspapers*, 448 U.S. at 587 (Brennan, J., concurring).

Because the district court failed to correctly apply either prong of the *Press-Enterprise II* analysis, it reached the constitutionally untenable conclusion that

Indiana need not make a particularized factual showing of any sort prior to closing its executions. Both the experience and logic test plainly favor the Media Coalition and this Court should remand to the district court for a determination as to whether IDOC can meet its constitutionally prescribed burden for closure.

### III. Section 6(a) and ISP 06-26 place more than an incidental burden on the press and are not generally applicable.

IDOC claims that Section 6(a) and ISP 06-26 are "generally applicable." Appellees' Br. 33. Yet, on the very same page of its brief, IDOC asserts that Section 6(a) and ISP 06-26 do not operate as a ban on press observation of executions because members of the Media Coalition can attend executions by petitioning the condemned inmate for inclusion in one of the favored groups that are *excepted from the restriction in Section 6(a) and ISP 06-26*. *Id.* These responses are contradictory. And the latter, while true, has no bearing on whether strict scrutiny must be shown to justify IDOC's ban on press observers.

Applying closely analogous Supreme Court free exercise cases, which IDOC does not address, the exceptions in Section 6(a) and ISP 06-26 foreclose a conclusion of general applicability. Appellants' Principal Br. 56; *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021); *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *see also* Br. of Amici Curiae 21–22. The salience of these free exercise cases to this case is strong—the Supreme Court has confirmed that the "general applicability" concept in the free exercise context "has parallels" with its use in Press Clause cases. *Church*

25

*of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993) (citing, *inter alia*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669–70 (1991); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983)); *see also* Br. of Amici Curiae 22–23.

Moreover, if Section 6(a) violates the Press Clause, that violation is not negated by IDOC's current policy of allowing a condemned inmate to ask Superintendent Neal to approve a member of the press to attend the execution as one of five permitted "relatives or friends." *See* A17 § B.3(a)(v), A18 § C.3. It is neither serious nor meaningful for IDOC to claim that it delegated its responsibility to uphold the Press Clause to Joseph Corcoran during his December 2024 execution. *See* Appellees' Br. 33. This argument is akin to asserting that the at-home worshipers in *Tandon* should simply have reserved space in one of the "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants" that were excepted from COVID pandemic restrictions. 593 U.S. at 63. And in any event, the Media Coalition seeks prospective equitable relief to prevent enforcement of Section 6(a) and ISP 06-26, because they prevent Appellants from observing future executions—which is exactly what came to pass after this case was filed, during Benjamin Ritchie's May 2025 execution.

Finally, *Pell* does not control the Press Clause claim asserted here. Appellees' Br. 36. The primary reason for this is that *Pell* involved a restriction on press

interviews with prisoners, while the right asserted in this case is the right to observe a government proceeding. Appellants' Principal Br. 51. Four of the eight participating justices in *Richmond Newspapers* wrote that the Press Clause provided part of the basis for their decision. 448 U.S. at 576 (plurality opinion); *id.* at 600 & n.3 (Stewart, J., concurring). A secondary reason is that the restriction in *Pell* was made against a backdrop of public access not permitted in here. 417 U.S. at 830 ("[B]oth the press and the general public are accorded full opportunities to observe prison conditions…. In addition, newsmen are permitted to visit both the maximum security and minimum-security sections of the institutions and to stop and speak about any subject to any inmates whom they might encounter."). In contrast, this case involves a complete restriction on press observation—it "operate[s] as a total ban." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 948 (7th Cir. 2015) (discussing *Alvarez*, 679 F.3d at 595). Accordingly, because Section 6(a) and ISP 06-26 present more than an incidental burden on press freedom, the district court erred by failing to require Indiana to satisfy strict scrutiny.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order denying the Media Coalition's motion for preliminary injunction and remand for a determination as to whether Indiana is likely to meet its burden under the applicable constitutional standards.

Dated:  September 17, 2025

Respectfully submitted,

*/s/ Lin Weeks*

Lin Weeks
   *Counsel of Record*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
lweeks@rcfp.org

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
P.O. Box 150
Fishers, IN 46038
(463) 271-4676
kcundiff@rcfp.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Circuit Rule 32(c) because, excluding the parts of the rule exempted by Fed. R. App. P. 32(f), this document contains 6,983 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R App. P. 32(a)(6) and Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: September 17, 2025

/s/ Lin Weeks
Lin Weeks
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS