In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 25-2025

ASSOCIATED PRESS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

RON NEAL and LLOYD ARNOLD,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for
the Southern District of Indiana, Indianapolis Division.
No. 1:25-cv-00872-MPB-MJD — **Matthew P. Brookman,** *Judge*.

———————————

ARGUED FEBRUARY 18, 2026 — DECIDED JUNE 5, 2026

———————————

Before SCUDDER, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Indiana permits a select few groups of people to attend executions. Members of the public may attend only if the offender invites them. The same rule applies to the media. Several media groups challenged this policy on First Amendment grounds and moved for a preliminary injunction to allow them to view forthcoming executions. The district court denied the motion, and we affirm.

# I

Indiana allows only the following people to attend executions: (1) the state prison warden; (2) those assisting in the execution; (3) the prison physician; (4) one other physician; (5) the inmate's spiritual advisor; (6) the prison chaplain; (7) up to five people invited by the inmate to attend; and (8) up to eight of the victim's immediate adult family members. See Ind. Code § 35-38-6-6(a).

The State's Department of Correction has adopted "appropriate guidelines to enable the Indiana State Prison to comply with state statutes governing the administration of the death penalty." ISP 06-26: *Execution of Death Sentence* (June 17, 2024), Dkt. 9, App. 16; see also Ind. Code § 35-38-6-1(d) (authorizing the adoption of rules). Those guidelines instruct the Department's Commissioner to designate a staff person who will assist with media leading up to the execution. See ISP 06-26 at 3. They also authorize members of the media to remain in a designated area outside of the execution chamber until the execution ends. See *id.* The guidelines clarify that "[m]edia personnel shall not be permitted to witness the execution" unless the prisoner includes them on "the list of five … persons" invited to witness the execution. *Id.*

No aspect of the Indiana statute or the Department of Correction implementing guidelines restrain media reporting on executions. Journalists remain free to interview witnesses, report on any aspect of the proceeding, and comment as they wish on the State's choice to allow capital punishment or to execute a particular person.

In May 2025, the plaintiff media outlets invoked 42 U.S.C. § 1983 and sued the Superintendent of the Indiana State

Prison and the Commissioner of the Indiana Department of Correction in their official capacities. They raised two as-applied claims. They alleged that Indiana's policy violates their qualified First Amendment right of access to certain government proceedings. They also contended that the State's policy violates the Press Clause of the First Amendment by unfavorably singling out members of the press. Their complaint sought declaratory and injunctive relief.

A week later the plaintiffs moved for a preliminary injunction. They asked the district court to enjoin enforcement of Section 35-38-6-6(a) of the Indiana Code and to order that they may attend any Indiana execution carried out before the entry of judgment in this case.

The district court denied the motion, concluding that the plaintiffs had failed to show a likelihood of success on the merits for either claim. As to the right-of-access claim, the district court held the Supreme Court's relevant doctrinal framework neither applied nor favored the plaintiffs. And as to the Press Clause claim, the district court determined that it was likely to fail because Indiana treats members of the press the same as members of the public.

The plaintiffs appealed.

## II

We begin with the First Amendment right of access to view Indiana executions.

### A

"[T]he Supreme Court has recognized a limited right of access to certain governmental proceedings, specifically those related to the judicial process." *Dahlstrom v. Sun-Times Media,*

*LLC*, 777 F.3d 937, 947 (7th Cir. 2015). Across a series of cases, the Court has "emphasized two complementary considerations." *Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 8 (1986) (*Press-Enterprise II*). Because a "tradition of accessibility implies the favorable judgment of experiences," it has "considered whether the place and process have historically been open to the press and general public." *Id.* (quoting *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 605 (1982)). Further, "the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* These considerations implicate "experience" and "logic" respectively. *Id.* at 9. And "[i]f the particular proceeding … passes these tests of experience and logic, a qualified First Amendment right of public access attaches." *Id.*

We doubt this framework applies to executions. The Supreme Court has only ever used it to assess whether the public has a right of access to traditional aspects of criminal proceedings. See, *e.g.*, *Press-Enterprise II*, 478 U.S. at 13 (holding that "the qualified First Amendment right of access to criminal proceedings applies to preliminary hearings"); *Press-Enter. Co. v. Super. Ct.*, 464 U.S. 501, 503, 505–10 (1984) (*Press-Enterprise I*) (holding that the "guarantees of open public proceedings in criminal trials" apply to the examination of potential jurors); *Globe Newspaper Co.*, 457 U.S. at 604–07 (holding that the qualified "right of access to criminal trials" applies to testimony by minor victims of specified sexual offenses); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (plurality opinion) ("We hold that the right to attend criminal trials is implicit in the guarantees of the First Amendment ….").

For our part, we have only applied this framework to "court proceedings" and related "documents." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1069 (7th Cir. 2018) (concluding that "the First Amendment right of access extends to civil proceedings and associated records and documents"); see also *In re Associated Press*, 162 F.3d 503, 506 (7th Cir. 1998) ("[T]he 'public's right of access to court proceedings and documents is well-established.'" (quoting *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994))).

An execution does not resemble a court proceeding. It occurs outside the adjudicative process, after the factfinder has determined guilt and the trial court has imposed a sentence and terminated the case. Cf. *Bradley v. United States*, 410 U.S. 605, 609 (1973) ("In the legal sense, a prosecution terminates only when sentence is imposed."). Nor does more open public scrutiny of an execution "provide a check on the activities of judges and litigants" or "foster more accurate fact finding." *United States v. Eppinger*, 49 F.3d 1244, 1252–53 (7th Cir. 1995) (cleaned up) (identifying values served by "[t]he public's right of access to court proceedings and documents").

B

Even assuming *Press-Enterprise II*'s "experience" and "logic" test applies, the plaintiffs still lack a qualified First Amendment right of access to view Indiana executions.

*First*, executions have not "historically been open to the press and general public" in many parts of the country for over a century. *Press-Enterprise II*, 478 U.S. at 8; see also *El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993) (looking "to the experience … throughout the United States" (cleaned up)). At the

Founding, "executions in the United States were held in public, often in the 'public squares or commons.'" John D. Bessler, *Televised Executions and the Constitution: Recognizing a First Amendment Right of Access to State Executions*, 45 Fed. Commc'ns L.J. 355, 359 (1993) (quoting Louis P. Masur, *Rites of Execution* 59 (1989)). But in the 1830s, several states "began to prohibit public executions." *Id.* at 360. "By 1845, states in the eastern and midwestern regions of the nation executed all of their criminals in private." Dane A. Drobny, *Death TV: Media Access to Executions Under the First Amendment*, 70 Wash. U. L.Q. 1179, 1191 (1992). Indiana followed suit in 1852, requiring executions to occur "in some private enclosure as near to the jail as possible." 1852 Ind. Acts, vol. II, 379 § 134.

The last public execution in the United States occurred in 1937. See Bessler, *Televised Executions and the Constitution*, at 365. By the time of World War II, "executions, which had once been frequent public spectacles, became infrequent private affairs." *Furman v. Georgia*, 408 U.S. 238, 340 (1972) (Marshall, J., concurring); see also *id.* at 297 (Brennan, J., concurring) ("No longer does our society countenance the spectacle of public executions, once thought desirable as a deterrent to criminal behavior by others."). Today, as both sides agree, all executions take place in facilities with only a small number of witnesses. This history "demonstrates a decided and long-standing trend away from openness." *PG Pub. Co. v. Aichele*, 705 F.3d 91, 110 (3d Cir. 2013) (applying the *Press-Enterprise II* framework).

To be sure, the plaintiffs observe that many of the nineteenth-century statutes prohibiting public executions still allowed some observers to attend the private executions. See, *e.g.,* 1835 N.Y. Laws 299 § 2 (requiring sheriffs to invite

"twelve reputable citizens"); 1836 N.H. Laws 241–42 § 5 (similar); 1882 Md. Laws 630–31 § 31 (allowing sheriffs to appoint "such other persons, not exceeding twenty" to attend); 1887 Ark. Acts 29 (permitting up to "twenty-five" witnesses).

From there the plaintiffs add that several states invited the press to attend private executions around this time as well. See, *e.g.*, 1885 Ohio Laws 170 (allowing sheriffs to invite "a reporter for each one of the two leading newspapers of opposite politics"); *The First Judicial Hanging in the State in Six Years*, Mount Pleasant Wkly. News, Nov. 7, 1864, at 6, https://perma.cc/XZF5-8BKU (reporting that "representatives of a score of newspapers and as many sheriffs, together with a dozen privileged persons, were admitted" to an execution in Iowa).

But this limited public access did not render executions "open to the press and *general public*." *Press-Enterprise II*, 478 U.S. at 8 (emphasis added). The Supreme Court has always looked for more categorically open invitations. See, *e.g.*, *id.* at 10 ("Long ago in the celebrated trial of Aaron Burr for treason, for example, … the probable-cause hearing was held in the Hall of the House of Delegates in Virginia, the courtroom being too small to accommodate the crush of interested citizens."); *Press-Enterprise I*, 464 U.S. at 507 (accepting historical account that sixteenth-century jury selection occurred "openly in the presence of the Judges, the Justices, the inquest, the prisoner, *and so many as will or can come so near as to hear it*" (emphasis in original) (cleaned up)); *Richmond Newspapers*, 448 U.S. at 564 (plurality opinion) ("What is significant for present purposes is that throughout its evolution, the trial has been open to all who care to observe."). Allowing a dozen or so witnesses to view a largely private execution does not

signal that public executions enjoy "the favorable judgment of experience." *Press-Enterprise II*, 478 U.S. at 11 (cleaned up).

The Ninth Circuit disagrees. It held in *California First Amendment Coalition v. Woodford* that this "tradition of at least limited public access to executions" satisfied the experience prong. 299 F.3d 868, 876 (9th Cir. 2002). In its view, the fact "[t]hat only select members of the public attend does not erode the public nature of executions" because "these official witnesses act as representatives for the public at large." *Id.*

In so reasoning, the Ninth Circuit relied on *Richmond Newspapers*, where the Supreme Court recognized a right of public access to criminal trials. See *Woodford*, 299 F.3d at 876 (citing *Richmond Newspapers*, 448 U.S. at 573). A plurality of the Court in *Richmond Newspapers* acknowledged that "attendance at court is no longer a widespread pastime" because "people now acquire" information about trials chiefly "through the print and electronic media." *Richmond Newspapers*, 448 U.S. at 572–73. Despite this decreased attendance, the plurality opinion concluded that there was an "unbroken, uncontradicted history" of opening criminal trials to the public. *Id.* at 573. The basic idea was that decreased attendance did not imply closure to the public.

Executions are different than trials. The public did not merely lose interest in watching them first-hand. Rather, people stopped attending because states passed laws prohibiting them from doing so. We therefore disagree with the Ninth Circuit and hold that executions have not historically been "open to the press and general public." *Press-Enterprise II*, 478 U.S. at 8. Because this opinion splits with the Ninth Circuit, we have circulated it among all judges of this court in regular

active service. See 7th Cir. R. 40(e). No judge favored rehearing the case en banc.

*Second*, public access to executions does not clearly play a "significant positive role in the functioning" of the process. *Id.* at 8. On the one hand, plaintiffs make the fair and compelling point that increased scrutiny may lead to more humane and competently administered executions. But "[a]ny inquiry into whether a role is positive must perforce consider whether it is potentially harmful." *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 200–01 (3d Cir. 2002). And as Indiana underscores, allowing uninvited strangers with no immediate connection to the underlying crime to watch a prisoner die risks offending the dignity of their final moments.

We need not reach a firm conclusion on this second consideration. The Supreme Court has explained that "a qualified First Amendment right of public access attaches" when a particular proceeding passes both "tests of experience and logic." *Press-Enterprise II*, 478 U.S. at 9. It is enough for us to agree with the Third Circuit that no right attaches based solely on logic "where history is ambiguous or lacking." *N. Jersey Media Grp.*, 308 F.3d at 213; *In re Reps. Comm. for Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985) (majority opinion by Scalia, J.) ("An historical tradition of at least some duration is obviously necessary …."). Our holding that executions have not historically been open to the press and the general public forecloses any likelihood of success on the merits.

### III

The plaintiffs next claim that Indiana's policy violates the First Amendment's Press Clause by treating them less

favorably than members of the public because they are members of the press. Once again, we disagree.

A

The First Amendment provides that "Congress shall make no law … abridging the freedom … of the press." U.S. Const. amend. I. But it is well-established that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991). That is because "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972). This same observation explains why the Supreme Court long ago held that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell v. Procunier*, 417 U.S. 817, 834 (1974).

B

Section 35-38-6-6(a) and Prison Guidance 06-26 do not discriminate against members of the press. Those provisions prohibit all members of the public, including the press, from attending executions unless they fit into one of the approved categories of observers. Prison Guidance 06-26 takes pains to clarify that media personnel may attend executions just like anyone else if the prisoner invites them. This generally applicable policy does not resemble the sort of targeting that triggers heightened scrutiny. See, *e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 630, 641 (1994) (applying "heightened … scrutiny" to statutory provisions requiring "cable operators to carry the signals of a specified number of local broadcast

television stations" because they "impose special obligations upon cable operators").

The fact that Indiana law permits some friends, family, and ministers to attend executions does not negate its general applicability. In *Pell*, the Supreme Court held that a state policy prohibiting the media from interviewing inmates did not discriminate against the press even though the state permitted "family, friends, attorneys, and clergy to visit inmates." 417 U.S. at 819, 830 n.8. It explained that the press enjoyed the same rights as the public because "[n]o member of the general public who does not have a personal or professional relationship to the inmate is permitted to enter the prison and name an inmate with whom he would like to engage in face-to-face discourse." *Id.* at 830 n.8. The same is true here. Indiana law permits only certain individuals with pre-existing relationships to the inmate or to the victim to attend executions. Their presence does not change the fact that Section 35-38-6-6(a) and Prison Guidance 06-26 treat the press like the general public.

The plaintiffs beg to differ. They do so by relying on two recent cases under the Free Exercise Clause for the proposition that "[a] law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021); see also *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (similar). The plaintiffs insist that the same test applies under the Press Clause. On this view, laws prohibiting media attendance are not generally applicable if they allow for non-media attendance that undercuts the asserted government interests.

At a high level of abstraction, importing this definition of "general applicability" to the Press Clause context has some appeal. The Supreme Court originally used the term in its free exercise cases based on analogies to its Press Clause jurisprudence. See, *e.g.*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993) (first citing *Cohen*, 501 U.S. at 669–70; then citing *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983)); *Emp. Div., Dep't. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878 (1990) (first citing *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 139 (1969); then citing *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250–51 (1936); and then citing *Minneapolis Star & Trib. Co.*, 460 U.S. at 581).

But the Supreme Court has yet to extend this relatively new free exercise definition to the Press Clause context. To the contrary, it has stated that it applies "for purposes of the Free Exercise Clause." *Tandon*, 593 U.S. at 62. And the definition itself speaks in terms of "religious conduct" and "secular conduct," *Fulton*, 593 U.S. at 534, implicitly cabining its scope. Given this narrow framing, we decline to break new ground by importing a recently developed free exercise test to the long-established Press Clause context.

Regardless, the plaintiffs' proffered definition of the term "general applicability" does not save their claim. Indiana explains that it prohibits uninvited press from attending executions in part out of respect for the dignity of the inmate. Under the plaintiffs' definition, that prohibition is not generally applicable if Indiana allows other people to attend whose presence similarly threatens the inmate's dignity. But Indiana invites only a small number of the victim's immediate family members and a handful of individuals chosen by the inmate along with spiritual advisers, doctors, the warden, and those

No. 25-2025                                                  13

facilitating the execution. All of these individuals have some direct connection to the crime, the inmate, or the procedure. Their presence does not "undermine[]" the dignity or solemnity of the occasion. *Fulton*, 593 U.S. at 534. Indiana's policy is therefore generally applicable even under the plaintiffs' modified free exercise definition.

* * *

For these reasons, we AFFIRM the district court's denial of the motion for a preliminary injunction.

JACKSON-AKIWUMI, *Circuit Judge,* dissenting. A government exercises its greatest power when it ends a person's life. As I see it, such severe and irreversible punishment on behalf of "the people" must be observable to comply with the Constitution. Why? Because the First Amendment protects an informed public's scrutiny of historically open government activities. And the Eighth Amendment guarantees a condemned inmate the right to be free from cruel and unusual punishment.

These independent protections meet in the execution chamber. There, the government's authority is at its peak and so is its accountability to its citizens. Transparency and checks on government power are essential in this context.

But the public cannot oversee what it cannot observe. It cannot be sure that executions conform to evolving standards of decency without eyes in the room. For these reasons, the Constitution grants the public and the press a qualified right to access executions that can be overcome only by satisfying strict scrutiny. And the public's ability to exercise its right should not require the condemned inmate to substitute a friend or relative for a member of the press. My colleagues in the majority see the issue differently, so I respectfully dissent.

\*       \*       \*

This case presents a straightforward question: Does the First Amendment permit Indiana to execute people in the public's name but without any public oversight? It does not. To explain, I begin with a reminder that the First Amendment was born of the Founders' desire for an effective self-governing nation. The Amendment's right to access certain government proceedings is a necessary tool for citizens to remain

educated about, confident in, and able to discuss government affairs. Next, I review the Supreme Court's right-of-access jurisprudence, all of which demonstrates that the point of the right is to maintain the above-mentioned democratic principles and to allow for public scrutiny. In reviewing this jurisprudence, I also highlight the consensus among the courts of appeals that the Court's framework, which uses experience and logic to decide which proceedings the public has the right to access, applies beyond the criminal context from which it originated. Then, I clarify that the Supreme Court's prison access cases, which support deference to prison administrators, do not control the analysis. Finally, I apply the experience-and-logic framework to this case. That framework confirms that the Constitution protects the right of the public and the press to access executions.

## I. America's Founding Principles

The Founders designed our system of government with England's oppressive and tyrannical rule in mind. The Declaration of Independence para. 2 (U.S. 1776) ("The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States."). They adopted the Bill of Rights to establish that "certain subjects"—life, liberty, property, and speech—are outside of government discretion and the election process. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). Instead, these subjects are "legal principles to be applied by the courts." *Id.*

The First Amendment prohibits the government from implementing any law "abridging the freedom of speech, or of the press." U.S. Const. amend. I; *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (extending the prohibition to the states). The

Supreme Court has explained that free speech includes "more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964). "[S]peech concerning public affairs," then, is paramount under the First Amendment and includes the related right to receive information essential to informed debate. *Id*. at 74.[1]

Logistical and time constraints, however, routinely limit the public's ability to access information directly.[2] In those circumstances, the media functions as a "surrogate[]" to ensure the public remains educated about government affairs.[3] To support that function, the Constitution guarantees the press a qualified right to obtain newsworthy information.[4] The Court has explained that whether the press's right is "a right of access, or a right to gather information," is irrelevant because

---

[1] *See also Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.").

[2] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980) ("Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media.").

[3] *Press-Enter. Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 507 (1984) (*Press-Enterprise I*) (recognizing that open criminal trials "gave assurance to those not attending trials that others were able to observe the proceedings and enhanced public confidence").

[4] *Richmond Newspapers*, 448 U.S. at 575–76 ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw . . . In a variety of contexts th[e Supreme] Court has referred to a First Amendment right to 'receive information and ideas.'").

No. 25-2025                                                    17

"without some protection for seeking out the news, freedom of the press could be eviscerated." *Richmond Newspapers*, 448 U.S. at 576 (citation modified). And that outcome would be unacceptable, for "the forefathers did not trust any government to separate the true from the false for us." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

It follows that the enumerated First Amendment rights to free speech and a free press include an inherent right to access government proceedings. *Richmond Newspapers*, 448 U.S. at 579–80. But the right is not absolute. States may overcome the right by showing "closure [of a proceeding] is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 9 (1986) (*Press Enterprise II*) (citation omitted). In other words, states must satisfy strict scrutiny review. In addition, the right does not entitle the press to any access greater than the public. The press's ability to gather newsworthy information is, at most, coextensive with the public's general right to access the proceeding.[5] This qualified right of access is at the core of this case.

## II. Right-of-Access Jurisprudence

### A. The Supreme Court's Right-of-Access Cases

To date, the Supreme Court has recognized a First Amendment right of the public to access criminal trials and related proceedings. *See Press Enterprise II*, 478 U.S. at 11–12. However, because the Court defines rights by deciding issues presented

---

[5] *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

to it, we cannot assume that the right is limited to those proceedings. Rather, for guidance on what other types of proceedings might qualify, we must look to the Court's justification for recognizing the right of access across its cases. Such a review shows that the Court determined the public's First Amendment right to access criminal proceedings was necessary to ensure a functioning democracy and to protect other constitutional rights, namely, those guaranteed by the Sixth Amendment. With that context, I see the right to access criminal proceedings as a subset of the First Amendment right of access, not the totality of the constitutional right.

The Supreme Court's jurisprudence illustrates this principle. The Court first recognized a First Amendment right of access to criminal trials in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575. There, after a series of mistrials, the trial judge granted the defendants' request to close the courtroom to the public and press. *Id*. at 559–60. The Supreme Court reversed:

> We hold that the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated.

*Id.* at 580. In reaching its holding, the Court considered several factors, including: the tradition of openness of criminal trials throughout American and English history; public confidence in the justice system; the nexus between openness and fairness; the goal of discouraging perjury, misconduct, and bias; and the therapeutic collective value of open justice. *Id*. at 569–71.

Next, in *Globe Newspaper Co. v. Superior Court*, the Court considered a state statute that mandated exclusion of the press and public from courtrooms during testimony by underage sexual assault victims. 457 U.S. 596, 598, 602 (1982). The Court announced that the First Amendment right of access is not limited to proceedings explicitly mentioned in the Constitution. *Id*. at 604. Rather, the right is "broad enough to encompass those rights that … are nonetheless necessary to the enjoyment of other First Amendment rights." *Id*.

The Court emphasized once again that a constitutional right of access makes sense given that criminal trials had traditionally been open to the public. *Id*. at 605. The Court also highlighted several reasons public access helps government and society to function. *Id*. at 606. First, public scrutiny of trials benefits the defendant and society by "enhanc[ing] the quality and safeguard[ing] the integrity of the factfinding process." *Id*. Second, access heightens public respect for the judicial process by fostering an appearance of fairness. *Id*. Third, allowing the public to participate in the trial process serves as a check on the government that is essential to our democracy. *Id*.

Later, in *Press-Enterprise Co. v. Superior Court* (*Press Enterprise I*), the Court held that the First Amendment guarantees the public access to voir dire examinations of potential jurors. 464 U.S. 501, 508–09 (1984). In that case, the trial judge denied the press's request to access individual voir dire on the grounds that press presence would cause a lack of candor in juror responses. *Id*. at 503. Although the press was granted access to general voir dire, in practice that meant the press observed only three days of the six-week voir dire process. *Id*. The Court ruled that excluding the press from voir dire was

unconstitutional because the juror selection process had traditionally been open to the public. *Id*. at 505–08. According to the Court, the open process: enhanced public confidence because those unable to attend were assured that others could monitor the process; allowed for witness testimony to support a future argument by either party about deficiencies in the process; enhanced the fairness of the trial process and the appearance of fairness to the public; and provided an outlet— "community therapeutic value"—for citizens' reactions to the defendant's offense. *Id*. at 508–10.

Two years later, in *Press Enterprise II*, the Court held that the press has a First Amendment right of access to transcripts of preliminary hearings in criminal cases. *Id*. at 13. There, the magistrate judge barred public access to the preliminary hearing at the defendant's request based on concerns about the defendant's right to a fair trial. *Id*. at 4. The Court declared the closure unconstitutional absent judicial findings of a compelling need to overcome the presumption of openness. *Id*. at 13–14. Again, the Court looked to the historical openness of preliminary hearings and their similarities to criminal trials. *Id*. at. 10–11. The Court also found that public access enhances fairness, discourages corruption and misconduct by the judge and prosecution, promotes confidence in the process, and aids the public in understanding the criminal justice system. *Id*. at 12–13. The Court even noted that "the First Amendment question cannot be resolved solely on the label we give the event, i.e., 'trial' or otherwise." *Id*. at 7.

*Press-Enterprise II* cemented the experience-and-logic framework for evaluating whether the public has a First Amendment right of access to a proceeding. However, the Court applied similar reasoning across all four cases. Each time, the Court

focused on the rights of and benefits to the public, demonstrating that the right of access does not depend on the government's or defendant's preferences. Each time, the Court reflected on First Amendment principles of government accountability and transparency as well as public confidence and oversight. The Court grounded all four cases in these principles, not in the characteristics of the proceedings. Collectively, then, these cases show that the public's right to access criminal proceedings is rooted in First Amendment principles, not that the First Amendment right of access is limited to the proceedings in those cases.

### B. Appellate Courts' Application of *Press Enterprise II*

Decisions from the federal courts of appeals support this view. Many courts have applied the experience-and-logic test outside of criminal proceedings. *See Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1069 (7th Cir. 2018) (collecting cases); *Dhiab v. Trump*, 852 F.3d 1087, 1099 (D.C. Cir. 2017) (Rogers, J., concurring) (collecting cases).[6]

Further, several of our sister circuits have interpreted *Richmond Newspapers* and its progeny to create a right to access proceedings that are essential for an informed democracy. For example, one circuit applied the test to an administrative civil infraction proceeding, concluding that the Court's right-of-access cases "focus not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does

---

[6] *See also* 1 LEE LEVINE ET AL., NEWSGATHERING AND THE LAW § 12.05 at 1 (4th ed. 2011) ("Other proceedings to which the public generally has been afforded access include meetings of university governing boards, unemployment compensation hearings, coroner's inquests, and the meetings of judicial nominating commissions.").

and on the First Amendment principles at stake." *N.Y. Civ. Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 299, 304–05 (2d Cir. 2012). Two other circuits have applied the test to immigration deportation proceedings. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 694–95 (6th Cir. 2002); *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 201 (3d Cir. 2002). Yet another has applied the test to executions, as we are asked to do here. *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 876–77 (9th Cir. 2002).

To be sure, there is disagreement about how far the experience-and-logic framework—and therefore the First Amendment right of access—reaches. *See, e.g., N. Jersey Media Grp.*, 308 F.3d at 201 (stating that it is "open to debate as a theoretical matter" whether the experience-and-logic test applies to immigration proceedings). However, all circuits that have addressed the issue agree the test applies beyond the criminal context. *See Courthouse News Serv.*, 908 F.3d at 1069 (collecting cases).

Our circuit has held that the Supreme Court's rationale in its right-of-access cases applies equally to civil cases. *Id*. From that, my colleagues in the majority suggest that the right begins and ends at the courthouse. *Supra* at 4. To be fair, our court previously observed that the Supreme Court has only applied the test to proceedings "related to the judicial process." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 947 (7th Cir. 2015) (summarizing the Supreme Court's right-of-access holdings in a case about public access to driving records). Our court also previously stated that *Press Enterprise II* provides "the framework for analyzing restrictions on the press's right of access to court proceedings and documents." *Courthouse News Serv.*, 908 F.3d at 1070. But, until today's decision,

we had never explicitly limited the test to judicial proceedings. Notably, the Supreme Court has never expressed such a limitation, and the majority opinion does not explain how the principles derived from the Court's jurisprudence support one.

### III.  The Supreme Court's Prison Access Cases

The majority opinion does not grapple with our founding principles, the First Amendment's broad reach, or our sister circuits' application of the Supreme Court's experience-and-logic framework beyond judicial proceedings. Instead, the majority opinion spotlights the Court's holding that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Supra* at 10 (citing *Pell v. Procunier*, 417 U.S. 817, 834 (1974)). The message I take from that is the history of public access to executions and the principles supporting that access are irrelevant because the public and the press do not have a constitutional right to access prisons. *Id*. at 7–8. Indiana made a similar argument in its brief—that the administration of capital punishment on prison grounds alone is enough to show no First Amendment right of access to executions exists. State Officials' Br. at 10, 13, 15, 18.

In my view, that position is based on the flawed premise that the public has no right to access prisons generally and the Media Coalition seeks special "press only" access in this case. *See* Oral Argument at 15:00. The Supreme Court has not held that the press has no constitutional right to access prisons generally; it has held that the press is not entitled to access beyond that afforded to the public. Here, members of the Media Coalition do not seek access beyond what the First Amendment guarantees the public. Rather, they seek to exercise their

rights as members of the public.[7] Thus, that the press does not have a greater right of access than the public is of no moment here.

In addition, even if the Supreme Court had held that the public and press do not have any constitutional right to access prisons to observe individuals serving their sentences (which it has not), that holding would not nullify a constitutional right to attend executions held at prisons. That result could follow only based on a false equivalence between prison sentences and executions. The two are materially different.

Prison sentences are served over a period and therefore theoretically allow for documentation and correction of issues. Because of the length of prison sentences, the public can learn of any problems within the prison from inmates' communications. By contrast, executions occur once, are irreversible, and the condemned inmate cannot document his complaints. In those situations, direct access by impartial individuals is necessary to ensure that accurate, neutral accounts of the execution reach the public. That reality shows why we cannot analogize the public's limited access to Indiana State Prison to its lack of access to Indiana executions.

Comparing the Media Coalition's request to access Indiana executions to the access sought in the Supreme Court's prison access cases—*Pell*, 417 U.S. 817; *Saxbe v. Washington*

---

[7] Media Coalition's Br. at 24 ("Through their action, the Media Coalition seeks access to executions in Indiana to ensure that the public is informed on a government proceeding of the highest import."); 15 (stating that members of the press are members of the public), 23 (stating this case differs from *Pell* and *Houchins* because the press does not seek an additional right of access beyond the public's), 28 (raising constitutional challenge based on exclusion of "public observers").

*Post Co.*, 417 U.S. 843 (1974); and *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978)—reveals additional shortcomings. Namely that Indiana does not guarantee the public and press any access to executions, and Indiana expressly takes issue with the press's desire to witness executions to report on them.

First, in each of the prison access cases, the government guaranteed the public and press *some* access to the prisons. In *Pell* and *Saxbe*, the policies permitted the press to communicate with inmates via written correspondence; interview randomly selected inmates; and tour the institution (along with the public) and interview any inmate they encountered. *Pell*, 417 U.S. at 830–31; *Saxbe*, 417 U.S. at 847–48. Similarly, although the press and public had "limited access to the jail" in *Houchins*, the policy there allowed the press to attend monthly pre-scheduled tours. *Houchins*, 438 U.S. at 4–5. In each case, the Court upheld the prisons' policies denying the press face-to-face interviews with designated inmates. But, each time, it recognized that the prison administrators provided the press opportunities to obtain the information it sought—the inmates' account of their experiences and prison conditions—through alternative means.

Unlike the policies challenged in the Court's prison access cases, Indiana State Prison's policy does not guarantee the public or press any access to executions. Instead, it leaves the public's and press's ability to enter the execution chamber to the discretion of the condemned inmate. This means the press's constitutionally protected role of reporting information to aid public oversight is in one person's hands, without any alternative guaranteed by the government. That fact distinguishes this case from the prison access cases.

There is a second difference between this case and the prison access cases. Each prison access case recognized that the challenged rule was not a means to interfere with First Amendment rights but rather an acceptable restriction advancing penological goals. *Pell*, 417 U.S. at 830–32; *Saxbe*, 417 U.S. at 848–49; *Houchins*, 438 U.S. at 5–6. Indeed, the Court upheld each restriction at issue because it furthered safety and security goals, such as the need to avoid violence among inmates when those selected for press interviews achieve celebrity status within the prison. *See, e.g., Pell*, 417 U.S. at 831–32. By contrast, during oral argument in this case, Indiana took issue with the Media Coalition's request for "access to the Indiana State Prison to gather information to report on Indiana executions." Oral Argument at 15:00. The State insisted that "what [the press] cannot do is be their own primary source of the information." Oral Argument at 25:40. And the State explicitly distinguished the press from other potential witnesses based on the press's reporting function. Because Indiana has placed the press's constitutionally protected activity at issue here, the prison access cases are inapposite.

The principles derived from *Pell*, *Saxbe*, and *Houchins* are not that the public's and press's First Amendment rights are nullified at prisons. Rather, those cases show that when assessing right to access claims, courts must balance prison administrative goals against First Amendment rights and any alternative means of protecting those rights. That is, those cases demonstrate the unremarkable proposition that the public and press do not have a First Amendment right to unfettered access to prisons and their access can be limited by prison administrators.

None of those cases preclude the challenge here. They did not require the Supreme Court to consider whether the First Amendment guarantees the public a limited right to access prisons for a specific purpose like witnessing executions. They also did not require the Court to answer the broader question of whether the Constitution guarantees the public *any* right to access prisons.

The Court's prison access jurisprudence therefore does not compel a finding that the public loses its First Amendment right to access a government proceeding simply because the proceeding is moved onto prison grounds. Such a rule would permit governments to circumvent public scrutiny by moving historically open proceedings to locations not traditionally open to the public. If access to a proceeding is guaranteed by the First Amendment, the venue the government chooses cannot void the constitutional protection.

Indiana chose to move executions to its state prison. The State's decision alone cannot force the conclusion that no constitutional right of access exists. Nor can it justify the violation of any such right. Therefore, we must apply the experience-and-logic test to determine whether the public has a right to access Indiana executions, wherever they may take place.

### IV. Experience-and-Logic Framework

The Supreme Court has applied the experience-and-logic test to determine whether the First Amendment guarantees a right of public access to any given government proceeding. The experience prong considers whether the proceeding has "historically been open to the press and general public." *Press Enterprise II*, 478 U.S. at 8. The logic prong assesses "whether public access plays a significant positive role in the

functioning of the particular process in question." *Id*. As I discuss below, executions satisfy both prongs.

### A.  Experience

Everyone in this case agrees that executions in England and colonial America were conducted in public squares and open to anyone who desired to attend. Everyone also agrees that, at some point during the nineteenth century, states started to execute people outside the general public's view, in prisons or behind enclosures. From this, Indiana and the majority opinion conclude that the public lost any right of access it may have had when executions were moved from communal spaces. The Media Coalition disagrees and argues that, in most states, members of the media and the public are invited by the government to attend executions and thus the public never lost access to executions.

A glimpse into history is necessary to resolve this dispute. Beginning in the 1830s, many states moved their executions from open communal spaces to private enclosures. *See* John D. Bessler, *Televised Executions and the Constitution: Recognizing A First Amendment Right of Access to State Executions*, 45 Fed. Comm. L.J. 355, 360 (1993). Some say that states moved executions outside of the general public's view in response to a growing movement to abolish capital punishment because of its barbarity. *Id*. Others posit that the move occurred to protect the decency of the proceedings in response to a growing public perception of executions as spectacles. Dane A. Drobny, Note, *Death TV: Media Access to Executions Under the First Amendment*, 70 Wash. U. L.Q. 1179, 1192 (1992). Whatever the true reason, I have found no evidence that executions were moved in response to any state's desire to limit transparency or the public's forfeiture of its right to witness the executions.

In fact, historical accounts indicate that the public retained a right of access even as more states enacted privacy statutes. Bessler, *supra*, at 368–70. Some states explicitly provided for press access to private executions. *Id*. at 369–70. Many states provided for members of the public, generically referred to as "respectable citizens," to attend in addition to the condemned person's invitees. *Id*. at 369. Others allowed both groups to attend. *Id*. at 369–70. That practice continues today. Indeed, the vast majority of the executions conducted in modern times have been witnessed by members of the public or the press. *See* Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 63, 106 (2002) ("The majority of state protocols allow for media witnesses at lethal injection executions."); *id*. at app. 1 tbl. 18.

In recent years, the known exceptions to this general practice have occurred in only one state (Indiana), *see post* at 21–25, or because of an inadvertent failure in the process in other states. *See, e.g.*, Jolie McCullough, *For the First Time in More Than 40 Years, Media Were Not Allowed to Witness a Texas Execution*, Tex. Trib. (May 20, 2021, 2:16 PM), https://www.texastribune.org/2021/05/20/texas-quintin-jones-execution-media/. Thus, most executions around the country are observed by witnesses who serve as surrogates for the public, ensuring visibility into executions and oversight of the government's exercise of supreme authority. *See Woodford*, 299 F.3d at 876 (recounting the history of public access to executions).

This nationwide practice reflects a tradition of public access to witness executions. As the Ninth Circuit observed, "[t]hat only select members of the public attend does not erode the public nature of executions—these official witnesses

act as representatives for the public at large." *Id*. (citing *Richmond Newspapers*, 448 U.S. at 573) (noting that people now acquire information about trials chiefly through the media rather than firsthand and validating the media's claim that it functions as a "surrogate[] for the public"). So, although the majority opinion may be correct that the masses "stopped attending [executions] because states passed laws prohibiting them from doing so," *supra* at 8, we cannot ignore the role of public representatives (in the form of the press and "respectable citizens") in our analysis.

What's more, the fact that Indiana has not guaranteed press or public access to its executions in decades does not negate the tradition of access I outlined above. *El Vocero de P.R. (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993) ("[T]he 'experience' test of *Globe Newspaper* does not look to the particular practice of any one jurisdiction, but instead 'to the experience in that type or kind of hearing throughout the United States ….'") (citation omitted). Executions therefore satisfy the experience prong.

The answer is the same even if we limit our analysis to the founding era. The Supreme Court has advised that, when assessing constitutional rights, courts should evaluate history and tradition based on the norms at the time an amendment was ratified. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 34 (2022) ("[W]hen it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (emphasis in original) (citation modified). Even with this lens, the Media Coalition should prevail. As indicated above, executions were communal activities when the First Amendment was ratified in 1791. *See*

Bessler, *supra*, at 360. By the time the Fourteenth Amendment extended the First Amendment to the states in 1898, some states had started conducting private executions, but most continued the public practice. *Id*. at 363. No matter the approach, executions satisfy the experience prong.

## B. Logic

The logic prong assesses "whether public access plays a significant positive role in the functioning of the particular process in question." *Press Enterprise II*, 478 U.S. at 8. The Media Coalition maintains that public access to executions plays a positive role by promoting accountability, public confidence, and informed debate about capital punishment. The Coalition's arguments largely mirror the Supreme Court's rationale for holding that public access plays a positive role in criminal proceedings. As I discuss below, the Court's reasoning applies with equal force to executions.

Public access to executions promotes accuracy and government accountability. The presence of live, neutral witnesses serves as a check and balance on the government as it ends a person's life. It helps incentivize government officials to adhere to standards of decency and reveal any issues that occur during an execution. Indeed, without public oversight, states would have little incentive to reveal flaws in the process. Thus, just as the right to access criminal proceedings safeguards a defendant's right to a fair trial, access to executions protects a condemned person's right not to be subjected to cruel and unusual punishment.

Relatedly, public access enhances public confidence in the legitimacy of the execution process. Citizens are less likely to harbor distrust and skepticism of a transparent process. *Press*

*Enterprise I*, 464 U.S. at 508 ("Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.").

Finally, reported witness accounts enable informed public discourse. Capital punishment remains a highly contested issue. Meaningful debate requires education and accurate information.

Considerations specific to executions further demonstrate the importance of public access and oversight. Twenty-seven states and the federal government permit capital punishment. *State by State*, Death Penalty Info. Ctr., https://deathpenaltyinfo.org/state-and-federal-info/state-by-state (last visited May 8, 2026). Of those twenty-seven states, four states are currently subject to moratoriums and therefore not executing anyone on death row. *Id.* Of the remaining twenty-three states, only two—Indiana and Wyoming—do not guarantee the press access to executions. *See* Wyo. Stat. § 7-13-908. But Wyoming conducted its last execution in 1992 and does not have any prisoners on death row.[8] Indiana on the other hand has executed three people since December 2024 and currently has five people awaiting execution.[9] Indiana is therefore the only state with an active death row that does not guarantee the public or press access to its executions. *Id*.

---

[8] *State by State: Wyoming*, DEATH PENALTY INFO. CTR., https://deathpenaltyinfo.org/state-and-federal-info/state-by-state/wyoming (last accessed May 8, 2026).

[9] Casey Smith, *Indiana's Death Row Dwindles to Five — And Future Executions Remain Uncertain*, IND. CAP. CHRON. (Oct. 20, 2025, 7:00 AM), https://indianacapitalchronicle.com/2025/10/20/indianas-death-row-dwindles-to-five-and-future-executions-remain-uncertain/.

No. 25-2025                                                                33

Indiana justifies its practice as necessary for the dignity of condemned inmates. State Officials' Br. at 30. At oral argument, Indiana invoked the Eighth Amendment in support of its position that constitutional standards of decency require secrecy during executions. Oral Argument at 19:40. According to Indiana, our nation's capital punishment regime evolved as a means of honoring the dignity of condemned persons and protecting them from spectacle. However, neither the Supreme Court nor any court of appeals has held that the Eighth Amendment requires secrecy during executions. And, as I have explained, the history on why executions were moved from public squares is inconsistent. *See* Drobny, *supra*, at 1191–92. Modern accounts refute Indiana's position and provide support for the Media Coalition's opposite contention: public access is necessary to ensure compliance with the Eighth Amendment's "evolving standards of decency." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

The story of what has happened with lethal injections proves this point. Lethal injection is the most common execution method in America—and the only method used by Indiana. States moved toward lethal injection believing it to be the most humane execution method. *Baze v. Rees*, 553 U.S. 35, 42 (2008). For the past two decades, however, media witnesses around the country have exposed flaws in execution procedure and executions that lacked dignity. Specifically, they have reported instances where it appeared the first drug in the typical three-drug protocol did not render the person unconscious before the killing continued.[10] Here are examples:

_____

[10] Most states use a three-drug protocol pursuant to which the first drug renders the condemned unconscious, the second stops respiration by paralyzing the condemned's diaphragm, and the third induces cardiac arrest. *Id*. at 44. "The proper administration of the first drug ensures that the

- **John Marion Grant (Oklahoma, October 28, 2021):** A reporter stated "[a]lmost immediately after the drug was administered, Grant began convulsing, so much so that his entire upper back repeatedly lifted off the gurney. As the convulsions continued, Grant then began to vomit. Multiple times over the course of the next few minutes medical staff entered the death chamber to wipe away and remove vomit from the still-breathing Grant."[11]

- **Kenneth Williams (Arkansas, April 27, 2017):** A reporter claimed it was "the most [he'd] seen an inmate move three or four minutes in[to]" an execution. The reporter "explained that Williams 'lurched' 15 times in quick succession, followed by five slower lurches, three minutes after the sedative midazolam was introduced" and noted that two other media witnesses agreed with his account.[12]

---

prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs." *Id*. "If all goes as planned, the entire execution takes about five minutes, with death usually occurring less than two minutes after the final injection." Deborah W. Denno, *Lethal Injection*, BRITANNICA (updated Mar. 23, 2026), https://www.britannica.com/topic/lethal-injection.

[11] Dan Snyder, *A Minute-By-Minute Account of John Grant's Death As Told By Witness of Execution*, KOKH (Oct. 30, 2021, 12:11 PM), https://okcfox.com/news/local/a-minute-by-minute-account-of-john-grants-death-as-told-by-witness-of-execution.

[12] Phil McCausland, *Arkansas Execution of Kenneth Williams 'Horrifying': Lawyer*, NBC NEWS (Apr. 27, 2017, 3:47 PM), https://www.nbcnews.com/storyline/lethal-injection/arkansas-executes-kenneth-williams-4th-lethal-injection-week-n752086.

- **Joseph R. Wood (Arizona, July 23, 2014):** A reporter stated: "Twelve minutes into the execution, everyone in the witness chamber jumped when Wood convulsed and exhaled forcefully, his lips pursed as if blowing smoke rings. Then he did it again. And again. I started making hash marks on my notebook, counting each one. Each time the executioner entered the chamber to check if Wood was conscious, he would turn on the microphone to tell us he was still sedated. But in the background, we could hear a loud sucking noise each time Wood gasped for air . . . We later learned that the executioner had injected Wood with 15 doses of what was supposed to kill him in one. It took nearly two hours. A normal execution took about 10 minutes, 20 at most. I had counted 640 gasps."[13]

- **Angel Nieves Diaz (Florida, December 13, 2006):** Diaz died 34 minutes after receiving the first of the two lethal injection doses administered during his execution. A media witness reported that Diaz "was alive, his eyes darting back at 25 witnesses" ten minutes after executioners injected him with the first dose. According to the report, Diaz "shuddered several times, but continued moving and breathing for nearly half an hour."[14]

---

[13] Michael Kiefer & Dale Baich, *Poorly Executed: 'The Experiment Failed,' Halting Executions in Arizona*, AZ MIRROR (Apr. 27, 2023, 5:00 AM), https://azmirror.com/2023/04/27/poorly-executed-the-experiment-failed-halting-executions-in-arizona/.

[14] Ron Ward, *Minutes Ticked By as Diaz Struggled After Injection*, ORLANDO SENTINEL, Dec. 15, 2006.

Indiana did not use the three-drug protocol in its recent lethal injection executions, opting instead for the single-drug pentobarbital method.[15] Pentobarbital has been the preferred drug used for animal euthanasia in the United States for decades. However, the single-drug pentobarbital execution method, first introduced in 2011,[16] has not been without error. Indeed, on August 5, 2025, just months after Indiana executed two people using the same method, Tennessee executed Byron Black with a single dose of pentobarbital. Media witnesses noted that he was still awake and groaning in apparent pain five minutes after the start of the execution, saying, "It hurts so bad." They also claimed that he said "I can't do this" and "repeatedly lifted his head." Seven reporters shared similar accounts of what they witnessed and "unanimous[ly]" concluded that they "saw him in distress."[17]

Public access to executions is also necessary to ensure oversight as states increasingly experiment with new lethal injection protocols in response to drug scarcity and cost. *Glossip v. Gross*, 576 U.S. 863, 869–70 (2015) (recognizing a "practical obstacle" to lethal injection "emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse

---

[15] Casey Smith, *What is Pentobarbital? More Questions Than Answers Surround Indiana's New Execution Drug*, IND. CAP. CHRON. (July 5, 2024, 7:00 AM), https://indianacapitalchronicle.com/2024/07/05/what-is-pentobarbital-more-questions-than-answers-around-indianas-new-execution-drug/.

[16] *See* Deborah W. Denno, *Lethal Injection Chaos Post-Baze*, 102 GEO. L.J. 1331, 1362 (2014).

[17] Sam Levin, *The Tennessee Execution That 'Went Horribly Wrong': How Byron Black's Killing Unfolded*, THE GUARDIAN (Aug, 9, 2025, 9:00 AM), https://www.theguardian.com/us-news/2025/aug/09/byron-black-execution-tennessee.

to supply the drugs used to carry out death sentences."). Indiana is no exception. The State did not execute anyone from 2009 until 2015, in part because it could not secure the necessary drugs.[18] It eventually obtained substitute drugs and used its full supply to execute three people in less than a year.[19] To execute the remaining people on death row, then, the State may need to revise its protocol.[20]

If Indiana does obtain new drugs for lethal injections, public oversight of the new protocol would be essential to ensure the State complies with the Eighth Amendment. This is because "[t]he execution protocols States hurriedly devise as they scramble to locate new and untested drugs, are all the more likely to be cruel and unusual." *Glossip*, 576 U.S. at 976 (Sotomayor, J., dissenting). As such, public scrutiny "should be more, not less, searching when States are engaged in what is in effect human experimentation." *Id*.

Execution methods other than lethal injection also need neutral observers. Of the alternatives—firing squads, nitrogen hypoxia (lethal gas), hanging, and electrocution—none are foolproof. Here again, media witness accounts prove helpful:

- **Mikal Deen Mahdi, Firing Squad (South Carolina, August 11, 2025)**: Witnesses reported Mahdi remained conscious and groaned for nearly a minute after the shots were fired. A reporter stated: "There was

---

[18] Smith, *supra* note 16.

[19] Smith, *supra* note 10.

[20] Casey Smith, *Indiana Lawmakers Tee Up New Death Penalty Bills Ahead of Short 2026 Session*, IND. CAP. CHRON. (Dec. 18, 2025, 6:45 AM), https://indianacapitalchronicle.com/2025/12/18/indiana-lawmakers-tee-up-new-death-penalty-bills-ahead-of-short-2026-session/.

certainly some agony in the cries. I can't tell how much pain he felt. It's impossible to say . . . There was agony in it, certainly." An autopsy showed bullets missed the intended target above Mahdi's heart, striking his liver and pancreas instead, thereby prolonging his death.[21]

- **Kenneth Eugene Smith, Nitrogen Hypoxia (Lethal Gas) (Alabama, January 25, 2024):** A reporter's eyewitness account was that, over the course of ten minutes, Smith shook "violently, in thrashing spasms and seizure-like movements" for two minutes, which "caused the gurney to visibly move at least once"; "pulled against the straps holding him to the gurney"; "lifted his head off the gurney and then fell back"; and took "a series of deep gasping breaths, his chest rising noticeably."[22]

- **Bill Bailey, Hanging (Delaware, January 25, 1996):** A news report detailed Bailey's eleven-minute execution: "The trap door opened with a thud and Bailey dropped 10 feet, stopping several feet above the ground. His body spun at the end of the rope rapidly five or six

---

[21] Alan Hovorka, Mikal Mahdi Killed by Firing Squad for 2004 Shooting, Burning Orangeburg Officer, POST AND COURIER (Apr. 12, 2025), https://www.postandcourier.com/news/crime/mikal-mahdi-executed-firing-squad-myers/article_1f5c5fee-8c1f-4322-b5e4-88de805649a5.html; Chiara Eisner, *A Firing Squad Tried to Shoot a Prisoner in the Heart. They Missed, Autopsy Indicates*, NPR (May 8, 2025, 2:41 PM), https://www.npr.org/2025/05/08/nx-s1-5389846/firing-squad-south-carolina-death-penalty-execution.

[22] Kim Chandler, *An Eyewitness Account of What Happened at the Nation's 1st Nitrogen Gas Execution*, PBS (Jan. 27, 2024, 6:41 PM), https://www.pbs.org/newshour/nation/an-eyewitness-account-of-what-happened-at-the-nations-1st-nitrogen-gas-execution.

times before halting."[23] A reporter said that Bailey showed little emotion and "looked like a 'rag doll' after the gallows door dropped."[24]

- **Alpha Otis Stephens, Electrocution (Georgia, December 12, 1984):** According to a news report, "[p]rison officials said one surge of electricity was expected to carry out the execution order and Stephens was 'brain dead' after the first surge. But witnesses saw Stephens' fingers move and his head rolled back and forth after the first surge." A reporter explained: "It was almost like he was trying to wake himself up, . . . Then he started breathing. We counted 23 breaths and they were deep breaths. It was obvious he was alive."[25]

Without the above media reports, the public would have remained ignorant about developments in the execution chamber. Or, they would have been left to rely on the state's account (which sometimes contradicts the media's account) or after-the-fact interviews of people authorized to attend the execution. But, again, the Constitution is at issue: "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect

---

[23] Frank Freudberg, *Murderer Hanged in Delaware*, UPI (Jan. 25, 1996), https://www.upi.com/Archives/1996/01/25/Murderer-hanged-in-Delaware/4428822546000/.

[24] Gary Tuchman, *Hanged Murderer Looked Like a "Rag Doll"*, CNN (Jan. 25, 1996, 9:40 AM), https://www.cnn.com/US/9601/delaware_execution/index.html.

[25] Cathy Keim, *Double-Murderer Alpha Otis Stephens was Executed in Georgia's Electric Chair*, UPI (Dec. 12, 1984), https://www.upi.com/Archives/1984/12/12/Double-murderer-Alpha-Otis-Stephens-was-executed-in-Georgias-electric/6160471675600/

the dignity of all persons." *Glossip*, 576 U.S. at 977–78 (Sotomayor, J., dissenting) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). Without disinterested witness reports, the public cannot confirm that duty has been fulfilled.

Equally problematic, in executions closed to the public and press, the courts are left without neutral accounts when assessing claims related to capital punishment. Press accounts of prior executions have been referenced in cases brought by death row inmates to challenge the constitutionality of execution methods. *See, e.g.*, *Frazier v. Hamm*, No. 2:24-CV-732-ECM [WO], 2025 WL 361172, at *6 (M.D. Ala. Jan. 31, 2025) (discussing media witness observations that an inmate "tightly clenched his hands, took deep gasps, shook his head vigorously[,] and pulled against his restraints" during a nitrogen hypoxia execution).

Neutral eyewitness accounts would also be relevant in a case brought by survivors of a condemned inmate seeking recourse for errors in the execution process. That is exactly the issue Benjamin Ritchie's survivors face today. Indiana put Ritchie to death last year, and its account is that everything went fine. Ritchie's attorneys, who witnessed the execution, say it was botched. Because the press was excluded, neither the public nor any future factfinder has an objective account to assess who is telling the truth.[26]

---

[26] Casey Smith, *'Violent' Moment During Indiana Execution Draws Scrutiny; DOC Officials Deny 'Botched' Process*, IND. CAP. CHRON. (May 22, 2025, 7:00 AM), https://indianacapitalchronicle.com/2025/05/22/violent-moment-during-indiana-execution-draws-scrutiny-doc-officials-deny-botched-process/.

Ritchie's execution is not the first time that Indiana's account differed from that of an authorized witness. Following William Vandiver's electrocution in 1985, his attorney recounted that he "observed smoke and the smell of burning." The State admitted only that the execution "did not go according to plan."[27] These conflicting accounts illustrate the utility of neutral public witnesses such as members of the press.

It is true that Indiana permits certain categories of people to attend its executions. *See* Ind. Code § 35-38-6-6(a); *see also supra* [Majority Op.] at 2. But friends and relatives of the victim or the condemned inmate should not bear the burden of sharing information to ensure government accountability. Moreover, they should not have an obligation to remain objective, and neither should any attorney the condemned inmate invites to witness the execution. The warden and warden's designees have similar problems. They lack the appearance of impartiality, and ensuring the public and press's right to information for accountability purposes is simply not their job. The same holds true for physicians, spiritual advisors, and prison chaplains. Accordingly, Indiana's solution—forcing the press to rely exclusively on information provided by prison employees, relatives, or friends as they leave the prison—is wholly wanting.

Indiana's other solution—permitting the press to attend only as one of the condemned inmate's invitees—has other problems. This scenario, too, can create the appearance of partiality towards the inmate. Even more importantly, the

---

[27] *Id.*; *see Indiana Execution 'Not According to Plan'*, CHI. TRIB. (Oct. 17, 1985), https://www.chicagotribune.com/1985/10/17/indiana-execution-not-according-to-plan/.

public's right to monitor the government during such an extreme exercise of power should not be contingent on whether the condemned person chooses to prioritize the media over other guests.

All these considerations demonstrate that public and press access plays a "significant positive role" in the functioning of executions. *Press Enterprise II*, 478 U.S. at 8. As Justice Sotomayor cautioned:

> The States may well be reluctant to pull back the curtain for fear of how the rest of us might react to what we see. But we deserve to know the price of our collective comfort before we blindly allow a State to make condemned inmates pay it in our names.

*Glossip*, 576 U.S. at 977 (Sotomayor, J., dissenting). Executions undisputedly satisfy the logic prong of the *Press-Enterprise II* framework.

*    *    *

To summarize, the Founders designed a self-governing nation with guaranteed protections of speech, the press, and access to government proceedings. To date, the Supreme Court has not determined the extent, if any, of the public's right to access executions or even prisons generally. Experience and logic, however, suggest that the Constitution protects access to executions. Members of the public or press have witnessed most of the documented executions in the United States. And the public's access to executions plays a positive role equivalent to the public's role in criminal proceedings—a role that the witnesses authorized by Indiana's statute cannot fulfill. For these reasons, I would hold that the public and

No. 25-2025                                                           43

press have a qualified right to access executions. I would therefore vacate the district court's denial of a preliminary injunction and remand for the court to determine, under the strict scrutiny standard of review, whether Indiana has met its constitutional burden before it can close executions to the public.[28]

---

[28] There is a second issue in this case: Does Indiana's policy infringe on the press's newsgathering function in violation of the First Amendment's Free Press Clause? I agree with the majority's decision to refrain from extending Free Establishment caselaw to the Free Press context, as one of the Media Coalition's arguments on this score would have us do. But the Coalition has a separate Free Press Clause argument based on the "more than incidental burden" Indiana's policy has on newsgathering. Media Coalition's Br. at 48. That argument points to Indiana's policy that "Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber." *Id*. at 54–55, 57, A18. Indiana contends that this policy does not discriminate against members of the press because they can bypass the policy if the condemned inmate lists them as invitees. State Officials' Br. at 30. That is not the standard. Permitting an exception to a discriminatory policy does not void the discrimination. Rather, discrimination exists where the press is treated differently because of its newsgathering function. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641–43 (1994) (explaining that the First Amendment "does not countenance governmental control over the content of messages expressed by private individuals" and that the "the mere assertion of a content-neutral purpose [cannot] save a law which, on its face, discriminates based on content."). That standard is met here for two reasons. First, Indiana's policy explicitly bans media personnel and no other group. Only the media is expressly singled out by policy. Second, at oral argument Indiana took issue with the Media Coalition's request for "access to the Indiana State Prison to gather information to report on Indiana executions." Oral Argument 15:00. Also at oral argument, Indiana distinguished the press from statutory witnesses based on the press's reporting function. Oral Argument 25:00. As I understand Indiana's position, it opposes the Media Coalition's challenge in this case because the press will gather information to disseminate to the public—in other words, because the press will engage in its constitutionally

**V. Conclusion**

Until today, neither the Supreme Court nor any federal court of appeals had declared that the First Amendment right of access is limited to judicial proceedings. Nor had any court held that the First Amendment does not grant the public or press any access to executions. In fact, the only circuit to consider the issue has concluded the opposite. *See Woodford*, 299 F.3d at 870–71. Our court is the first, and I see great implications.

By beginning and ending the inquiry at courthouse doors, our court shields most state and federal executive branch proceedings (including those of an adjudicatory nature) from public oversight, thereby granting officials a license to operate without accountability. This repudiates the First Amendment's foundations: the Founders recognized that the government must be monitored and the people must be informed.

Today's decision also overlooks that "[w]hen government begins closing doors, it selectively controls information rightfully belonging to the people." *Detroit Free Press*, 303 F.3d at 683. The decision grants the State the privilege to kill its death row inmates behind shut doors and beyond reproach, without requiring it to show that closed executions are narrowly tailored to achieve a compelling state interest. The decision overlooks that the legitimacy of capital punishment rests on both the legality and integrity of the execution process.

Indiana executed three people in less than a year—Joseph Corcoran, Benjamin Ritchie, and Roy Lee Ward. A media

---

protected reporting function. For these reasons, Indiana's policy violates the Free Press Clause and should be subject to heightened scrutiny on this basis.

representative witnessed Corcoran's execution as one of Corcoran's five maximum invited guests. However, the press was informed of Ritchie's and Ward's executions by a note a prison official placed in the media box outside of Indiana State Prison after their deaths. Consistent with Indiana's policy, the note contained only the State's account of each man's time of death and last words. According to the majority opinion, that is enough. Because I think our Constitution compels much more, I respectfully dissent.